**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**

| | | |
|---|---|---|
| ADVANFORT COMPANY, et al., | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | No. 1:15-CV-220 (LO/IDD) |
| | ) | |
| INTERNATIONAL REGISTRIES, INC., et al., | ) | |
| | ) | |
| Defendants | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS THE COMPLAINT**

Defendant Dr. John A. C. Cartner submits this memorandum in support of his Motion to Dismiss the Complaint for failure to state a claim on which relief may be granted. *See* Fed. R. Civ. P. 12(b)(6).

## BACKGROUND

This case arises out of an article ("Article") written by Dr. John A.C. Cartner—a member of the Council of American Master Mariners and the International Federation of Shipmasters' Associations, a former ship's captain and U.S. Navy Reserve officer, and a distinguished maritime lawyer. The Article expressed Cartner's grave concerns with the failure of the Plaintiffs—father and son Samir Farajallah and Ahmed Farajallah and their privately held companies AdvanFort Company and AdvanFort International (collectively "AdvanFort")—to do more to assist the crew of one of AdvanFort's ships imprisoned in India after the Indian Coast Guard found a large cache of guns and ammunition on board. Ex. A, John A.C. Cartner,

*[Exclusive] Self-Described Advanfort "Billionaire" May Not Be*, THE MARITIME EXECUTIVE, Jan. 6, 2014 ("ARTICLE").[1]

**A. Seizure of AdvanFort Vessel and Guns**

According to AdvanFort's complaint ("Complaint"), AdvanFort provides "security solutions" for commercial shipping. The "*MV Seaman Guard Ohio*" ("the *Ohio*") is a "special purpose patrol vessel" operated by AdvanFort as part of its "maritime security services." Complaint ¶¶ 12, 17, *AdvanFort v. International Registries, Inc.* (Fairfax Cnty. Cir. Ct. Jan. 20, 2015).

On or about October 12, 2013, the *Ohio* was detained by the Indian Coast Guard in Indian waters. Upon boarding the vessel, Indian authorities seized about 35 guns—one gun for each person on board—and thousands of rounds of ammunition. Indian authorities arrested the *Ohio*'s crew and imprisoned them in Puzhal prison in Chennai, India. On December 20, 2013, India filed a First Initial Report ("FIR") charging the crew with violations of India's Arms Act. *Id.* ¶¶ 22-26.

**B. Widespread Reporting Concerning the *Ohio* Incident**

National and international media reported India's arrest and detention of the *Ohio*'s crew. On October 14, 2013, for example, the Wall Street Journal reported that "no permits were available on board for more than 30 guns and rifles" on the *Ohio*, and that a complaint had been filed by Indian police against the crew "for failing to produce papers authorizing them to carry arms in Indian waters." Ex. B, Niharika Mandhana, *India Seizes U.S. Maritime Security Ship*, WALL ST. J., Oct. 14, 2013, http://www.wsj.com/articles/SB1000142405270230456100

---

[1] In evaluating a motion to dismiss, a court may take judicial notice of a document when there is no dispute as to its authenticity, the document is referenced in the complaint, and the document is central to the plaintiff's claims. *Clark v. BASF Corp.*, 142 F. App'x 659, 660-61 (4th Cir. 2005).

4579135552413001532, at 1, ("WALL ST. J.").[2] BBC News reported that AdvanFort claimed that these men were "provid[ing] counter-piracy protection" and that their equipment was "properly registered and licensed to AdvanFort." Ex. C, *MV Seaman Guard Ohio: India police arrest crew of US ship*, BBC NEWS, Oct. 18, 2013, http://www.bbc.com/news/world-asia-india-24577190, at 2 ("BBC NEWS"). The L.A. Times quoted the deputy director of the London-based International Maritime Bureau as describing the incident as "like a ship coming into the Port of Los Angeles with a load of arms on board." Ex. D, Mark Magnier, *Indians Arrest 35 Aboard U.S.-owned Vessel Reportedly Carrying Weapons*, LA TIMES, Oct. 18, 2013, http://www.latimes.com/world/worldnow/la-fg-wn-india-arrests-us-vessel-20131018-story.html at 2. Many more articles were also published about this incident.[3]

---

[2] It is well settled courts may take judicial notice of newspaper articles without converting a motion to dismiss into a motion for summary judgment when the articles discuss the subject matter of the case. *See, e.g.*, *Plymouth Cnty. Retirement Ass'n v. Primo Water Corp.*, 966 F. Supp. 2d 525, 536-37 (M.D.N.C. 2013). Moreover, this rule has been applied in the defamation context. *See, e.g.*, *Farah v. Esquire Magazine*, 736 F.3d 528, 534 (D.C. Cir. 2013) ("Judicial notice is properly taken of publicly available historical articles such as were attached to *Esquire*'s motions to dismiss.").

[3] *See, e.g.*, Ex. E, *India arrests US ship crew over weapons*, AL JAZEERA, Oct. 18, 2013, http://www.aljazeera.com/news/asia/2013/10/india-arrests-us-ship-crew-20131018164435558661.html ("AL JAZEERA"); Ex. F, Sanjay Gha and Tucker Reals, *India Arrests 35 from U.S. Security Firm AdvanFort's Well-Armed Anti-Piracy "Mother Ship,"* CBS NEWS, Oct. 18, 2013, http://www.cbsnews.com/news/india-arrests-35-from-us-security-firm-advanforts-well-armed-anti-piracy-mother-ship/ ("CBS NEWS"); Ex. G, Steve Nolan and Daily Mail Reporter, *Crew of US ship arrested after it entered Indian waters carrying a 'huge cache of weapons on board,'* THE DAILY MAIL, Oct. 18, 2013, http://www.dailymail.co.uk/news/article-2465806/Seaman-Guard-probe-reveals-worrying-weakness-maritime-security.html ("THE DAILY MAIL"); Ex. H, *India arrests crew of US ship on weapons charges*, FOX NEWS, Oct.18, 2013, http://www.foxnews.com/world/2013/10/18/india-arrests-crew-us-ship-on-weapons-charges/ ("FOX NEWS"); Ex. I, Scott Neuman, *India Arrests Crew Of U.S. Ship For Carrying Weapons*, NPR, Oct. 18, 2013, http://www.npr.org/blogs/thetwo-way/2013/10/18/237075357/india-arrests-crew-of-u-s-ship-for-carrying-weapons ("NPR"); Ex. J, Rob Crilly, *British armed guards among crew arrested in Indian port city*, THE TELEGRAPH, Oct. 18, 2013, http://www.telegraph.co.uk/news/worldnews/asia/india/10389294/British-armed-guards-among-crew-arrested-in-Indian-port-city.html ("THE TELEGRAPH"); Ex. K, *India Arrests Crew of US-Owned Anti-Piracy Ship*, VOICE OF

The Article by Dr. Cartner giving rise to this case was published well after most of this extensive press coverage. Specifically, Maritime Executive—a maritime industry journal—published the Article on January 6, 2014, on a website maintained by the journal. As further discussed below, the Article criticized AdvanFort and its owners for failing to do enough to assist their seamen detained in India.

**C. The Complaint**

The Complaint alleges that the Article "contains many false and defamatory statements about AdvanFort and the Farajallahs and was published with actual malice." Compl. ¶ 48. The Complaint also alleges that the Article was "published so as to lower the estimation of Plaintiffs in their professional community and to deter third parties from having dealings with the Farajallahs and AdvanFort." Compl. ¶ 49. The Complaint contains counts alleging defamation, defamation *per se*, tortious interference with contract, and tortious interference with business expectancy. Compl. ¶¶ 87-125.

**ARGUMENT**

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint. While a court must accept all factual allegations properly pleaded in the complaint as true for the purposes of a motion to dismiss, it need not accept as true unreasonable inferences or legal conclusions couched as factual allegations. See *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.") (citations omitted). Thus, a complaint must "contain sufficient factual

---

AMERICA, Oct. 18, 2013, http://www.voanews.com/content/india-arrests-crew-of-us-ship/1772162.html ("VOICE OF AMERICA").

matter, accepted as true, to 'state a claim to relief that is plausible on its face.' . . . A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009).

This standard is to be applied with particular care in assessing a claim for libel. As Professors Wright and Miller have explained:

> [There is] one significant exception to the general rule that the complaint will be construed liberally on a Rule 12(b)(6) motion . . . . When the claim alleged is a traditionally disfavored "cause of action," such as . . . libel, or slander, courts [tend] to construe the complaint by a somewhat stricter standard and [are] more inclined to grant a Rule 12(b)(6) motion to dismiss.

Charles A. Wright & Arthur R. Miller, *5B Fed. Prac. and Proc. Civ.* § 1357 (3d ed.).

## I. Counts I and II for Defamation and Defamation *Per Se* Fail as a Matter of Law Because the Article's Representations, Taken in Context, are Rhetorical Hyperbole Rather than Assertions of Fact.

Under Virginia law, rhetorical hyperbole is not defamatory. *See, e.g., Yeagle v. Collegiate Times*, 255 Va. 293, 295-96, 497 S.E.2d 136, 137 (1998); *Snyder v. Phelps*, 580 F.3d 206, 220 (4th Cir. 2009). Whether a statement is rhetorical hyperbole is a question of law for the Court. *See, e.g., Snyder*, 580 F.3d at 220 ("We assess as a matter of law whether speech contains rhetorical hyperbole protected by the First Amendment."); *Hatfill v. N.Y. Times Co.*, 416 F.3d 320, 330 (4th Cir. 2005). ("The question whether a statement is capable of having a defamatory meaning is a question of law to be decided by the court.").

In determining whether particular statements are rhetorical hyperbole, the Court should take into account the entirety of the statements made and the circumstances in which they were made. *See Yeagle*, 255 Va. at 297-98, 497 S.E.2d at 138. In particular, the Court should consider whether the language used is "'loose, figurative, or hyperbolic language,'" as well as

the "general tenor of rhetorical speech" as a whole. *Snyder*, 580 F.3d at 220; *see also Schnare v. Ziessow*, 104 Fed.Appx. 847, 851 (4th Cir. 2004), quoting *Dilworth v. Dudley*, 75 F.3d 307, 310 (7th Cir. 1996), in turn at 309 quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990). Rhetorical hyperbole is not actionable because the speaker is using exaggerated language to drive home a point of view—the exaggerated rhetoric is intended to convey outrage or condemnation as opposed to factual information. *See, e.g., Greenbelt Coop. Publ'g Ass'n, Inc., v. Bresler*, 398 U.S. 6, 13-14 (1970).

The Fourth Circuit recently applied these principles in *CACI Premier Tech., Inc., v. Rhodes*, 536 F.3d 280 (4th Cir. 2008). CACI—a civilian defense contractor that had performed interrogation services for the military at Abu Ghraib prison in Iraq—claimed that it was defamed by a talk radio host. The host stated, for example, that CACI and other defense contractors employed "[m]ercenaries all over the country, killing people," and characterized CACI and other contractors as "hired killers." *Id.* at 301. The Fourth Circuit explained that a reasonable listener would understand these statements as "exaggerated rhetoric intended to spark the debate about the wisdom of the use of contractors in Iraq." *Id.* at 301-02.

Similarly, in context, it is clear that the Cartner Article's assertions that give rise to the Complaint are rhetorical hyperbole. From the very first paragraph—denigrating Samir Farajallah's Dubai apartment as "tackily-decorated" and his demeanor as "prone to temper tantrums"—to the last—describing him as "a bit player with pretensions on the world stage which he clearly does not understand"—the Article contains "loose, figurative, or hyperbolic language" throughout, *Schnare*, 104 Fed.Appx. at 851, intended to convey condemnation or outrage. Ex. A, ARTICLE at 1-2.

The Complaint itself only underscores this point by failing to identify specific statements alleged to be defamatory. Instead, both Count I and Count II allege that *nearly the entire Article*—in fact, *everything* but the first and last paragraphs described above—is defamatory and defamatory *per se*. Of course, much of the text quoted in the Complaint is not even arguably defamatory; it is either factual and undisputed (like "Farajallah is the owner of AdvanFort," Compl. ¶ 93), or an expression of opinion (like the sarcastic description of Farajallah as an "[u]pstanding man"). *Id.*

But, more importantly, the text taken as a whole constitutes "exaggerated rhetoric" analogous to the comments at issue in *CACI*. For example, Cartner's assertion that "Farajallah has done little or nothing to assist [the imprisoned crew members] or anyone else" cannot, in context, be understood as a factual assertion. *Id.* Cartner plainly did not mean that Farajallah has literally *never* assisted *anyone*—he meant that Farajallah had not, in Cartner's strongly held opinion, done enough to help the *Ohio*'s crew.

In short, Counts I and II should be dismissed because rhetorical hyperbole employed to make a larger point is constitutionally protected speech. *See Milkovich*, 497 U.S. at 16-17. And taken as a whole, Cartner's Article does not make factual accusations against AdvanFort and the Farajallahs, but rather roundly criticizes them for failing to do more to help the *Ohio*'s crew.

## II. Counts I and II for Defamation and Defamation *Per Se* Fail as a Matter of Law Because Defendants are, at a Minimum, Limited Public Figures for the Purpose of the Events Described in the Article and Failed to Sufficiently Plead Actual Malice.

It is, of course, black-letter law that a public figure—a person who has essentially become part of public debate—may only recover damages for a defamatory falsehood if he or she proves that it "was made with 'actual malice,'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254,

279-80 (1964). An individual may be either a "general purpose public figure" or a "limited purpose public figure." A "general purpose public figure"—a public figure under the First Amendment for all purposes—is a person who occupies a position of "general fame or notoriety in the community, and pervasive involvement in the affairs of society." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351-52 (1974); *Blue Ridge Bank v. Veribanc, Inc.*, 866 F.2d 681, 687 (4th Cir. 1989).

The Farajallahs are likely general purpose public figures, because this is far from their first brush with public scrutiny. In 2009, for example, the National Security News Service published an article entitled *Unlicensed "New-Fields Exhibitions" Claims To Provide Clients Easy Access in Iraq*, detailing how New-Fields—run by President, CEO, and apparent owner Samir Farajallah—became the "self-arrogated hookup for Iraqi business deals" while "avoid[ing] the scrutiny faced by some of its more dubious clientele." Ex. L, Adam Lichtenheld, *Unlicensed "New- Fields Exhibitions" Claims To Provide Clients Easy Access in Iraq*, NAT'L SEC. NEWS SERV., July 1, 2009, http://www.dcbureau.org/20090701645/national-security-news-service/unlicensed-new-fields-exhibitions-claims-to-provide-clients-easy-access-in-iraq.html, at 1. In that article, Samir Farajallah commented: "We never imagined when we were planning our [annual "Rebuilding Iraq"] Forum that it would become so central to the current reconstruction of Iraq." *Id.* The article's author lamented that Farajallah's "central" role in Iraqi "reconstruction" was achieved despite New-Fields'

> token office and unwitting phone receptionists compris[ing] a shroud of legitimacy over an operation that appears to be anything but credible. An investigation into public records with the District of Columbia Secretary of State found that New-Fields' corporate license has been revoked on multiple occasions, most recently last September, for failing to update its filings. The firm, in other words, is not legally authorized to operate in Washington—or anywhere in the United States.

*Id.* at 2. In February 2012, Time ran a similar article about New-Fields and Mr. Farajallah called *Post-War Profiteering*, written by Pulitzer Prize-winning reporter Mark Thompson. After criticizing New-Fields "6th Annual Iraq Aviation & Defense summit" as a "crass" and "bloody bazaar," Mr. Thompson argued that a "platoon of U.S. political and military leaders . . . who pushed for the war that gave birth to this vile exposition" should "show up at the Sheraton Premier Hotel at Tyson's Corner, in Vienna, Va., Thursday morning, and insist it be shut down." Ex. M, Mark Thompson, *Post-War Profiteering*, TIME, Feb. 27, 2012, http://nation.time.com/2012/02/27/post-war-profiteering/, at 1-2.

Significantly, however, this Court need not decide whether the Plaintiffs are general purpose public figures—it is well settled that a person need not be a public figure in all respects to trigger the actual malice standard. The Supreme Court has held that, in certain circumstances, the Constitution treats private citizens who are not otherwise public figures as public figures for the purpose of comment on a *particular* public controversy. *See, e.g., Hutchinson v. Proxmire,* 443 U.S. 111, 134-35 (1979); *Wolston v. Reader's Digest Assoc.,* 443 U.S. 157, 164–68 (1979); *Gertz*, 418 U.S. at 351. Specifically, when a person thrusts himself into the forefront of public debate, he is treated as a "limited-purpose public figure" for purposes of comment on issues *arising from that debate*. *Wolston*, 443 U.S. at 166. Such limited-purpose public figures, like general purpose public figures, may only recover for defamatory statements made with actual malice. Whether a person has achieved the status of a limited-purpose public figure is a question of law for the Court. *Foretich v. Capital Cities/ABC, Inc.*, 37 F.3d 1541, 1551 (4th Cir. 1994).

The Fourth Circuit has held that answering that question requires a two-part inquiry. The Court must first "ascertain whether a public controversy gave rise to the defamatory statement"; second, it must determine "whether the plaintiff's participation in that controversy sufficed to

establish him as a public figure within the context of that public controversy." *Carr v. Forbes, Inc.*, 259 F.3d 273, 278 (4th Cir. 2001) (citing *Foretich*, 37 F.3d at 1553).

With respect to the first question, there is no doubt here that a public controversy gave rise to the allegedly defamatory statements in the Cartner Article. Indeed, that public controversy dates back even before the Indian government detained the *Ohio* and its crew, to when AdvanFort began obtaining weapons for its Indian Ocean operations. In July 2013—well before the *Ohio* incident—the news media reported that AdvanFort had just completed "a quarter of its two-year probation" in conjunction with a guilty plea to "'Aiding and Abetting the Making of a False Statement During the Acquisition of Firearms,' which is a felony." Ex. N, Rob Almeida, *AdvanFort Addresses Judgement [sic] Stemming from 2011 Firearms Purchase*, GCAPTAIN, July 31, 2013, http://gcaptain.com/advanfort-felony-firearm-purchase/, at 1-2. According to the article, when AdvanFort in 2011 needed "some rifles to undertake counter-piracy missions" in the Indian Ocean, it hired a contractor who "went to a gun shop and bought 16 hunting rifles," triggering "a bit of a red flag" for "the Feds." *Id.* at 1. According to media reports at the time, that "red flag" led to the arrest of three individuals, including Ahmed Farajallah, for federal firearms violations. *See, e.g.*, Ex. O, Stephen Tschida, *Ahmed Farajallah Accused of Illegally Buying Weapons*, WJLA NEWSCHANNEL8, July 14, 2011, http://www.wjla.com/articles/2011/07/man-accused-of-illegally-buying-weapons-63672.html. at 1; Ex. P, *Three Men Charged with Buying Guns for Others at Leesburg Store*, WASH. POST, July 13, 2011, http://www.washingtonpost.com/blogs/crime-scene/post/three-men-charged-with-buying-guns-for-others-at-leesburg-store/2011/07/13/gIQARqrxCI_blog.html, at 1. While the charges against Ahmed Farajallah were dropped after AdvanFort entered the guilty plea noted

above,[4] AdvanFort and the Farajallahs clearly thrust themselves to the forefront of debate regarding the use of unlicensed arms in the Indian Ocean as early as 2011.

But putting aside the fact that AdvanFort had previously "landed in the news for the wrong reasons over the use of firearms," Ex. S, *US Company to Undertake Anti-Piracy Patrols off Benin*, DEFENCEWEB, Sept. 12, 2013, http://www.defenceweb.co.za/index.php?option =com_content&view=article&id=31866:us-company-to-undertake-anti-piracy-patrols-off-benin&catid=108:maritime-security, at 1,[5] the *Ohio* incident itself unquestionably engendered public controversy at the highest levels of national and international media. *Before* the Cartner Article was published, numerous publications—ranging from the Wall Street Journal, to NPR, to the New York Times, to Fox and CBS News, to even the BBC and the Times of India—covered India's "arrest[] [of] the crew of a US-owned ship accused of illegally entering Indian waters with a huge cache of weapons on board."[6] Ex. C, BBC NEWS at 1. These articles indicate that this issue "received public attention because its ramifications will be felt by persons who are not direct participants." *Foretich*, 37 F.3d at 1554. Indeed, information about the case was "shared

---

4 *See* Ex. Q, *United States v. Advanfort Company*, Case 1:13-cr-00053-GBL, Docket No. 6 (Mar. 5, 2015) (AdvanFort plea agreement); Ex. R, *United States v. Ambers, et al.*, 1:11-mj-00551-TRJ-3, Docket No. 35 (Sept. 28, 2011) (dismissing case against Ahmed Farajallah without prejudice). This Court may, of course, take judicial notice of public records from its own docket. *See Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (citing *Hall v. Virginia*, 385 F.3d 421, 424 (4th Cir.2004)).

5 *See also* Ex. T, *US Company to Undertake Anti-Piracy Patrols off Benin*, SEC. ASSISTANCE MONITOR, Sept. 18, 2013, http://www.securityassistance.org/content/us-company-undertake-anti-piracy-patrols-benin, at 1.

6 *See* Ex. B, WALL ST. J.; NPR; Ex. U, *India: Arrests on American Owned* Ship, N.Y. TIMES, Oct. 18, 2015, http://www.nytimes.com/2013/10/19/world/asia/india-arrests-on-american-owned-ship.html?_r=0 ("N.Y. TIMES"); Ex. H, FOX NEWS; Ex. F, CBS NEWS; Ex. C, BBC NEWS; Ex. V, *Private firm AdvanFort requests India to release all 35 crew of detained US ship*, TIMES OF INDIA, Oct. 24, 2013, http://timesofindia.indiatimes.com/india/Private-firm-AdvanFort-requests-India-to-release-all-35-crew-of-detained-US-ship/articleshow/24659141.cms ("TIMES OF INDIA").

with representatives from the U.S. Embassy in New Dehli," *see* Ex. W, Nirmala George, *MV Seaman Guard Ohio Arrests*, HUFFINGTON POST, Oct. 18, 2013, http://www.huffingtonpost.com/2013/10/18/mv-seaman-guard-ohio-arrests_n_4121537.html, at 2 ("HUFFINGTON POST"), and "the British high commission in Dehli" was also involved. Ex. C, BBC NEWS at 1.

With respect to the second question, the participation of AdvanFort and the Farajallahs in this controversy certainly "sufficed to establish [them] as . . . public figure[s] within the context of th[e] public controversy." *Carr*, 259 F.3d at 278. The Fourth Circuit has set forth five factors to guide courts in determining whether plaintiffs were sufficiently involved in a public controversy to become limited purpose public figures, including whether: "(1) the plaintiff had access to channels of effective communication; (2) the plaintiff voluntarily assumed a role of special prominence in a public controversy; (3) the plaintiff sought to influence the resolution or outcome of the controversy; (4) the controversy existed prior to the publication of the defamatory statements; and (5) the plaintiff retained public figure status at the time of the alleged defamation." *See Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 708-11 (4th Cir. 1991); *Fitzgerald v. Penthouse Int'l, Ltd.*, 691 F.2d 666, 668–70 (4th Cir. 1982). The second and third factors are often combined to ask "whether the plaintiff ha[d] voluntarily assumed a role of special prominence in a public controversy by attempting to influence the outcome of the controversy." *Reuber*, 925 F.2d at 709 (citing *Fitzgerald*, 691 F.2d at 668).

Here, AdvanFort and the Farajallahs obviously had "access to channels of effective communication." Indeed, essentially every one of the articles set forth above—again, all published by national and international news media—quotes AdvanFort, reporting the

company's perspective on the controversy.[7] And AdvanFort and the Farajallahs certainly "voluntarily assumed a role of special prominence in [the] public controversy by attempting to influence the outcome of the controversy." The Complaint itself alleges that "AdvanFort, including the Farajallahs, assembled a crisis reaction team that worked round the clock to address the matter and to secure the release of the vessel and crew." Compl. ¶ 27. "Addressing the matter" obviously included the numerous *public* statements that AdvanFort made to the press prior to publication of the Cartner Article. For that reason, the fourth factor noted above—that the controversy existed prior to the publication of the allegedly defamatory statement—was also met. And, finally, AdvanFort and the Farajallahs clearly retained public-figure status at the time of the Article—the *Ohio* controversy was still ongoing months after the Article at issue here was published. *See, e.g.*, Ex. X, Gary Howard, *AdvanFort President Quits, 35 Guards Remain in*

---

[7] *See, e.g.*, Ex. E, AL JAZEERA at 1 (including statement from AdvanFort president that ship only entered Indian waters because it was asked to do so by Indian coast guard); Ex. C, BBC NEWS at 1 (citing and linking to an AdvanFort statement asserting that Indian officials had allowed the vessel to enter an Indian port to refuel); Ex. F, CBS NEWS at 2 ("In the statement released Monday, AdvanFort said the weapons and ammunition were registered and licensed to the company."); Ex. G, THE DAILY MAIL at 2 ("AdvanFort claims that the ship has been supporting an anti-piracy initiative in Asia."); Ex. H, FOX NEWS at 2 (including statement from AdvanFort president that weapons on board vessel were legal and registered); Ex. W, HUFFINGTON POST at 2 (citing statement from AdvanFort's president denying that the ship was navigating in Indian waters); Ex. I, NPR at 2 (quoting and linking to an AdvanFort statement on the incident); Ex. U, N.Y. TIMES at 1 ("AdvanFort's president, William H. Watson, denied that the ship was navigating in Indian waters."); Ex. J, THE TELEGRAPH at 1 ("A statement released by the company said the weapons were all properly registered and licensed."); Ex. V, TIMES OF INDIA at 1 ("Company president William H Watson had claimed in an interview that all the firearms and ammunition were used to safeguard commercial ships against piracy in high-risk areas."); Ex. K, VOICE OF AMERICA at 1 ("AdvanFort President William Watson told VOA the arms and ammunition on board were licensed and meant for anti-piracy missions in the eastern Indian Ocean.").

*Indian Prison*, SEATRADE GLOBAL, Mar. 10, 2014, http://www.seatrade-global.com/news/americas/advanfort-president-quits-as-35-guards-remain-in-indian-prison.html.

The Fourth Circuit applied this limited public figure analysis to analogous facts in *Carr* in 2001. In *Carr*, the plaintiff was president and CEO of Interwest Management, Inc. A Forbes article critical of Carr suggested that he was a "shady businessman with a troubled history" who had been deeply involved in a large publicly funded project (the "Quartzsite project") that "ended in a legal mess." *Carr*, 259 F.3d at 277. The article argued against Carr's involvement in a new "South Carolina project" involving a "new federal financing program." *Id.* Carr argued that he was not a limited purpose public figure because neither of these projects "gave rise to a public controversy." *Id.* at 279. The Fourth Circuit found that "[u]nquestionably, public attention focused on the legitimacy of the projects described" in the Forbes article, and that "Carr's conduct . . . had a concrete impact on the lives of people outside the controversy." *Id.* The same is true here—there is no question that "public attention focused on the legitimacy" of the *Ohio*'s anti-piracy activities, and that those activities had a direct bearing on the "controversial" "multi-national campaign to combat . . . pirates targeting ships in the Indian Ocean." Ex. C, BBC NEWS at 2.

The Fourth Circuit also found that Carr "voluntarily assumed a role of special prominence" in a public controversy. For example, "[a]lthough Carr did not own Interwest, the company was his brain-child and he served as the company's President and chief executive." *Carr*, 259 F.3d at 280. He also "selected the team that would build" the Arizona project, and "at least behind the scenes . . . managed the [South Carolina] project"—in short, Carr "directed Interwest and managed all of the projects" discussed in

the Forbes article. *Id.* at 281. Again, these points are even more true here—the Farajallahs *do* own AdvanFort, and were themselves directly responsible for "assembl[ing] a crisis reaction team that worked round the clock" on the *Ohio* matter. Compl. ¶¶ 4, 5, 27.

In short, like *Carr*, this case involves a privately held company whose principals "voluntarily assumed a role of special prominence in a public controversy." The Plaintiffs were therefore required to plead actual malice on Cartner's part, and they have not adequately done so. In particular, this pleading burden is not satisfied merely by alleging that the defendant acted with knowledge that the alleged defamatory statements were false. Compl. ¶ 48. Rather, the Complaint must allege *specific facts* to support an allegation of actual malice, which it failed to do. *See, e.g.*, *Dobkin v. Johns Hopkins Univ.*, 172 F.3d 43, *4 (4th Cir. 1999); see also *Hovatter v. Widdowson*, No. CIV.CCB-03-2904, 2004 WL 2075467, at *6-7 (D. Md. Sept. 15, 2004) (denying motion to dismiss as to defendants against whom specific allegations of scheming to procure false testimony had been made, while granting motion to dismiss as to defendant against whom plaintiff had failed to allege any specific facts that would support a finding of malice); *Young v. City of Mount Ranier*, 238 F.3d 567, 577 (4th Cir. 2001) ("To be sure, the original complaint throws in words and phrases such as 'deliberate indifference,' 'malicious,' 'outrageous,' and 'wanton' . . . . The presence, however, of a few conclusory legal terms does not insulate a complaint from dismissal under Rule 12(b)(6). . . ."). The defamation and defamation *per se* counts against Cartner should therefore be dismissed.

**III. Counts III and IV for Tortious Interference With Contract and Tortious Interference With Business Expectancy Should be Dismissed for Failure to Properly Plead All Required Elements of These Causes of Action.**

Counts III and IV of the Complaint allege torts of intentional interference with business relations. In *Glass v. Glass*, the Virginia Supreme Court defined the elements of these causes of action as: "(1) the existence of a business relationship or expectancy, with a probability of future economic benefit to plaintiff; (2) defendant's knowledge of the relationship or expectancy; (3) a reasonable certainty that absent defendant's intentional misconduct, plaintiff would have continued in the relationship or realized the expectancy; and (4) damage to plaintiff." *Glass v. Glass*, 228 Va. 39, 51-52, 321 S.E.2d 69, 77 (1984) (citations omitted); *see also Duggin v. Adams*, 234 Va. 221, 360 S.E.2d 382 (1987); *Chaves v. Johnson*, 230 Va. 112, 335 S.E.2d 97 (1985); and *Allen Realty Corp. v. Holbert*, 227 Va. 441, 318 S.E.2d 592 (1984).

The Fourth Circuit has, however, made clear that "conclusory and speculative allegations" are "insufficient to satisfy" these requirements. *Painter's Mill Grille v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013); *see also Phelps v. Wichita Eagle–Beacon*, 886 F.2d 1262, 1267 (10th Cir. 1989) ("Plaintiff has alleged that defendants' actions have interfered with his 'prospective business opportunities,' but we find that vague and conclusory allegation insufficient to state a deprivation of the right to make and enforce contracts . . . ."). Virginia, like most states, largely follows the law of tortious interference of the Restatement (Second) of Torts, *see, e.g.*, *Chaves*, 335 S.E.2d at 120, and Section 766 of the Restatement requires that the plaintiff must show that "the actor . . . h[as] knowledge" *of the specific contract* "with which he is interfering and of the fact that he is interfering with the performance of the contract." Restatement (Second) of Torts § 766 cmt. I (1979). But while the Complaint maintains that "Plaintiffs had contractual relationships with various customers," Compl. ¶ 109, it does not

identify a single specific customer or contract, or any facts supporting the bald allegation that "Cartner had knowledge of these contracts." *Id.* ¶ 110. Plaintiffs' failure to make specific allegations with regard to either specific contracts or Cartner's knowledge of them requires dismissal. *See, e.g., Masco Contractor Serv. East, Inc., v. Beals*, 279 F.Supp.2d 699, 709 (E.D. Va. 2003) (cause of action provides a legal remedy for interference with a "particular party's *specific, existing* contract" (emphasis in original)); *Medtech Prods. Inc. v. Ranir, LLC*, 596 F.Supp.2d 778, 796–97 (S.D.N.Y. 2008) (dismissing tortious interference claim because complaint failed to allege defendants were aware of limitations that the employment contract imposed which created the third party's breach); *Leadsinger, Inc. v. Cole*, No. 05–5606, 2006 WL 2320544, *11-*12 (S.D.N.Y. 2006) (tortious interference claim dismissed for failure to allege defendant's knowledge of relevant terms at the time of purported interference).

Plaintiffs' business "expectancy" claim suffers the same fatal defect. "Virginia law requires that a plaintiff plead a specific . . . business expectancy, and [holds] that a general expectancy . . . which is all that plaintiff has alleged, does not suffice." *Gov't Employees Ins. Co. v. Google, Inc.*, 330 F. Supp. 2d 700, 705 (E.D. Va. 2004). As the court wrote in *Vuyyuru v. Metropolitan Hosp.*, 1998 WL 972210, *5 (Va. Cir. Ct. 1998):

> It is hard to imagine how a plaintiff can prove the existence of a valid contractual relationship or business expectancy without proving what contractual relationship or business expectancy existed. And since a specific contractual relationship or business expectancy must be proved, it makes sense that a specific contractual relationship or business expectancy must be alleged.

Here, Plaintiffs vaguely invoke "business relationships and expectancies with Marshall Island flagged vessels," Compl. ¶ 116, but do not offer to "prove the existence" of *any* specific business expectancy. Moreover, the Complaint fails to allege Cartner's knowledge of any business expectancy in even the vaguest terms.

The Complaint also falls short in pleading the element of "intentional misconduct" required by *Glass*. While Counts III and IV of the Complaint both allude to allegedly "tortious" conduct, Compl. ¶¶ 111, 118, to the extent that vague reference is intended to invoke the defamation claims discussed above, Plaintiffs' "tortious interference" claims fail for the same reason as their defamation claims. The allegedly defamatory Article was not defamatory at all, but constitutionally protected speech. The Complaint also alleges—in the most conclusory terms—"sharp dealing, unfair competition . . . and undue influence." Compl. ¶ 112. Once again, however, such "conclusory and speculative" allegations" are "insufficient to satisfy" Plaintiffs' pleading burden. *Painter's Mill*, 716 F.3d at 350. Plaintiffs have thus failed to properly allege any intentional misconduct to support their tortious interference claims, and those claims fail for that reason as well. *See, e.g*, *Appleton v. Bondurant & Appleton, P.C.*, 68 Va. Cir. 208, at *19 *(2005)* (finding no intentional misconduct and thus no tortious interference).

In short, because Plaintiffs have failed to adequately allege 1) the existence, the parties, or the terms of any specific legally protected contract or business expectancy; and 2) any intentional misconduct to support their tortious interference claims, Counts III and IV of the Complaint against Cartner should be dismissed.

## IV. Plaintiffs' Complaint Also Fails for Two Reasons Detailed by Defendant Cartner's Co-Defendants

Plaintiffs' complaint is deficient in two additional respects. First, as noted in Defendant The Maritime Executive LLC's Motion to Dismiss, neither corporate plaintiff is registered to as a foreign corporation or otherwise authorized to transact business in the State of Virginia. According to Virginia law, "[a] foreign corporation transacting business in the Commonwealth without a certificate of authority may not maintain a proceeding in any court in the Commonwealth until it obtains a certificate of authority." VA. CODE § 13.1-758. Second, as

Plaintiff International Registries, Inc. ("IRI") explains in its Motion to Dismiss, plaintiffs' claims of tortious interference in Counts III and IV are improperly joined with Counts I and II, since the two sets of claims do not "arise out of the same transaction or occurrence." VA. CODE § 8.01-272; see also *Powers v. Cherin*, 249 Va. 33, 452 S.E. 2d 666 (1995). Indeed, the complaint highlights this deficiency by failing to allege any facts linking Cartner and IRI, despite naming both as defendants in Counts III and IV, and by failing to provide any factual allegations indicating what connection Cartner's alleged conduct had on plaintiffs' dealings with the Marshall Islands-flagged vessels of their customers. See Compl. ¶¶ 108-125.

Rather than repeating these arguments here in detail, Defendant Cartner incorporates by reference his co-defendants' arguments regarding these deficiencies.

**CONCLUSION**

For the foregoing reasons, Defendant Cartner respectfully requests that this Court grant his Motion to Dismiss with prejudice.

February 26, 2015

Respectfully submitted,

/s/ *Thomas G. Connolly*
Thomas G. Connolly
Virginia Bar No. 29164
HARRIS, WILTSHIRE & GRANNIS LLP
1919 M Street, N.W., 8th Floor
Washington, D.C. 20037
Telephone: (202) 730-1339
Fax: (202) 730-1301
E-mail: TConnolly@hwglaw.com

*Counsel for John A.C. Cartner*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and accurate copy of the foregoing was sent electronically via the Court's ECF system this 26th day of February, 2015 to all counsel of record.

Respectfully submitted,

/s/ *Thomas G. Connolly*
Thomas G. Connolly
Virginia Bar No. 29164
HARRIS, WILTSHIRE & GRANNIS LLP
1919 M Street, N.W., 8th Floor
Washington, D.C. 20037
Telephone: (202) 730-1339
Fax: (202) 730-1301
E-mail: TConnolly@hwglaw.com

*Counsel for John A.C. Cartner*