## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

|  |  |  |
|---|---|---|
| ADVANFORT COMPANY, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:15-cv-220 |
| | ) | |
| INTERNATIONAL REGISTRIES, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### <u>MEMORANDUM OPINION</u>

This matter comes before the Court on Motions to Dismiss by Defendants The Maritime Executive, LLC, John Cartner, and International Registries, Inc. (Dkt. Nos. 3, 7, 9) as well as a Motion to Remand by Plaintiffs. Dkt. No 20. The motions have been fully briefed by the parties, and the Court heard oral argument on April 17, 2015. For the reasons set forth below, Plaintiffs' Motion to Remand will be denied, the Motions to Dismiss by International Registries and The Maritime Executive will be granted, and John Cartner's Motion to Dismiss will be granted in part and denied in part.[1]

### I.   Background

This controversy arises out of an article ("Article") written by Defendant John Cartner and published by Defendant The Maritime Executive, LLC ("TME") on its website. The following facts, taken from the Complaint, are accepted as true. Plaintiffs are father and son Samir Farajallah and Ahmed Farajallah, and their privately held companies AdvanFort Company and AdvanFort International, Inc. Both AdvanFort companies "provid[e] world class global security solutions" and "specialize[] in ... maritime, port and terminal security ...." Compl.

---

[1] As will be discussed herein, some claims against Defendants will be dismissed with prejudice and some without.

¶ 3. Such entities are referred to in the maritime industry as "private maritime security compan[ies]." *Id.* Defendants include Cartner, a maritime lawyer who represented Plaintiffs during some of the underlying events; TME, a maritime industry journal; and International Registries, Inc. ("IRI"), a Virginia corporation that "administers the maritime and corporate programs of the Republic of the Marshall Islands." *Id.* ¶ 9.

On October 11, 2013, a typhoon developed over the Indian Ocean. Due to the severe weather conditions, AdvanFort's vessel, the MV Seaman Guard Ohio ("the Ohio"), was running low on fuel and anchored off the coast of India. The vessel requested permission to come into port to refuel, which was denied. As a result, the ship was forced to buy fuel from a private vendor—an act later alleged to violate Indian law, as the vendor lacked the necessary permits. The Indian Coastguard later directed the Ohio to come into port. On October 12, 2013, all thirty-five crew members of the Ohio were detained by Indian authorities. As anti-piracy measures, the crew was equipped with protective gear, rifles, and ammunition. The Indian Coastguard seized all 35 non-automatic weapons and numerous rounds of ammunition found on board.

On October 18, 2013, thirty-three of the crew members were arrested by Indian authorities.[2] Upon learning of the crew and ship's detention, Plaintiffs "assembled a crisis reaction team that worked round the clock to address the matter and to secure the release of the vessel and the crew." *Id.* ¶ 27. AdvanFort flew its representatives to India to address the crisis. Plaintiffs also made multiple attempts to secure bail for its crew and promptly retained legal counsel, including Defendant Cartner, a maritime and admiralty lawyer. Pursuant to Cartner's advice, AdvanFort also retained local as well as English counsel with ties in India. Approximately two months after the initial detention, charges were brought against the crew for alleged violations of India's Arms Act. The charges were ultimately dropped on July 10, 2014.

---

[2] The remaining two crew members were allowed to stay on board the Ohio, but were later arrested as well.

Approximately eleven days after Cartner's initial retention, a fee dispute arose over his

billing Plaintiffs more than $28,000 for less than two weeks' worth of legal services. The

dispute was submitted to arbitration and later became the subject of a bar complaint against

Cartner, which remains pending.

On November 11, 2013, Cartner engaged in email correspondence with AdvanFort's

then-President, William Watson, in which he "solicited Watson … and … the two engaged in

discussions and made plans to go into business together." *Id.* ¶ 83. "The two appear to be

currently working together at a firm called Gulf Coast Maritime, LLC ("GCM") which provides

consulting 'in maritime consulting, security, training, intelligence operations, and information

security.'" *Id.* ¶ 84. Plaintiffs allege that GCM is a competitor of AdvanFort.

On or about January 6, 2014, Cartner authored an article entitled "Self-Described

AdvanFort 'Billionaire' May Not Be." Compl. ¶ 45. The Article was labeled an "exclusive" and

published on TME's website. *Id.* The Article is alleged to contain multiple defamatory

statements that were calculated to lower the estimation of Plaintiffs in the maritime community.

For example, Cartner wrote that AdvanFort had "been accused by the Indian government of arms

running." *Id.* ¶ 93. Plaintiffs allege that Cartner wrote the Article out of "personal spite, or ill-

will and a desire to hurt one or more of the Plaintiffs." *Id.* ¶ 48. Plaintiffs claim that the

defamatory statements in the Article have caused them to suffer "tangible economic losses and

substantial injury to their reputation and their business." *Id.* ¶ 56.

On January 7, 2014, the day after the Article was published, AdvanFort received a letter

from the Republic of the Marshall Islands ("RMI") Maritime Administrator ("the

Administrator") stating that "it was no longer permitted to provide security services to Marshall

Islands registered vessels, effective immediately." *Id.* ¶ 65. Defendant IRI, charged with

providing technical and administrative support to the Administrator, then directed all RMI

3

flagged ships not to allow AdvanFort personnel on their vessels due to the company's suspension. Plaintiffs allege that AdvanFort's suspension was "improper and done without providing proper notice ... or a meaningful opportunity to respond to the allegations." *Id.* ¶ 68. The suspension was eventually lifted over six months later, on June 17, 2014. As a result of the suspension, Plaintiffs claim to have lost a significant portion of its customer base as well as prospective clients.

Based on the above events, on January 20, 2015, Plaintiffs filed this action against Defendants in Fairfax County Circuit Court alleging four counts of common law claims: defamation and defamation *per se* against TME and Cartner (Counts I and II) as well as tortious interference with contract and business expectancy against Cartner and IRI (Counts III and IV). On February 19, 2015, Defendants removed the action to this Court. Dkt. No. 1. The sole basis for removal is the alleged fraudulent joinder of non-diverse defendant IRI, which is a citizen of Virginia, like Plaintiff Ahmed Farajallah. A week after the Notice of Removal was filed in this Court, each of the three Defendants moved to dismiss the respective claims against them on various grounds. Dkt. Nos. 3, 7, 9. Plaintiffs in turn moved to remand the matter to state court. Dkt. No. 20. On April 17, 2015, the Court heard oral argument on the above motions. After careful consideration, the matter is now ripe for adjudication.

## II.   Legal Standard

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint. *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). The Court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in Plaintiff's favor. *Tobey v. Jones*, 706 F.3d 379, 383 (4th Cir. 2013). To survive a motion to dismiss, the complaint "must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell*

4

*Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint "establish[es] facial plausibility by pleading factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 554 (4th Cir. 2013) (citation and internal quotation marks omitted). Moreover, a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

## III. Analysis

Each of the Defendants has raised distinct bases in support of their motions to dismiss. The Court will therefore address each Defendant's motion separately. Because the "threshold question in any matter brought before a federal court is whether the court has jurisdiction to resolve the controversy involved," the Court turns first to Plaintiffs' motion to remand the case to state court. *17th St. Assocs., LLP v. Markel Int'l Ins. Co.*, 373 F. Supp. 2d 584, 591 (E.D. Va. 2005).

### A. Plaintiffs' Motion to Remand and IRI's Motion to Dismiss[3]

Plaintiffs have moved to remand the matter to the Fairfax County Circuit Court, stating that complete diversity does not exist between the parties because both Defendant IRI and Plaintiff Ahmed Farajallah are citizens of Virginia. Defendants maintain that IRI's citizenship should be disregarded for diversity jurisdiction purposes because it was fraudulently joined in this suit. Dkt. No. 1. To show that removal was proper, Defendants bear the "heavy burden of establishing that a non-diverse defendant has been fraudulently joined." *Balt. Cnty. v. Cigna Healthcare*, 238 F. App'x 914, 919–20 (4th Cir. 2007). This may be accomplished by establishing "that there is *no possibility* that the plaintiff would be able to establish a cause of action against the in-state defendant in state court; or that there has been outright fraud in the

---

[3] Because the issues raised in Plaintiffs' motion to remand and IRI's motion to dismiss are intertwined, the Court considers them simultaneously.

plaintiff's pleading of jurisdictional facts.  *Id.* at 920 (emphasis in original) (quoting *Mayes v. Rapoport*, 198 F.3d 457, 464 (4th Cir. 1999)).  The "no possibility" standard, however, "is not to be taken literally, nor is it to be applied mechanically." *Hien Pham v. Bank of N.Y.*, 856 F. Supp. 2d 804, 809 (E.D. Va. 2012) (citation and internal quotation marks omitted).  Rather, it requires the Court to ascertain whether there is a "reasonable basis for predicting that state law might impose liability on the facts involved." *Boss v. Nissan N. Am., Inc.*, 228 F. App'x 331, 335 (4th Cir. 2007) (citation and internal quotation marks omitted).

The Fourth Circuit has admonished courts not to "incorrectly place[] the burden on [the plaintiff] to show that her claims may succeed rather than requiring [the defendant] to negate all possibility of recovery." *Hartley v. CSX Transp., Inc.*, 187 F.3d 422, 425 (4th Cir. 1999).  The standard for a motion to remand is thus more favorable than that for a Rule 12(b)(6) motion to dismiss, in that the removing party must show that the plaintiff cannot establish a claim even after "all legal uncertainties are ...resolved in the plaintiff's favor." *Id.* at 424.  Because Defendants have not alleged any bad faith or fraud in the pleading, the only inquiry is whether there is a reasonable basis for predicting that state law might impose liability against IRI, the non-diverse defendant.

The dispositive issue at the heart of both the motion for remand and the motion to dismiss is whether the allegations in the Complaint state claims for tortious interference with contract and business expectancy against IRI.[4]  Under Virginia law, a plaintiff pursuing a claim for tortious interference with contracts must allege facts sufficient to show: "(1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach

---

[4]  IRI has advanced multiple other arguments in support of its motion to dismiss, including the act of state doctrine, misjoinder of parties and causes of action, and Plaintiffs' lack of standing.  However, because it is clear that Plaintiffs have not alleged an essential element of their tortious interference claims, nor could they even if given the opportunity to amend, the Court will address only the 12(b)(6) argument.

or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted."[5] *Skillstorm, Inc. v. Elec. Data Sys., LLC*, 666 F. Supp. 2d 610, 616 (E.D. Va. 2009) (quoting *Duggin v. Adams*, 234 Va. 221, 226 (1987)).  With respect to the first element, a plaintiff's failure to allege a "*specific*, existing contract or business expectancy" with which the defendant has allegedly interfered "is fatal to the claim." *Masco Contractor Servs. E., Inc. v. Beals*, 279 F. Supp. 2d 699, 709–10 (E.D. Va. 2003) (emphasis in original).  In Virginia, there is also "a fifth, unstated element [requiring] a competitive relationship between the party interfered with and the interferor." *17th St. Assocs.*, 373 F. Supp. 2d at 600 (citing several Virginia Supreme Court cases); *accord Adeptech Sys., Inc. v. Fed. Home Loan Mortg. Corp.*, No. 1:11-cv-383, 2011 WL 6820184, at *17 (E.D. Va. Dec. 28, 2011), *aff'd*, 502 F. App'x 295 (4th Cir. 2012) (holding that plaintiff's failure to show defendant was a competitor "preclud[es] the tortious interference action").  Furthermore, if the claim involves an at-will contract, the plaintiff must also allege "that the defendant employed improper methods."[6] *Duggin*, 234 Va. at 227 (citation and internal quotation marks omitted); *Glass,* 228 Va. at 51–52.

     Under Virginia law, it is clear that Plaintiffs' allegations fail, on multiple levels, to state claims against IRI.  First, Plaintiffs have failed to identify any *specific* contract or business expectancy with which Defendants have allegedly interfered, and instead only allege that they had "had contractual relationships with *various customers* who were Marshall Island flagged vessels, vessel owners and operators, and had contractual relationships with their employees and contractors who worked in service of those contracts." Compl. ¶ 109 (emphasis added).  They

---

[5] The standard for tortious interference with a business expectancy is identical except for the additional requirement that the plaintiff allege the existence of a business expectancy "with a probability of future economic benefit." *Commerce Funding Corp. v. Worldwide Sec. Servs. Corp.*, 249 F.3d 204, 213 (4th Cir. 2001); *Glass v. Glass*, 228 Va. 39, 51 (1984).

[6] A plaintiff claiming tortious interference with business expectancy must also allege improper methods. *Duggin*, 234 Va. at 227 (citation omitted).

have therefore failed to allege facts sufficient to satisfy the first element of both Counts III and

IV—the existence of a valid contractual relationship or business expectancy.

Plaintiffs have also failed to adequately allege the second element of their tortious

interference claims—Defendants' knowledge of the contracts or expectancies. Plaintiffs' sole

allegation on this element is a barebones, conclusory assertion: "IRI... had knowledge of these

contracts." *Id.* ¶ 110. Although a defendant's knowledge "may be alleged generally, it must still

be accompanied by allegations of fact giving rise to a reasonable inference of knowledge . . . ."

*Alliance Tech. Grp., LLC v. Achieve 1, LLC*, No. 3:12-cv-701, 2013 WL 143500, at *7 (E.D. Va.

Jan. 11, 2013). Such facts do not appear in the Complaint, as Plaintiffs have essentially

admitted—"While IRI complains that the Complaint does not give 'specifics', IRI is sufficiently

on notice as to the allegations brought by Plaintiffs and the nature of their claims." Pls.' Opp'n

to IRI's Mot. Dismiss 10. Although Plaintiffs have alleged that "IRI emailed *all of [RMI's]*

*flagged ships* and notified them of AdvanFort's suspension and forbade them from using

AdvanFort's services while the company remained under suspension," they have not pled that

IRI knew which of RMI's flagged vessels, if any, had contracts or business relationships with

Advanfort. Compl. ¶ 67. Indeed, Plaintiffs have not named *a single customer* that was the

subject of tortious interference by IRI. Thus, under the *Twombly/Iqbal* pleading standard, the

conclusory statement that IRI "had knowledge of these contracts" cannot reasonably support an

inference that IRI had the requisite knowledge to sustain Plaintiffs' tortious interference claims.

Finally, Plaintiffs have failed to state a claim for tortious interference because they have

not alleged that IRI was their competitor. *17th St. Assocs.*, 373 F. Supp. 2d at 600. The

Complaint describes Plaintiffs' business as "providing world class global security solutions and

... protective services to safeguard people, assets and properties." Compl. ¶ 3. By contrast, it

alleges that IRI "is a privately administered ship and corporate registration firm . . . [and]

8

administers the maritime and corporate programs of the Republic of the Marshall Islands ... and is responsible for its vessel registrations worldwide." *Id.* ¶ 9. Clearly, Plaintiffs and IRI do not engage in the same business and thus cannot reasonably be considered competitors. Allowing Plaintiffs to amend the Complaint would therefore be futile.

Plaintiffs argue that, because the "competitive relationship" element has not been *explicitly* required by the Supreme Court of Virginia, there is at least a glimmer of hope that they might convince a Virginia court that their claims have merit. Pls.' Rebuttal Br. to IRI's Mot. Dismiss 8. The plaintiff in *17th St.* made the same argument, however, and this Court rejected it as "thoroughly unconvincing" because "[t]he string of cases cited above make clear that the Supreme Court of Virginia would not extend the tort of intentional interference" to a fact pattern in which there was no competitive relationship between the parties. *17th St. Assocs.*, 373 F. Supp. 2d at 601. This conclusion was based on the fact that "the existence of a competitive relationship between a plaintiff and a defendant is the factual circumstance giving rise a common law duty actionable in tort." *Id.* The Court also stated that "where the Supreme Court of Virginia has never recognized a cause of action, . . . it would be inappropriate for this Court to do so in the first instance . . . ." *Id.* The Court sees no reason to draw a different conclusion here.

Accordingly, because Plaintiffs cannot in good faith allege that they and IRI are competitors, the Court finds "there is no reasonable basis for predicting that state law might impose liability" against IRI for tortious interference with contract or a business expectancy. *Boss*, 228 F. App'x at 335. Defendants have thus met their "heavy burden" to show that non-diverse defendant IRI had been fraudulently joined. *Cigna*, 238 F. App'x at 919–20. Plaintiffs' motion to remand will therefore be denied and IRI's motion to dismiss will be granted.

## B. *Defamation Claims Against Cartner*

Cartner has moved to dismiss the defamation claims against him for two principal reasons: first, the statements in the Article are rhetorical hyperbole and thus not actionable; and second, because they are, at the very least, limited public figures, Plaintiffs were required to allege facts to support a plausible inference that the statements were made with actual malice, but have not done so.

Under Virginia law, the elements of a defamation claim are: (1) publication[7] of (2) an actionable statement with (3) the requisite intent. *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993) (citing *Gazette, Inc. v. Harris*, 229 Va. 1 (1985)). A statement is defamatory *per se* if it (1) "impute[s] to a person the commission of some criminal offense involving moral turpitude;" (2) "impute[s] to a person unfitness to perform the duties of an office or employment of profit, or want of integrity in the discharge of the duties of such an office or employment;" or (3) "prejudice[s a] person in his or her profession or trade." *CACI Premier Tech., Inc. v. Rhodes*, 536 F.3d 280, 292–93 (4th Cir. 2008) (quoting *Carwile v. Richmond Newspapers, Inc.*, 196 Va. 1, 7 (1954)). It is also black letter law that if the plaintiff is a public official or public figure, the First Amendment requires clear and convincing evidence that the statement was made with "actual malice"—in other words, "with knowledge that it was false or with reckless disregard of whether it was false or not." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964). Only the second two elements of defamation are at issue here, and they will be addressed in turn.

### i. Are the Statements Actionable?

For a statement to be actionable in defamation, it must contain either a "provably false factual connotation" or be "reasonably ... interpreted as stating actual facts about a person."

---

[7] Publication is not disputed in this case.

*Yeagle v. Collegiate Times*, 255 Va. 293, 295 (1998) (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 16–17 (1990)). Conversely, statements that constitute "rhetorical hyperbole" are protected under the First Amendment and cannot form the basis of a defamation claim. *Milkovich*, 497 U.S. at 17, 21. The Fourth Circuit has described rhetorical hyperbole as a statement that "might appear to make an assertion, but *a reasonable reader or listener would not construe that assertion seriously.*" *Schnare v. Ziessow*, 104 F. App'x 847, 851 (4th Cir. 2004) (emphasis added). In deciding whether a particular statement represents rhetorical hyperbole, courts must take into account the context and "general tenor" of the statements. *Snyder v. Phelps*, 580 F.3d 206, 220 (4th Cir. 2009), *aff'd*, 562 U.S. 443 (2011); *accord Schnare*, 104 F. App'x at 851; *Yeagle*, 255 Va. at 297–98 (upholding dismissal of claim after "considering the phrase at issue in the context of the entire article"). Whether a statement is actionable is a question of law to be decided by the Court. *Chapin*, 993 F.2d at 1092.

Plaintiffs allege that the Article contains numerous false statements of fact, including but not limited to the following statements: (1) "Samir Farajallah has done little or nothing to assist [the crew members] or anyone else"; (2) "Samir ... appears to be on the edge of abandoning his detained employees to the tender hands of the India prosecutors"; (3) "Samir has paid few wages . . . . Still other sources say that vendors are owed substantial sums by Farajallah *et fil*. These debts include legal fees, supplies, officer and staff pay . . . ."; (4) "because he believed to [sic] could sway the Indian government with hand-wringing and cheap press releases, rather than hiring counsel timely from a reputable firm to deal with the matters he faced"; (5) "[AdvanFort] has been accused by the Indian government of arms running"; and (6) "it seems a 1200-page charge sheet has been filed by the Indian government against AdvanFort and anyone connected with it including Mr. Farajallah and plucky Amad [sic]." Compl. ¶¶ 89–93.

11

In Count I, Plaintiffs allege that the above statements "caused damage to [their] reputations, financial loss, loss of standing in the community and/or emotional distress." *Id.* ¶ 88. Count II alleges that the statements amount to defamation per se because they "imputed to the Plaintiffs an unfitness to perform their professional duties and a want of integrity in the discharge of those duties and prejudiced Plaintiffs in their profession or trade" as well as "falsely impute[d] that criminal charges had been filed against the Farajallahs personally in a manner ruinous to [their] reputation." *Id.* ¶¶ 99–100. Because there are multiple statements at issue, the Court will evaluate each separately.

### a) *"Samir Farajallah has done little or nothing to assist [the crew members] or anyone else"*

Cartner argues that this statement "cannot, in context, be understood as a factual assertion," and that the Article as a whole is rhetorical hyperbole. Cartner's Mem. Supp. Mot. Dismiss ("Cartner's Mot.") 6–7. Although this statement does not rise to the level of a "provably false factual connotation," the Court would not go so far as to call it rhetorical hyperbole. *Echtenkamp*, 263 F. Supp. 2d at 1061. If the Article stated that Plaintiff had "done nothing" to assist the Ohio's crew, Plaintiffs would have stated a cause of action because they arguably could prove that Mr. Farajallah had done *something*. The actual statement reads that Plaintiff had "done little or nothing," rendering it a non-actionable opinion because whether a person has done little to assist, or sufficiently assisted, his or her employees is completely subjective and not verifiable.

### b) *"Samir . . . appears to be on the edge of abandoning his detained employees to the tender hands of the India prosecutors."*

Although Cartner does not specifically challenge this statement, he argues generally that the Article, taken as a whole, constitutes rhetorical hyperbole. To support that view, he relies upon the Fourth Circuit's decision in *CACI Premier Technologies, Inc. v. Rhodes*, 536 F.3d 280

(4th Cir. 2008). In that case, CACI—a defense contractor that had performed interrogation services for the military at Abu Ghraib prison in Iraq—claimed that it had been defamed by a talk-radio host. The claim was based on statements that CACI employed "[m]ercenaries all over the country, killing people," and were "hired killers," among others. *Id.* at 301. The Fourth Circuit, in affirming the district court's award of summary judgment to the defendants, explained that a reasonable listener would understand these statements as "exaggerated rhetoric intended to spark the debate about the wisdom of the use of contractors in Iraq." *Id.* at 301–02.

Although the Court agrees with Cartner that the statement is not actionable, it does not share his reasoning. Even though the Article is replete with negative comments about Plaintiff Samir Farajallah, none of them are so outlandish as to rise to the level of incredible, hyperbolic rhetoric. For example, the Article sarcastically describes the elder Farajallah as an "[u]pstanding man." Compl. ¶ 93. It also states that his apartment is "tackily-decorated" and that he is "a bit player with pretensions on the world stage which he clearly does not understand." Cartner's Mot., Ex. A (full text of the Article). These comments, cited by Cartner as examples of rhetorical hyperbole, are instead "pure expressions of opinion"—that is, "[s]peech which does not contain a provably false factual connotation." *Yeagle*, 255 Va. at 295 n.1.

Likewise, when viewed within the context of the Article as a whole, the statement itself is not so exaggerated that it "cannot reasonably be interpreted as stating actual facts" about him. *Milkovich*, 497 U.S. at 20 (citation, brackets, and internal quotation marks omitted). More accurately, the statement is not *demonstrably* false, having been qualified by the subjective phrase "*appears to be on the edge of* abandoning . . . ." Compl. ¶ 90 (emphasis added); *see Yeagle*, 255 Va. at 295. As such, it cannot form the basis of Plaintiffs' defamation claims.

c) *"Samir has paid few wages . . . . Still other sources say that vendors are owed substantial sums by Farajallah et fil. These debts include legal fees, supplies, officer and staff pay . . . ."*

This statement differs from the first two in that it contains an objectively verifiable statement of fact. Whether Plaintiffs owe vendors "substantial sums" can be disproven by showing that Plaintiffs owed nothing to the vendors. Plaintiffs could also prove the falsity of the statement by disproving the alleged sources of the debts—legal fees, staff pay, etc. Additionally, if the statement is proven false, it constitutes defamation per se because it disparages Plaintiffs' fitness to perform their professional duties and accordingly prejudices them in their trade. This statement is therefore actionable and will sustain Counts I and II if the other elements are met.

d) *"because he believed to [sic] could sway the Indian government with hand-wringing and cheap press releases, rather than hiring counsel timely from a reputable firm to deal with the matters he faced"*

Whether this statement is actionable is a close call. Although the first half of the statement is pure conjecture, given that there is no way Cartner could know what Plaintiff "believed" during the events in question, the second half of the statement does appear to be a demonstrably false statement of fact. At first glance, whether Plaintiff Samir Farajallah hired counsel "timely" seems to call for a subjective opinion because the definition of "timely" differs from person to person. However, if Farajallah had hired counsel the day of the crew's arrest, or the day he discovered his crew had been arrested, reasonable minds could not differ in concluding that he had hired counsel "timely." This statement is thus actionable as well.

e) *"[AdvanFort] has been accused by the Indian government of arms running"*

The Court finds that this statement is also capable of being proven false. Based on a review of the attached exhibits, it appears that Plaintiffs were charged with "failing to produce papers authorizing them to carry arms in Indian waters," "illegal weapons possession," and/or "entering India's territorial waters without permission." Cartner's Mot., Exs. B, E. These

14

charges, although similar, do not equate to an accusation of "arms running," which implies

illegal weapons *trafficking* or *smuggling*. Because the statement can potentially be proven false,

and because it imputes to Plaintiffs the commission of a crime, it satisfies the "actionable"

element of both Counts I and II.

> *f)  "it seems a 1200-page charge sheet has been filed by the Indian government against AdvanFort and anyone connected with it including Mr. Farajallah and plucky Amad [sic]."*

This statement also contains a verifiable statement of fact. Whether in fact the

Farajallahs had been charged *personally* with criminal conduct is independently verifiable. As a

result, the Court must defer to Plaintiffs' allegation of the falsity of the statement, and it may

form the basis of the defamation claims. In sum, the Court finds that statements C, D, E, and F

are actionable while statements A and B are not. Cartner's motion to dismiss will therefore be

granted in part as to those non-actionable statements.[8]

ii.    Have Plaintiffs Pled the Requisite Intent?

As to the actionable statements, the question remains as to whether Plaintiffs must allege

actual malice. It is well settled that "a public official or public figure cannot recover damages for

a defamatory falsehood ... unless he proves that the statement was made with actual malice—

that is, with knowledge that it was false or with reckless disregard of whether it was false or not."

*CACI*, 536 F.3d at 293 (quoting *Sullivan*, 376 U.S. at 279–80 (brackets and internal quotation

marks omitted)). Cartner argues that Plaintiffs are, at the very least, limited-purpose public

figures and therefore should be subject to the actual malice standard.

a)  *Are Plaintiffs Limited-Purpose Public Figures?*

In certain circumstances, the Constitution treats private citizens, who are not otherwise

public figures, as public figures for the purpose of comment on a *particular* public controversy.

---

[8] This same ruling applies to the defamation claims against TME.

*See, e.g.*, *Hutchinson v. Proxmire*, 443 U.S. 111, 134–35 (1979); *Wolston v. Reader's Digest Assoc.*, 443 U.S. 157, 164–68 (1979); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974) (describing limited-purpose public figures as those who "have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved"). Whether a defamation plaintiff is a "limited-purpose public figure" is an issue of law for the Court. *Foretich v. Capital Cities/ABC, Inc.*, 37 F.3d 1541, 1551 (4th Cir. 1994).

The Fourth Circuit has set forth five factors to guide courts in this inquiry, including whether: "(1) the plaintiff had access to channels of effective communication; (2) the plaintiff voluntarily assumed a role of special prominence in a public controversy; (3) the plaintiff sought to influence the resolution or outcome of the controversy; (4) the controversy existed prior to the publication of the defamatory statements; and (5) the plaintiff retained public figure status at the time of the alleged defamation."[9] *Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 708–11 (4th Cir. 1991); *accord Fitzgerald v. Penthouse Int'l, Ltd.*, 691 F.2d 666, 668–70 (4th Cir. 1982).

Here, AdvanFort and the Farajallahs obviously had "access to channels of effective communication," as demonstrated by the numerous news articles that include statements of AdvanFort representatives. *See, e.g.*, Cartner's Mot., Ex. C at 1 (BBC News article citing and linking to AdvanFort statement asserting that Indian officials had allowed the vessel to enter an Indian port to refuel); Cartner's Mot., Ex. F at 2 (CBS News article stating "[i]n the statement released Monday, AdvanFort said the weapons and ammunition were registered and licensed to the company."); Cartner's Mot., Ex. H at 2 (Fox News article including statement from AdvanFort president that weapons on board vessel were legal and registered). Their multiple press releases and official statements to international news media belie any attempt by Plaintiffs

---

[9] The second and third factors are generally combined to ask "whether the plaintiff ha[d] voluntarily assumed a role of special prominence in a public controversy by attempting to influence the outcome of the controversy." *Reuber*, 925 F.2d at 709 (citing *Fitzgerald*, 691 F.2d at 668).

to deny that they "assumed a role of special prominence in a public controversy by attempting to influence the outcome of the controversy." *Reuber*, 925 F.2d at 709.  The Complaint itself even alleges that "AdvanFort, including the Farajallahs, assembled a crisis reaction team that worked round the clock to address the matter . . . ." Compl. ¶ 27.  With respect to the fourth factor, the public controversy—the Indian government's detaining of the Ohio and arrest of its crew members—clearly occurred before the publication of the Article.  And finally, Plaintiffs unquestionably retained public-figure status at the time of the alleged defamation, as the Ohio controversy was still ongoing months after the Article was published. *See, e.g.*, Cartner's Mot., Ex. X, Gary Howard, *AdvanFort President Quits, 35 Guards Remain in Indian Prison*, Seatrade Global (Mar. 10, 2014), http://www.seatrade-global.com/news/americas/advanfort-president-quits-as-35-guards-remain-in-indian-prison.html.

Accordingly, based on the allegations in the Complaint as well as the numerous news articles of which the Court may take judicial notice,[10] Plaintiffs are at the very least limited-purpose public figures and thus subject to the actual malice standard with respect to their defamation claims.

### b) *Have Plaintiffs Sufficiently Alleged Actual Malice?*

Cartner argues that the Complaint fails to allege specific facts to support an allegation of actual malice.  Cartner's Mot. 15 (citing *e.g.*, *Young v. City of Mount Ranier*, 238 F.3d 567, 577 (4th Cir. 2001) ("[T]he original complaint throws in words and phrases such as 'deliberate indifference,' 'malicious,' 'outrageous,' and 'wanton' . . . . The presence, however, of a few conclusory legal terms does not insulate a complaint from dismissal under Rule 12(b)(6) . . . .")).  Although they dispute being required to do so, Plaintiffs claim that they nevertheless have

---

[10] A court may take judicial notice of newspaper articles at the motion to dismiss stage when the articles discuss the subject matter of the case. *See, e.g.*, *Plymouth Cnty. Retirement Ass'n v. Primo Water Corp.*, 966 F. Supp. 2d 525, 536–37 (M.D.N.C. 2013); *Farah v. Esquire Magazine*, 736 F.3d 528, 534 (D.C. Cir. 2013) ("Judicial notice is properly taken of publicly available historical articles such as were attached to *Esquire*'s motions to dismiss.").

adequately alleged actual malice. Pls.' Opp'n to Cartner's Mot. 12 (citing Compl. ¶¶ 48, 50, 53–54, 98).

When a plaintiff is required to plead actual malice, this Court has found that "conclusory allegations regarding the [defendants'] intent ... are insufficient to survive a motion to dismiss." *E.g.*, *Zhang v. Regan*, 1:10-cv-1329, 2011 WL 1456188, at *8 (E.D. Va. Apr. 14, 2011); *accord Besen v. Parents & Friends of Ex-Gays, Inc.*, No. 3:12-cv-204, 2012 WL 1440183, at *5–7 (E.D. Va. Apr. 25, 2012) ("Setting aside Plaintiff's legal conclusions, this Court cannot reasonably infer from the scant facts alleged that [the defendant] was aware of the probable falsity of his statements about [the plaintiff]." (citation, brackets, and internal quotation marks omitted)). This Court's decision in *Echtenkamp* is instructive. In that case, the Court held that the "plaintiff's repeated assertions that each defendant charged with defamation acted 'with malice' and with 'motive of personal spite and revenge' are not, by themselves, sufficient to state a claim." *Echtenkamp*, 263 F. Supp. 2d at 1062. The Court ultimately found, however, that the plaintiff had sufficiently pled actual malice based on her allegation of "a general pattern of retaliation against plaintiff and a larger conspiracy among the defendants to discredit plaintiff through false statements and unfounded disciplinary actions." *Id.*

Here, the paragraphs cited by Plaintiffs that supposedly satisfy the actual malice pleading requirement are nothing more than legal conclusions. Indeed, the allegation that the Article was "motivated by personal spite, or ill-will and a desire to hurt ... the Plaintiffs" is identical to the deficient allegation in *Echtenkamp*. *Compare id. with* Compl. ¶ 48. There are, however, *other* allegations in the Complaint that allow this Court to "reasonably infer" that Cartner "was aware of the probable falsity of his statements . . . ." *Besen*, 2012 WL 1440183, at *6 (citing *Ryan v. Brooks*, 634 F.2d 726, 732 (4th Cir. 1980)). For instance, Plaintiffs allege that "[a]s part of its crisis response, AdvanFort enlisted the services of John Cartner as counsel." Compl. ¶ 33. It

18

further alleges that "[a] dispute arose approximately eleven days [after retaining Cartner] as to the nature and quality of the legal services provided by Cartner, who billed the Company $28,640 for less than two-weeks' worth of legal services . . . ." *Id.* ¶ 36.  As a result of the fee dispute, AdvanFort registered a bar complaint against Cartner, "which remains pending." *Id.* ¶ 37.  These allegations certainly permit a reasonable inference that Cartner acted out of personal spite and ill will towards Plaintiffs when he wrote the allegedly defamatory Article about his former clients. *See id.* ¶ 45.  Because the Court finds that Plaintiffs have sufficiently alleged actual malice, they have stated claims of defamation and defamation *per se* against Cartner for the actionable statements listed above.  Cartner's motion to dismiss the defamation claims against him will therefore be granted in part and denied in part.

### D. *Tortious Interference Claims Against Cartner*

Cartner has also moved to dismiss the tortious interference claims against him for failure to state a claim.  Specifically, he argues that "Plaintiffs have failed to adequately allege 1) the existence, the parties, or the terms of any specific legally protected contract or business expectancy; and 2) any intentional misconduct to support their tortious interference claims." Cartner's Mot. 18.  As discussed above with respect to the tortious interference claims against IRI,[11] Plaintiffs have failed to allege the existence of any *specific* contractual relationship or business expectancy with which Defendants have allegedly interfered.  As currently pled, then, Plaintiffs have not met the first element of their tortious interference claims.

Unlike their claims against IRI, however, Plaintiffs *have* adequately alleged the second element of their tortious interference claims against Cartner—his knowledge of the contracts or expectancies.  Although Plaintiffs make the conclusory assertion that "Cartner had knowledge of these contracts," there are plenty of facts elsewhere in the Complaint that raise a reasonable

---

[11] The allegations against IRI are identical and grouped together with those against Cartner. Compl. ¶¶ 108–25.

inference that he was aware of Plaintiffs' specific contracts and customer base. Compl. ¶ 110. Specifically, Plaintiffs allege that "[e]-mail correspondence between the Defendant Cartner and Mr. Watson [AdvanFort's then-President] dated November 11, 2013 reveal that Cartner solicited Watson during Watson's tenure at AdvanFort and indicate that the two engaged in discussions and made plans to go into business together." *Id.* ¶ 83. This communication occurred during the crisis involving the Ohio, and only a month before Mr. Watson resigned from AdvanFort. *See id.* ¶¶ 81, 83. Additionally, Plaintiffs allege that the two "appear to be currently working together at a firm called Gulf Coast Maritime, LLC ("GGM") which provides consulting 'in maritime consulting, security, training, intelligence operations, and information security.'" *Id.* ¶ 84. These allegations are sufficient to establish the plausibility of Cartner's knowledge of the contracts and expectancies with which he has allegedly interfered given that he communicated and later went into business with AdvanFort's then-President, who surely would have intimate knowledge of these details. Plaintiffs have thus met the pleading requirements for the second element of their tortious interference claims against Cartner.

Lastly, Cartner argues that Plaintiffs have not sufficiently alleged that he engaged in improper methods. This is plainly not the case, as Plaintiffs have alleged his tortious conduct via their defamation claims. Accordingly, although the first element of the tortious interference claims against Cartner has not been met, the Court will allow Plaintiffs the opportunity to cure the defect. Cartner's motion will therefore be granted and the tortious interference claims dismissed without prejudice.

### E. *Defamation Claims Against TME*

TME has advanced several reasons why the claims against it should be dismissed, including lack of personal jurisdiction, insufficient service of process, the statute of limitations, and preclusion of the claim by the Communications Decency Act ("CDA"). Because the Court

20

concludes that the statute of limitations and the CDA bar the claims until Plaintiffs take further action, it will limit its inquiry to those segments of TME's motion.

i.   Statute of Limitations

TME asserts that Plaintiffs' defamation claims against it are time-barred under Virginia's one-year statute of limitations.[12] Va. Code. Ann. § 8.01-247.1. In Virginia, a cause of action for defamation arises on the date of publication. *Hatfill v. N.Y. Times Co.*, 416 F.3d 320, 334 (4th Cir. 2005) (citing *Jordan v. Shands*, 255 Va. 492, 497–98 (1998)). In this case, the Article was published on January 6, 2014, but the instant Complaint was not filed until January 20, 2015.

Plaintiffs argue that their claims are not time barred because they were effectively tolled pursuant to Va. Code Ann. § 8.01-229(E)(3), which provides as follows:

> If a plaintiff suffers a voluntary nonsuit as prescribed in § 8.01-380, the statute of limitations with respect to such action *shall be tolled by the commencement of the nonsuited action, and the plaintiff may recommence his action within six months from the date of the order entered by the court,* or within the original period of limitation, or within the limitation period as provided by subdivision B 1, whichever period is longer. This tolling provision shall apply irrespective of whether the action is originally filed in a federal or a state court and recommenced in any other court, and shall apply to all actions irrespective of whether they arise under common law or statute.

The Fourth Circuit has observed that this provision only permits the statute of limitations to be tolled if the nonsuit order is entered *before* the filing of the new complaint. *Payne v. Brake*, 439 F.3d 198, 202 (4th Cir. 2005) ("Payne failed to obtain a nonsuit order from the court as required by Virginia law to toll the statute of limitations."); *see also Hatfill*, 416 F.3d at 334 ("Hatfill filed a lawsuit in state court on June 18, 2003; took a nonsuit on March 9, 2004; and commenced this

---

[12] Cartner, the other defendant charged with defamation, has waived the statute of limitations defense, as it was not raised in his first responsive pleading. *Eriline Co. S.A. v. Johnson*, 440 F.3d 648, 653–54 (4th Cir. 2006). His waiver was apparently based on an agreement with Plaintiffs. Pls.' Opp'n to TME's Mot. Dismiss 10 n.3.

action in federal court on July 13, 2004. Thus, the one-year statute of limitations was tolled as of June 18, 2003.").

Here, Plaintiffs filed two complaints in state court—a complaint dated January 5, 2015 naming TME as the sole defendant and the instant Complaint that was later removed to this Court, filed on January 20, 2015. Plaintiffs admit that the January 5th complaint "is still pending in Fairfax Circuit Court." Pls.' Opp'n to TME's Mot. Dismiss 10. As a result, no non-suit order exists as required by Virginia law to toll the statute of limitations *in this case*. Further, Plaintiffs cannot correct the problem now by non-suiting the January 5th complaint because under Virginia Code Ann. § 8.01-229(E)(3), the second complaint must be filed *after* the non-suit.

To properly toll the statute of limitations for their claims against TME, Plaintiffs must obtain a non-suit order from the state court in the related action against TME, and then file a new action in either state or federal court. Until they do so, Plaintiffs' claims are time barred. Accordingly, the Court will dismiss the claims against TME without prejudice to allow Plaintiffs to obtain a non-suit order in the other case and then refile its action.

ii.  Communications Decency Act

TME has also argued that Section 230 of the CDA bars Plaintiffs' defamation claims against it. That section provides that "[n]o provider or user of an interactive computer service shall be treated as the *publisher or speaker* of any information provided by another information content provider." 47 U.S.C. § 230(c)(1) (emphasis added). In plain language, the statute "precludes plaintiffs from holding interactive computer service providers liable for the publication of information created and developed by others." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 252 (4th Cir. 2009). "Specifically, § 230 precludes courts from entertaining claims that would place a computer service provider in a publisher's role. Thus, lawsuits seeking to hold a service provider liable for its exercise of a publisher's

22

traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content—are barred." *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997). "To further the policies underlying the CDA, courts have generally accorded § 230 immunity a broad scope." *Consumeraffairs.com*, 591 F.3d at 254.

Congress has defined the term "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." 47 U.S.C. § 230(f)(2). In a recent opinion, the Sixth Circuit held that interactive computer service providers include "broadband providers, hosting companies, and *website operators* . . . ." *Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 406 n.2 (6th Cir. 2014) (emphasis added). In light of these principles, it appears that TME is an "interactive computer service" because it is both a website operator and "enables computer access by multiple users to a computer server." *DiMeo v. Max*, 248 F. App'x 280, 282 (3d Cir. 2007); *accord Jones*, 755 F.3d at 406 n.2; Compl. ¶ 43 (stating that TME "maintains a website where it published articles and information").

Despite meeting the statutory definition of an "interactive computer service provider," TME may nevertheless remain outside the scope of CDA's immunity if it also functions as an "information content provider." *Consumeraffairs.com*, 591 F.3d at 254. The statute defines "information content provider" as "any person or entity that is *responsible, in whole or in part, for the creation or development of information* provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3) (emphasis added).

The most recent court of appeals to discuss the extent of "information content provider" liability was the Sixth Circuit in *Jones*. In that case, the court surveyed the decisions of its sister

23

circuits to "provide a workable measure of 'development' that not only preserves the broad

immunity the CDA provides for website operators' exercise of traditional publisher functions but

also highlights the limited circumstances under which exercises of those functions are not

protected." *Jones*, 755 F.3d at 410. It went on to hold that "'development' ... means something

more involved than merely displaying or allowing access to content created by a third party." *Id.*

Thus, even a website operator that edits third-party content by correcting spelling, adding

headnotes, removing obscenity, or trimming down for length does not lose its CDA immunity

unless it *"contributes materially to the alleged illegality of the conduct*." *Id.* at 410–13

(emphasis added) (quoting *Fair Hous. Council of San Fernando Valley v. Roommates.Com,*

*LLC,* 521 F.3d 1157, 1167–68 (9th Cir. 2008) (en banc)). The Sixth Circuit ultimately adopted

the "material contribution test" from *Roommates*, citing the Fourth and Tenth Circuit's

application of the test "with instructive effect." *Id.* at 412–13 (citing *Consumeraffairs.com*, 591

F.3d at 257–58; *F.T.C. v. Accusearch Inc.*, 570 F.3d 1187, 1200–01 (10th Cir. 2009)).

Here, TME asserts that Plaintiffs have failed to allege that it was an "information content

provider" and, as a result, it is immune from liability under the CDA. In support thereof, it cites

Plaintiffs' allegations that "Cartner authored" the Article, "which was published on [TME's]

website." Compl. ¶ 45. TME also maintains that, because they concede that TME did not author

the Article, Plaintiffs were also "required to plead facts to show any alleged drafting or revision

by [TME] was something more than a website operator performs as part of its traditional

editorial function," *i.e.*, some sort of material contribution to the defamatory content.

*Consumeraffairs.com*, 591 F.3d at 258 (4th Cir. 2009).

Plaintiffs contend that they have pled enough facts to support a plausible inference that

TME is responsible for the creation or development of the Article. They point specifically to the

allegations that the Article was labeled an "exclusive," and that TME "publishes articles and

24

information" on its website. Compl. ¶¶ 43–47. The Court finds that these allegations are insufficient, by themselves, to support a reasonable inference that TME was at least partly responsible for the creation or development of the Article. With additional allegations, such as those contained within Plaintiffs' briefing but not alleged in the Complaint, Plaintiffs will perhaps be able to overcome this pleading hurdle. For instance, if TME paid Cartner to write the Article, or has paid him in the past,[13] an allegation to that effect might support a reasonable inference that TME was in part responsible for creating the Article or materially contributing to its alleged unlawfulness. Because it is not clear from the Complaint as currently pled that TME is outside the scope of CDA immunity, however, the Court will dismiss the defamation claims against TME without prejudice on this basis as well.

## IV. Conclusion

Due to the Complaint's multiple pleading deficiencies, IRI's motion to dismiss will be granted with prejudice. For the same reason, but especially because Plaintiffs cannot plausibly allege that IRI is a competitor, there is no possibility of Plaintiffs' succeeding in their claims against IRI. Their motion to remand will accordingly be denied.

With respect to the defamation claims, statements labeled c, d, e, and f are actionable, and therefore Cartner's motion to dismiss will be denied as to those statements. Regarding the tortious interference claims against Cartner, Plaintiffs have failed to allege the specific contracts he allegedly interfered with. Because this defect can likely be cured if allowed to amend, Cartner's motion will be granted and the claims dismissed without prejudice.

And finally, because Plaintiffs have not yet obtained a non-suit order from the state court on their first complaint, the Virginia statute of limitations tolling provision does not apply to the

---

[13] This seems likely given that Cartner is a frequent editorial contributor to the website and even hosts an "Internet TV series known as 'Conversations with Cartner,' a weekly video and blog discussion on maritime industry issues of the day." *E.g., [Op-Ed] [Watch] John A.C. Cartner on Recent Iranian Actions*, THE MARITIME EXECUTIVE (May 5, 2015, 4:24 PM), http://www.maritime-executive.com/article/john-ac-cartner-on-recent-iranian-actions.

defamation claims against TME. Moreover, as currently pled, these claims are barred by the

CDA. The Court will therefore grant TME's motion and dismiss the claims without prejudice to

allow Plaintiffs to seek a non-suit order in the other case and then refile its action against TME.

An appropriate Order shall issue.

May 12, 2015

Alexandria, Virginia

/s/
Liam O'Grady
United States District Judge