**V I R G I N I A :**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## ALEXANDRIA DIVISION

| | |
|---|---|
| ADVANFORT COMPANY, et al. ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | CA. NO. 1:15:cv-220 (LO)(IDD) |
| ) | |
| JOHN A.C. CARTNER, ) | |
| ) | |
|  -and- ) | |
| ) | |
| THE MARITIME EXECUTIVE LLC, ) | |
| ) | |
| Defendants. ) | |
| ) | |

### FIRST AMENDED COMPLAINT

For their complaint against the Defendants, John A. C. Cartner and The Maritime Executive LLC, Plaintiffs AdvanFort Company, AdvanFort International Inc., Samir Farajallah and Ahmed Farajallah allege and aver as follows:

### I.       PARTIES, ENTITIES AND JURISDICTION

1.      Plaintiff, AdvanFort Company, is a District of Columbia Corporation with its principal place of business in Virginia.  Its corporate headquarters are currently located at 13800 Coppermine Road, Third Floor, Herndon, Virginia 20171 and were previously located at 13755 Sunrise Valley Drive, Seventh Floor, Herndon, VA 20171.

2.      Plaintiff, AdvanFort International Inc., is a Delaware Corporation.  Its address is 16192 Coastal Highway, Lewes, DE 19958.

3.      Both AdvanFort Company and AdvanFort International Inc. (hereinafter, "AdvanFort") have been engaged in the business of providing world class global security solutions and offered a wide range of protective services to safeguard people, assets and properties.  AdvanFort specialized in, among other things, maritime, port and terminal security and government relations consulting.  It also has provided Counter-Piracy Solutions including fully equipped escort and protective forces to protect vulnerable vessels and crew, specifically in the Gulf of Aden.  It is what is referred to in the maritime industry as a private maritime security company ("PMSC.")

4.      Plaintiff, Samir Farajallah, is an owner and Chief Executive Officer ("CEO") of AdvanFort Company and AdvanFort International Inc. and a resident of Dubai, United Arab Emirates.

5.      Plaintiff, Ahmed Farajallah, is the son of Samir Farajallah and the Business Development Manager for the AdvanFort Companies.  Ahmed Farajallah is a resident of the Commonwealth of Virginia who resides in Fairfax County, Virginia.

6.      Defendant Maritime Executive LLC (hereinafter, "The Maritime Executive" or TME) is a publishing company that publishes an industry trade journal, newsletters and maintains a website and is located at 3200 South Andrews Avenue, Suite 100, Fort Lauderdale, Florida 33316.

7.      Defendant, Dr. John A. C. Cartner (hereinafter, "Cartner"), is a UK and US maritime lawyer and author who offers legal services in matters of shipping and transport with the admiralty jurisdiction in international and U.S. venues.  He is a resident of Beaufort, North Carolina.

8.      Non-party, International Registries Inc., (hereinafter, "IRI") is a corporation incorporated under the laws of the Commonwealth of Virginia, with its principal place of business at 11495 Commerce Park Drive, Reston, Virginia 20191.

9.      IRI is a privately administered ship and corporate registration firm.    IRI administers the maritime and corporate programs of the Republic of the Marshall Islands (hereinafter, "RMI") and is responsible for its vessel registrations worldwide.

10.     This Court has jurisdiction over this matter because there is diversity of citizenship among the remaining parties and adverse claimants within the meaning of 28 U.S.C. § 1332, and because the amount in controversy exceeds $75,000.00[1].

11.     This Court has jurisdiction over the Defendants pursuant to § 8.01-328.1 as the actions of both of the Defendants caused tortious injury in this Commonwealth and both of the Defendants  engaged in and engage in business in the Commonwealth of Virginia.  For example, Cartner performed work for and provided services, including legal services, to AdvanFort in the Eastern District of Virginia for which he received some payment.  Cartner and TME also caused a defamatory article to be published in Virginia and elsewhere outside of Virginia, and such defamation caused injury in Virginia and elsewhere.  Further, the article was targeted to do harm to Plaintiffs in Virginia and elsewhere.  On information and belief, Cartner also engaged in and transacted and regularly solicited other business in Virginia.   TME directs electronic activity into the state with the intent of engaging in business in the state and that activity created a cause of action in Virginia.  TME transacts business in the state, and intentionally directed tortious conduct toward the Plaintiffs, knowing that that conduct would cause harm to Plaintiffs in Virginia.  TME's print and digital editions are sold on the web and made available to customers

---

[1] The original Defendants removed this matter to Federal Court.  Plaintiffs allege diversity because the Court dismissed the non- diverse Defendant, International Registries, Inc. (hereinafter "IRI.")

in Virginia and, on information and belief, its newsletter is distributed to Virginia Customers. Additionally, Cartner regularly appears on Maritime TV, (http://maritimetv.com) through a video program titled, "Conversations with Cartner." The program is produced and distributed through TVWordwide.com, Inc., a Delaware Corporation with its principal place of business in Chantilly, Virginia.

12.     Venue is proper in accordance with Va. Code § 8.01-262 as part of the harm occurred in the Eastern District of Virginia.

## II.     FACTS

### A.  Background and Publication of the Defamatory "Exclusive" Article

13.     The Plaintiff AdvanFort Companies ("AdvanFort") are global providers of security solutions for commercial shipping on land, sea and air as well as for government, private port and terminal operations.

14.     AdvanFort was a signatory to the International Code of Conduct (ICoC) for Private Security Providers.

15.     AdvanFort also obtained ISO 9001:2008 certification for its quality management systems.

16.     As part of its business, AdvanFort maintained a number of long endurance speed boats and ships.

17.     Plaintiff Samir Farajallah and Plaintiff Ahmed Farajallah (hereinafter, collectively "the Farajallahs") have substantial involvement in the operations of AdvanFort, (collectively, "the Plaintiffs.")

18.     The MV Seaman Guard Ohio is a special purpose patrol vessel that was operated by AdvanFort as part of its maritime security services.

19.     On or about October 11, 2013, Typhoon Phailin, the second-strongest typhoon to ever to make landfall in India and measured to have the equivalent strength of a category five hurricane, developed over the Indian Ocean.

20.     Battered by wind and turbulent seas, AdvanFort's vessel, the MV Seaman Guard Ohio, which had been operating in international waters, ran low on fuel and anchored off the Coast of India to escape the effects of the typhoon.

21.     The vessel requested permission from the Indian Coast Guard to come into port to refuel, but the request was denied, and the ship was forced to buy a small amount of fuel from a private broker to get the vessel to port in another country – a transaction later alleged to violate India's Essential Commodities and Control Act as the vendor was alleged to lack proper permits and documentation.

22.     After communications with the Indian Coastguard, the vessel was directed to Tuticorin port in the Indian state of Tamil Nadu.

23.     On or about October 12, 2013, the Seaman Guard Ohio and its thirty-five (35) crew members were then lured into Indian waters and detained by the Indian Coast Guard.

24.     As part of its anti-piracy mission, the crew of the vessel was equipped with uniforms, protective equipment, medical kits, rifles and ammunition, which were properly possessed by and used by AdvanFort, for their security work.

25.     Upon boarding the vessel, the Indian Coast guard seized approximately thirty five (35) non-automatic weapons and accompanying rounds of ammunition.

26.     On or about October 18, 2013, instead of only detaining the Captain, thirty-three (33) members of the crew were formally arrested and taken to a Puzhal prison in Chennai, India while two crew members were left behind to mind the ship, though they too were later arrested.

27.     Also on or about October 18, 2013, AdvanFort retained a highly regarded law firm which specialized in maritime and admiralty law in India. Defendant Cartner was aware of the hiring of this law firm. On or about October 21, 2013, Cartner was included in strategy discussions with Indian counsel. Cartner was also tasked with monitoring this counsel.

28.     Approximately two months later, on or about December 20, 2013 a First Initial Report ("FIR") was filed against the crew for alleged violations of India's Arms Act.

29.     Upon seizure of the vessel and crew by Indian authorities, AdvanFort, including the Farajallahs, assembled a crisis reaction team that same day which worked round the clock to address the matter and to secure the release of the vessel and crew. AdvanFort also promptly took steps to retain and did retain legal counsel, including counsel in the United Kingdom and India.

30.     AdvanFort also flew its country manager for India to India. He arrived the day after the vessel's detention.

31.     Mr. Chako Thomas, the country manager for India, then stayed in the city to serve as a liaison between the authorities, the crew, their families and various embassies.

32.     AdvanFort also flew in its President of Operations to help address the crisis and kept its United Kingdom office open twenty four hours a day to respond to and better liaise with the Foreign Ministry and different embassies in India and address family members' concerns.

33.     Indian officials, however, denied repeated requests by representatives of AdvanFort for permission to visit the crew in prison.

34.     Several attempts to secure bail by AdvanFort's counsel were also unsuccessful.

35.     On or about October 15, 2013, Defendant Cartner was asked to join AdvanFort at a press conference about the Seaman Guard Ohio's detention at the National Press Club.

Throughout this process, Cartner was kept informed and apprised of breaking developments and was actively involved in assisting in addressing the crisis.

36.     On October 17, 2013, in an e-mail commenting on proposed press releases, Cartner urged that the company assert a "strong and simple message, … "[w]e have done nothing illegal, we will do nothing illegal, we have not been charged, we have cooperated in any investigation fully, and we have committed no offense."

37.     As part of its crisis response, on or about October 21, 2013, AdvanFort formally retained Defendant John Cartner as legal counsel.  Cartner is a self-described specialist in admiralty law who also had served in an advisory capacity to AdvanFort.

38.     Cartner advised AdvanFort to retain an English firm with ties in India to address the local Indian matters as well as another law firm to serve as local counsel. The Farajallahs agreed and directed Cartner to find such firms and counsel.  AdvanFort then retained the services of Ince & Company, one of the leading shipping law firms in the world, in London and Mr. Stephen Askins, Esquire.  Cartner was aware of the retention of Askins to assist in legal efforts to free the detained crew.  Cartner was also aware of the retention of local counsel in India and the law firm of Singhania and Company, advocates and solicitors.  Cartner commented on briefs written by counsel on October 21, 2013, the day of his retention by AdvanFort.  Ince and Askins and Singhania and Company worked diligently at the direction of AdvanFort to secure bail for the 35 detained officers and crew, including working with counsel in India.  Cartner was copied on correspondence with Indian counsel and was aware of their efforts to secure bail, medical aid and food and meet with the detained men.

39.     On or about October 17, 2013, Cartner was made aware of AdvanFort's various efforts including diplomatic efforts to secure release for the detained vessel and crew.

40.     On or about October 21, 2013, Cartner and AdvanFort exchanged emails regarding the hiring of Cartner as an attorney.  When asked if he would lower his hourly rate, Cartner stated "no" and that he does "the work of three for that rate and for these matters, without any boasting, I am the best in the business."

41.     AdvanFort agreed to hire Cartner.  On or about October 21, 2013, Cartner sent AdvanFort an engagement letter, identifying Samir Farajallah as the client.  The engagement letter specified that neither William H. Watson, AdvanFort's President at the time, nor Samir Farajallah's son, Ahmed, were liable for the fees.

42.     During his engagement on October 22, 203, Cartner drafted or helped in drafting the following message on behalf of the Company to be sent to the family of detained crewmembers: "AdvanFort is working diligently and around the clock with the best lawyers in the world specializing in these kinds of things in India and in the United States and elsewhere to bring these matters to a satisfactory conclusion."

43.     Cartner also wrote of the Seaman Guard Ohio situation in an article for AdvanFort's Piracy Daily publication on October 18, 2013 that "[t]he master and officers and crew were not mercenaries but a lawfully operated armoury ship with weapons and ammunition on board."  Cartner took an active role with regard to public relations, media inquiries, press releases, and offered to write "regularly and frequently" on behalf of AdvanFort and "to publicize the key [articles] on maritime TV and use his 500,000 [person] mailing list."

44.     On October 25, 2013 Cartner also advised AdvanFort that the provisions of the Arms Act did not apply to "arms or ammunition on board any seagoing vessel or aircraft and forming part of the ordinary armament or equipment of such vessel or aircraft."

45.     On or about October 25, 2013 Cartner advised the CEO and President of the Company that "[i]t appears that the government is now looking for new charges for the men. This is called 'piling on' in the US law and is the tactic of a prosecutor to make it as difficult as possible for defensive actions to be successful."

46.     On or about November 3, 2013, Cartner emailed an invoice for legal services related to the Seaman Guard Ohio.

47.     In the invoice, Cartner listed his alleged hours and hourly rate and billed a total of $28,640.00.

48.     In bold below the total, Cartner's invoice stated that it was "Payable net 30 days…per agreement with and promise of Mr. Watson confirmed without demurrer.  Please note that legal fees place a maritime lien on the vessel M/V Seaman's Guard Ohio under the laws of the Republic of India and the United States of America and the republic of Sierra Leone, which lien will be enforced for failure to pay…"

49.     On or about November 5, 2013, Cartner emailed Watson and inquired, in a derogatory and demeaning fashion, "how is it going today?   Any movement from our sheikh?", referring to Mr. Farajallah.

50.     On or about November 11, 2013, Cartner emailed Watson, the subject of which appeared to be the discussion of setting up a business which included providing consulting services for "the vetting of routes and dangers" related to maritime shipping.

51.    On November 12, 2013, at 9:56 a.m., Cartner emailed Watson with the subject line stating 'withdrawal." Cartner stated, "sorry about the abruptness of the withdrawal. I am sensing and I am hearing that Sam is incapable of pulling this out. On counsel, I am withdrawing because I do not want to be mired in the fallout of the matter later. I hope you understand. I am still available of course to whisper in your ear."

52.    On November 12, 2013, at 5:07 p.m., Cartner emailed Watson and Samir Farajallah that he was withdrawing because he had not received a signed copy of the engagement letter.

53.    On November 22, 2013, Cartner sent wiring instructions for the payment of his invoice.

54.    On November 26, 2013, AdvanFort emailed Cartner and stated that they were "disappointed and saddened" to see the language in his letter [invoice] concerning the placing of maritime liens. AdvanFort further stated that "we have always given you the priority as matter of fact the only person to promote and to invite to any event and in these times of need where the company and its people have been hit and paralyzed we relied on our friend to stand next to us. Would you please send us the reports and briefings on the research done as per your invoice?"

55.    A dispute then arose between the Plaintiffs and Cartner, as to the nature and quality of the legal services provided by Cartner. Cartner billed the Company $28,640.00 (Twenty Eight Thousand Six Hundred Forty Dollars) for less than two-week's worth of legal services but initially refused to provide further itemization for the charges upon request.

56.    The relationship between Cartner and the Plaintiffs continued to deteriorate, and Cartner threatened his former clients with negative and harmful publicity several times during the discussions that ensued. In correspondence over the disputed fees, Cartner wrote on

December 23, 2013:  "It is … my practice to publicly announce suits that I have filed in the maritime press and by e-mail to the maritime industry worldwide and the reasons therefore.  As you are aware, the filing of lawsuits is public information which should rightly be disseminated to persons who may have business of this nature."

57.     Cartner also wrote to his former client, Samir Farajallah, in what appeared to be a not so subtle threat:  "Sir, It is now being discussed that your company's liability insurance has been cancelled.  This may become a matter of wide public knowledge in the next few days."

58.     On or about January 7, 2014, the day after the Article was published, Cartner wrote an email to AdvanFort and Samir Farajallah, with the clear intention to threaten and intimidate them, in which he stated, "I have prepared and will file in Manila, Dubai, Chennai and Washington a cause against you personally as well as your entities and your son for the outstanding amount you owe and ask for attorney fees for collection as well as interest from December 1, 2013.  Further, I will declare publicly that the suit has been filed and the reasons therefore and will join additional plaintiffs against you from time to time as the matter progresses.  I hold you personally responsible for this debt and I will collect for it.  Pay the bill in full by wire within 72 hours."

59.     The fee dispute was later submitted to arbitration through the District of Columbia Bar Association but subsequently withdrawn, and a bar complaint was registered by AdvanFort through other legal counsel against Cartner, which remains pending.

60.     The charge invoking the Arms Act against the crew of the M.V. Seamen Guard Ohio was ultimately dropped against all thirty-five (35) crew members, who were exonerated on July 10, 2014.  Only an administrative charge relating to the purchase of fuel from the alleged unauthorized vendor remained.

61.     The judge found that the ship had made a distress entry into Indian waters in search of food and fuel and had anchored outside of port where it awaited supplies.

62.     The only charges sustained were predicated upon India's Essential Commodities and Control Act for the illegal purchase of ten (10) drums of fuel for the distressed vessel by the Captain of the ship and the First Mate.

63.     The prosecution subsequently appealed the decision, which remains under appellate review.

64.     Defendant Maritime Executive LLC (the "Maritime Executive" or TME) is the largest business journal in the maritime industry.  According to its website, the journal distributes 28,000 copies six times a year to 127 countries.  On information and belief, TME regularly transacts business and solicits business in Virginia and provides its publications and electronic communications in Virginia.

65.     TME's newsletter is published five times a week and is sent to more than 60,000 subscribers. The publication claims to be the leading source of maritime news, jobs, events and industry analysis.

66.     TME also maintains a website where it publishes articles and information at http://www.maritime-executive.com.  These articles are available across the internet, including in Virginia, and on information and belief, TME has substantial numbers of members, or subscribers, or persons who access their website who view their materials in Virginia.

67.     All of TME's publications are targeted towards maritime industry leaders, high level professionals, executives and governmental personnel working in nautical services, many of whom work, on information and belief, in Virginia, including the Norfolk, Hampton Roads and Virginia Beach areas.

68.    TME's website boasts that it provides "original editorial content to more than 325,000 people worldwide."

69.    The website also indicates that "[o]ur timely articles and thought-provoking editorials have become the standard for business executives and government leaders around the world."

70.    According to the CEO of TME, TME has an editorial staff that reviews articles before they are posted.

71.    On information and belief, all TME's content on its published web site is reviewed and approved by their editorial staff prior to posting.

72.    Unauthorized third party users do not have the ability to modify the content of the website without permission other than in the comment sections.  The website, in other words, is "read only."

73.    The publisher, TME, thusly, is responsible in whole or in part for the creation or development of the information it publishes on its website.

74.    Cartner has enjoyed a long and productive relationship with TME, which dates back to the 1990s.  As will be described in more detail, Cartner wrote many articles, book reviews and white papers that were published by TME.

75.    These articles include a May 9, 2011 article entitled, Change in SOLAS to Suppress Piracy available at   http://www.maritime-executive.com/article/call-for-changes-to-solas-to-suppress-piracy-at-sea.

76.    On October 16, 2013 TME also published an article entitled, Captain Phillips Defended    Against    Frivolous    Lawsuits,    available    at    http://www.maritime-executive.com/article/Captain-Richard-Phillips-Defended-Against-Frivolous-Lawsuit-2013-10-

16 authored by Cartner. TME also published a book review in the May June print edition in 2010, and a September 11, 2013 Whitepaper on Ten Points to Rationalize and Restart the U.S. Maritime Industry along with many other pieces by Cartner.

77. Cartner also spoke on numerous occasions as a panelist on presentations sponsored or hosted by TME and appeared on several of the publications webcast including a January 11, 2013 Webcast on Maritime TV on Pirate Mitigation Strategies, and on Piracy off the Coast of West Africa on September 23, 2013.

78. Some of these presentations involved panels on which TME participated.

79. On or about January 6, 2014, Cartner authored an article about his former clients as an "exclusive," which was published on the Maritime Executive website. The piece was entitled, "Self- Described AdvanFort 'Billionaire' may not be."

80. The relationship between Cartner and TME, likely was, on information and belief, a contributing factor in TME's decision to publish Cartner's article, especially as an "exclusive."

81. On information and belief, TME had the opportunity to review and edit the article and may have made edits. TME also had the opportunity to contact AdvanFort to verify the article or seek comment and did not do so.

82. TME and Cartner's article did not contain any disclaimers that the content was not created by the TME or that the opinions and representations expressed therein were not those of the publisher.

83. Cartner did not identify the subjects of the article as having been former clients nor did he disclose his previous position as an AdvanFort advisor.

84.     In industry terms, an "exclusive" signifies that the publisher is the first one to publish the story, which can be copyrighted, and other news organizations must seek permission to re-print it.  It also signifies that an article is of great importance or interest.

85.     The article contains many false and defamatory statements about AdvanFort and the Farajallahs and was written and published with actual malice by Cartner, that is, with knowledge of their falsity, and was motivated by personal spite, or ill-will and a desire to hurt one or more of the Plaintiffs.

86.     The article was also maliciously targeted to the maritime community, especially by Cartner, who had previously threatened his former clients with damaging and negative publicity in the past.  The article was written and published so as to lower the estimation of Plaintiffs in their professional community and to deter third parties from having dealings with the Farajallahs and AdvanFort.

87.     The publisher, TME is liable for Cartner's actual malice and under doctrine of agency and is vicariously liable for the action of its agent and for its own and reckless indifference and willful disregard of the truth as it failed to ascertain the veracity of the factual statements it published on its website.

88.     TME editors were familiar with AdvanFort and knew the company had previously published articles or white papers which described AdvanFort as a "maritime security leader."

89.     TME personnel also attended and covered many AdvanFort television programs, web cast and conferences at which Cartner was present as an AdvanFort advisor.

90.     TME also published previous articles regarding the detention of the Seaman Guard Ohio which quoted a protest letter from the  Sierre Leone Shipping Registry that indicated that the Indian Coast Guard   "is said to have acted to "illegally lure" the MV

SEAMAN GUARD OHIO, which was operating in international waters…and then … illegally boarding and searching the vessel and detaining and arresting the crew without the consent of the Government of Sierra Leone, and preventing the vessel's freedom of navigation."

91.     TME had also previously published interviews with U.S. Rear Admirals who had criticized the detention of the Seaman Guard Ohio as unlawful.

92.     TME, thus, possessed a high degree of awareness of the statements probable falsity and obvious reasons existed to doubt the veracity of the statements made in the article.

93.     The substance of the defamatory statements made the substantial danger to the Plaintiffs' reputations apparent and the vitriolic nature of the article and its personal attacks should have put the publisher on notice that the statements contained therein were likely false.

94.     TME's recklessness is evident where reasons existed to doubt the veracity of Cartner and the accuracy of his reports which TME knew or willfully disregarded, i.e. Cartner's past unsuccessful business relationship with AdvanFort and the Farajallahs.

95.     On information and belief, after the article was submitted, TME made no effort to ascertain the truth or validity of statements that were defamatory to the Plaintiffs.

96.     As a result of the defamatory statements published by TME and Cartner, the Plaintiffs have suffered tangible economic losses and substantial injury to their reputation and their business, from which they might never be able to recover.

**B.   Defendant Cartner's Tortious Interference with AdvanFort's Contracts and Business Expectancies**

97.     The Republic of the Marshall Islands ("RMI") is an island country located near the equator in the Pacific Ocean.

98.     The RMI Maritime Administrator (the "Administrator") has been delegated responsibility for performing various governmental functions on behalf of RMI including

administering all matters pertaining to vessels of RMI that are subject to the provisions of the Maritime Act (the "Maritime Act"), promulgating rules and regulations to carry out the provisions of the Maritime Act, and ensuring the seaworthiness of vessels registered under the laws of the Republic. The "Administrator" is represented by International Registries, Inc., a Virginia Corporation with its principal place of business in Reston, Virginia.

99.    The business function of IRI is to provide technical and administrative services to the Administrator.   The types of services that IRI provides to the Administrator include without limitation technical, investigative, documentation, registration, seafarer identification, marketing, communications, legal, and regulatory support.  IRI assists the Administrator in performing its government functions all over the world and wherever vessels seeking to be registered under RMI's flag may be located.

100.    Many of the management personnel of IRI are also officers of the Maritime Administrator of RMI.

101.    Under Maritime law, all vessel owners must be registered with a Flag State and carry insurance.  The requirements are similar to those for owning, insuring, and registering a car.  If a vessel is not registered with a Flag State, it cannot enter a port.

102.    According to the U.S. Department of Transportation, the RMI is the top vessel registry, accounting for 31 percent (31%) of all U.S.-owned vessels.

103.    Many vessels operating in High Risk Areas ("HRAs") where nautical piracy is common utilize Private Marine Security Company ("PMSCs") to protect their crew and valuable cargo.

104.    As a matter of common sense, vessel owners tend to use only approved PMSCs to avoid issues.

105.   The day following the publication of the Cartner/ TME article, on January 7, 2014, AdvanFort received a letter from the RMI Maritime Administrator indicating that "it was no longer permitted to provide security services to Marshall Islands registered vessels, effective immediately."

106.   Officials from IRI then informed AdvanFort's clients that AdvanFort had committed illegal acts which resulted in the ban, and customers of AdvanFort, whose vessels were flagged under RMI, were directed not to allow AdvanFort personnel on their vessels.

107.   IRI emailed all of its flagged ships and notified them of AdvanFort's termination and forbade them from using AdvanFort's services.

108.   AdvanFort's termination was improper and done without providing any reasons or providing proper notice to AdvanFort.   Nor was AdvanFort provided with a meaningful opportunity to respond to the allegations.

109.   Initial requests for information regarding and justifications for the termination were ignored for more than two months.  In subsequent discussions with IRI, the Company was never able to provide justification for the termination of AdvanFort.

110.   After multiple discussions, IRI reinstated AdvanFort on June 17, 2014.

111.   By the time AdvanFort was reinstated, however, it had lost a significant portion of its customer base.

112.   On information and belief, one or more persons at IRI read the Cartner article before IRI issued the termination notice.  Further, one or more persons at IRI knew and was on good personal terms with William H. Watson, AdvanFort's former president who had recently left AdvanFort.  Watson had a close personal relationship with Cartner, and on information and belief would have spoken with Cartner about IRI and Cartner would have known about

AdvanFort's business relationship with and interaction with IRI.  On information and belief the Cartner article contributed to IRI's decision to terminate AdvanFort, and Cartner knew that his article was likely to be read by IRI.  Cartner also knew that his article was likely to be read by AdvanFort's customers and prospective customers in the maritime industry.

113.    In fact, personnel at one or more of AdvanFort's customer's/referral sources, including but not limited to Moran Office of Maritime and Port Security (MOMPS), read the Cartner article at or about the date it was published and were aware at the time they read it, that Cartner had been AdvanFort's attorney and advisor.  MOMPS personnel were concerned by the article, contacted the Company and demanded an explanation from AdvanFort.

114.    A well-known large U.S. corporation which does government contracting work and consulting in the defense industry and had used AdvanFort's consulting services also read the Cartner article and communicated that fact to AdvanFort and subsequently did not renew its contract with AdvanFort.  On information and belief, the article was a substantial factor in the decision not to renew the contract.

115.    In addition, one or more of AdvanFort's existing clients read the Cartner/TME article and communicated that fact to AdvanFort sales representatives.   AdvanFort sales representatives received numerous expressions of concerns from customers regarding the allegations in the article and its sales staff sought instruction from management as to how to deal with the negative fallout and client concern and numerous questions arising out of the Cartner/ TME article. The harm was exacerbated by the fact that some members of the maritime community knew Cartner had been legal counsel and an advisor to AdvanFort.  His critical and defamatory article thus contributed to the perception that the allegations in India were true, thus further harming AdvanFort.

116.    Ultimately, many of AdvanFort's existing clients ceased relationships with the Company following its termination by the IRI and the publication of the article including but not limited to GO OFFSHORE (ASIA) PTE LTD, Oman Ship Management Company S.A.O.C., MANTA SHIPPING LTD, VBG SHIPPING & TRADING CO., COSCO SHIP Management Co. LTD, Med Brokerage & Management Company, Primrose Shipping Co. LTD, Stella Marine Services, GMBH & Co, Eagle Shipping International LLC (USA), OForce LTD, Liberty Maritime International, Noah Maritime Co., B. Emerald Limited Union Maritime Limited, Kopak Shipping Company, Clemko Ship Management, SA, and CMIO among others.

117.    On information and belief, one or more of these customers read the article at or about the time it was published, and the harm caused by the article contributed to customer concerns about AdvanFort and contributed to their decision not to seek to use AdvanFort as a PMSC.

118.    Several customers, including those listed above, also expressly indicated that a reason for their refusal to continue to do business with the Company was because of its termination by IRI and the inability to service RMI vessels.

119.    AdvanFort, thus, lost customers, clients, and, on information and belief, prospective clients and business opportunities as a result of the damage caused by the publication of the Article and the termination by the IRI.

120.    AdvanFort had the necessary resources and personnel committed to continued efforts under its contracts and justifiable expectations of future business servicing vessels registered under the RMI flag.

121.    AdvanFort thus had a reasonable expectancy in continuing its work and realizing future profits from its contracts and business relationships.

122.    Plaintiffs also had a reasonable expectancy of future contract awards and a continued business relationship with their customers.

123.    As a result of the actions of Cartner and TME, AdvanFort lost valuable business and was damaged in its ability to obtain future work as a PMSC contractor.

124.    AdvanFort lost most of its sales managers and sales representatives due, at least in part to, fears created by the Cartner/ TME article.

125.    Many clients also viewed the IRI action as validation or the truth of the Cartner/TME article in which he accused the company and its shareholders of arms-running.

126.    Many of AdvanFort's clients, including those flagged under different flag states, believed that because of the close temporal relationship between Article and the termination, the two events were causally connected, and each in that way, were viewed to legitimize the other.

127.    As a result of the Cartner/TME article and the IRI action, AdvanFort's legitimacy and the character of its officers were called into question even by non – Marshall Island flagged clients, and referral sources, such as Moran (MOMPS) who worked with many ships under different flags, and was a source of business for AdvanFort.  Thus, AdvanFort's business and reputation was harmed even among ships that were not flagged in the Marshall Islands.

128.    Cartner engaged in this conduct willfully, intentionally, purposefully, and without lawful justification.

129.    IRI's termination of AdvanFort makes it less likely it will be able to successfully bid for future work.

130.    Cartner was perfectly aware of the potential for harm from his actions and using the publication to exert undue influence over IRI and targeted his article towards maritime industry professionals.

131.    On information and belief, Cartner also either created and or circulated rumors that AdvanFort had lost its insurance coverage, which also led customers to make inquiries as to the status of their coverage including the CSO of vessel Blue Balance.

132.    Cartner thus acted in bad faith and willfully and intentionally interfered with AdvanFort's contracts and legitimate business expectancies.

C.    **Cartner's Business Efforts**

133.    William Hughes Watson served as the former president of AdvanFort from approximately September of 2012 until December of 2013.

134.    Prior to joining AdvanFort, he worked in the Office of the Maritime Administrator of the Republic of the Marshall Islands ("RMI").

135.    E-mail correspondence between the Defendant Cartner and Mr. Watson dated November 11, 2013 reveal that Cartner solicited Watson during Watson's tenure at AdvanFort and indicate that the two engaged in discussions and made plans to go into business together.

136.    The two appear to have subsequently worked together at a firm called Gulf Coast Maritime, LLC ("GCM") which provides consulting "in maritime consulting, security, training, intelligence operations, and information security."

137.    Both Watson and Cartner were listed as team members on Gulf Coast Maritime, LLC's current website, http://www.gulfcoastmaritime.co/ourteam.html. (though recently, after the initial Complaint was filed in this case, Watson's and Cartner's names appear to have been removed from the website.

138.   On information and belief, Cartner had discussions and communications with Watson and others about working together in the maritime security industry, including discussions about Gulf Coast Maritime, LLC.

139.   GCM offers worldwide security services and has established itself as a competitor to AdvanFort.

## COUNT I
### (Defamation –TME and Cartner)

140.   Plaintiffs incorporate and reallege the factual allegations in paragraphs 1 – 139 of the Complaint as if fully set forth herein.

141.   Defendants TME and Cartner published one or more written statements about AdvanFort and the Farajallahs, which were seen by individuals other than the Plaintiffs and that were false and defamatory in nature, recklessly so as to amount to willful disregard of the truth, and which were made with actual malice, i.e., knowledge of their falsity, by Cartner, which caused damage to the Plaintiffs reputation, financial loss, loss of standing in the community, and/or emotional distress.

142.   The article includes several personal and malicious attacks on the character and competency of Samir Farajallah, Ahmed Farajallah and AdvanFort as well as many false statements of fact.

143.   The article also includes representations that "Samir has paid few wages."

144.   The article also impugns Samir Farajallah "because he believed to (sic) could sway the Indian government with hand-wringing and cheap press releases, rather than hiring counsel timely from a reputable firm to deal with the matters which he faced" - another representation Cartner knew to be false as he was aware of AdvanFort's retention of multiple counsel and efforts to secure bail for the detained men.  Such efforts also included him and he

was also aware of actions taken through various embassies and the U.S. State Department. Cartner also knew of multiple meetings which occurred with governmental officials from the United States, United Kingdom, Republic of Estonia and Republic of India in efforts to secure the crew of the Seaman Guard Ohio's release.  Again, Mr.  Cartner himself had been hired by AdvanFort and the Farajallahs to address the situation in India and had knowledge of their retention of other law firms that he personally recommended and so made this statement knowing it to be false.

145.    As set forth, the article also states that AdvanFort was "accused of arms running;" this is not true and a gross mischaracterization of the charges levied and the situation which led to them.

146.    The defamatory statements include the following **bolded statements** as contained in the article :

a.  Farajallah is the owner of AdvanFort.  His son, Amad (*sic*), is his factotum.  **This company has been accused by the Indian government of arms running**.  Some 35 of its seagoing staff are under arrest and his pompously-named SEAMEN GUARD OHIO is detained indefinitely.  Samir Farajallah has done little or nothing to assist them or anyone else.  Sources say that he gave the problem to son Amad (*sic*) to sort out.  These same sources say that junior messed up.  It appears that the senior Farajallah tastes in business are similar to his tastes in home décor.

b.  Other sources confirm that **Samir has paid few wages** and appears to be on the edge of abandoning his detained employees to the tender hands of the Indian prosecutors.  **Still other sources say that vendors are owed substantial sums by Farajallah *et fil*.  These debts include legal fees, supplies, officer and staff pay for those has laid off and all the bills coming with contracts necessary** for running a pseudo-navy dealing with the gray world of providing armed guards to owners for the stated effect of suppressing pirates.  Owners are not hiring or paying waiting for the likely failure of the operation.

c.  The AdvanFort model is looking more and more like a house of cards under which Mr. Farajallah & son, aka AdvanFort, live.  Sources confirm that he has scurried crablike his operations to the Philippine

Islands.  So it seems he is running and will continue to do so until cornered and made to pay.  Upstanding man.  People in jail.  People not paid.  All apparently, say other sources, **because he believed to could sway the Indian government with hand-wringing and cheap press releases, rather than hiring counsel timely from a reputable firm to deal with the matters which he faced.**

d.  AdvanFort is circling the drain and it appears that Mr. Farajallah may not be able to avoid being sucked down with it.  **Now it seems that a 1200-page charge sheet has been filed by the government of India against AdvanFort and anyone connected with it including Mr. Farajallah and plucky Amad (*sic*).**  So at this writing the cards on the upper layers are failing fast and furious.

147.   Neither AdvanFort nor the Farajallahs are public figures, or at most, are limited purpose public figures.

148.   On information and belief, TME was aware of John Cartner's previous relationship with AdvanFort at the time it published his "exclusive" article and was aware or should have been aware that the Indian government had engaged in improper conduct, in, at a minimum, detaining the entire crew in the matter.

149.   The Statements made with actual malice and/or intentional or reckless indifference proximately caused Plaintiffs general and special damages in the form of injury to their reputation throughout the United States and internationally and were targeted to do harm the Plaintiffs in the Commonwealth of Virginia. These damages include, but are not limited to, AdvanFort's termination by the IRI, loss of business revenues, lost profits and resulted in significant damages to Plaintiffs.

WHEREFORE, Plaintiffs demands judgment against Defendants Cartner and TME for actual, special, punitive, and compensatory damages in an amount deemed at time of trial to be just, fair, and appropriate, which are estimated to be in excess of one million dollars.

## COUNT II
### (Defamation *per se*- TME and Cartner)

150.    Plaintiffs incorporate and reallege the factual allegations in paragraphs 1 – 149 of the Complaint as if fully set forth herein.

151.    Defendants TME and Cartner published one or more written statements about AdvanFort and the Farajallahs, which were seen by individuals other than the Plaintiffs and that were false and defamatory in nature, recklessly so as to amount to willful disregard of the truth, and which were made with actual malice by Cartner, which caused damage to the Plaintiffs reputation, financial loss, loss of standing in the community, and/or emotional distress.

152.    The statements published by the TME and Cartner imputed to the Plaintiffs an unfitness to perform their professional duties and a want of integrity in the discharge of those duties and prejudiced Plaintiffs in their profession or trade.

153.    The statements also falsely impute that criminal charges had been filed against the Farajallahs personally in a manner ruinous to the reputation of the Farajallahs, locally, nationally, and globally.

154.    The article stated that "[n]ow, it seems a 1200-page charge sheet has been filed by the government of India against AdvanFort and anyone connected with it including Mr. Farajallah and plucky Amad (*sic*)."

155.    As Cartner and the TME knew or willfully and recklessly disregarded, the document was not a charge sheet but a First Initial Report.

156.    In addition, neither Samir Farajallah or his son, Ahmed Farajallah, were ever named in any of the charge sheets that were ultimately submitted.

157.    The article also states that AdvanFort was "accused of arms running;" this is not true and a gross mischaracterization of the charges levied and the situation which led to them.

158.   The defamatory statements were, including, but not limited to, the following **bolded statements**:

    a.   Farajallah is the owner of AdvanFort.  His son, Amad (*sic*), is his factotum.   **This company has been accused by the Indian government of arms running**.  Some 35 of its seagoing staff are under arrest and his pompously-named SEAMEN GUARD OHIO is detained indefinitely.  Samir Farajallah has done little or nothing to assist them or anyone else.  Sources say that he gave the problem to son Amad (*sic*) to sort out.  These same sources say that junior messed up.  It appears that the senior Farajallah tastes in business are similar to his tastes in home décor.

    b.   Other sources confirm that **Samir has paid few wages** and appears to be on the edge of abandoning his detained employees to the tender hands of the Indian prosecutors.  **Still other sources say that vendors are owed substantial sums by Farajallah *et fil*.   These debts include legal fees, supplies, officer and staff pay for those has laid off and all the bills coming with contracts necessary** for running a pseudo-navy dealing with the gray world of providing armed guards to owners for the stated effect of suppressing pirates.  Owners are not hiring or paying waiting for the likely failure of the operation.

    c.   The AdvanFort model is looking more and more like a house of cards under which Mr. Farajallah & son, aka AdvanFort, live.  Sources confirm that he has scurried crablike his operations to the Philippine Islands.  So it seems he is running and will continue to do so until cornered and made to pay.  Upstanding man.  People in jail.  People not paid.  All apparently, say other sources, **because he believed to could sway the Indian government with hand-wringing and cheap press releases, rather than hiring counsel timely from a reputable firm to deal with the matters which he faced.**

    d.   AdvanFort is circling the drain and it appears that Mr. Farajallah may not be able to avoid being sucked down with it.  **Now it seems that a 1200-page charge sheet has been filed by the government of India against AdvanFort and anyone connected with it including Mr. Farajallah and plucky Amad** (*sic*).  So at this writing the cards on the upper layers are failing fast and furious.

159.   Neither AdvanFort nor the Farajallahs are public figures or are at most are limited purpose public figures.

160.     The Statements, individually and taken as a whole in context of the article and on the website for the TME in which they appeared, are defamatory because they falsely indicate that criminal charges were personally brought against the Farajallahs and also impute to them unfitness to perform their professional duties.

161.     The Statements made with actual malice and/or reckless indifference proximately caused Plaintiffs general and special damages in the form of injury to their reputation throughout the United States and internationally and were targeted to do harm the Plaintiffs in the Commonwealth of Virginia. These damages include, but are not limited to, AdvanFort's termination by the IRI, loss of business revenues, lost profits and resulted in significant damages to Plaintiffs.

### COUNT III
### (Tortious Interference with Contract – Cartner)

162.     Plaintiffs incorporate and reallege the factual allegations in paragraphs 1 - 161 of the Complaint as if fully set forth herein.

163.     Plaintiffs had contractual relationships with various customers who were Marshall Island flagged vessels, vessel owners and operators, and had contractual relationships with their employees and contractors who worked in service of those contracts.

164.     Cartner through his work, frequent interaction with AdvanFort, including his contact with AdvanFort's President, marketing department, and his relationship with AdvanFort, and his relationship with others, and knowledge of the anti-piracy industry, had knowledge of at least some of these contracts.

165.     Cartner intentionally and tortiously interfered with one or more of these contracts, which resulted in a loss of business and income to the Plaintiffs.

166.    The methods by which Cartner has interfered, as alleged above, have been improper and consisted of, among other things, sharp dealing, unfair competition, defamation and undue influence, including but not limited to the facts described in the preceding paragraphs.

167.    Cartner's tortious interference has been willful, wanton, and in malicious disregard of Plaintiffs' rights.

168.    As a direct and proximate result of Cartner's tortious interference, Plaintiffs have suffered damages, the full extent of which are not yet known, but which are believed to be at least Five Million Dollars ($5,000,000.00.)

## COUNT IV
### (Tortious Interference with Business Expectancies – Cartner)

169.    Plaintiffs incorporate and reallege the factual allegations in paragraphs 1 - 168 of the Complaint as if fully set forth herein,

170.    Plaintiffs had business relationships and expectancies with Marshall Island flagged vessels, and with one or more referral sources as discussed above, with a reasonable probability of future economic benefit to Plaintiffs.

171.    Plaintiffs reasonably expected to maintain, continue and build their business relationships and expectancies with their customers and referral sources based on their successful record and licensure to perform work for the Marshall Island flagged vessels.

172.    Cartner engaged in intentional, malicious, bad faith, non-privileged and unjustified tortious conduct, designed to, and which did, interfere with Plaintiffs' advantageous business relationships as set forth above.

173.    Prior to the acts complained of herein, Plaintiffs enjoyed advantageous business relationships as described herein, and the acts of Cartner caused the loss of, and contributed to the loss of, and damage to, such business relationships, including, but not limited to, loss of

business, loss of income, injury to Plaintiffs' business reputation and standing, loss of referrals, and decreased revenues, and other services.

174.    As a result of Cartner's acts, Plaintiffs have suffered damages and will suffer future damages.

175.    Cartner had knowledge of Plaintiffs' expectancy to continue the work and of the probability of future economic benefit to Plaintiff from these relationships and expectancies.

176.    It was reasonably certain that, but for the Defendant's intentional and tortious interference, Plaintiffs would have realized their business expectancies by, among other things, obtaining additional work as well as possible other private maritime security contracts and possible novation's of existing contracts.

177.    The methods by which the Defendant has interfered, as alleged above, have been improper and consisted of, among other things, sharp dealing, unfair competition, defamation, and undue influence, including but not limited to the facts described in the preceding paragraphs.

178.    The Defendant's tortious interference has been willful, wanton, and in malicious disregard of Plaintiffs' rights.

179.    As a direct and proximate result of Defendant's tortious interference with the Plaintiffs' legitimate business expectancies, Plaintiffs have suffered damages, the full extent of which are not yet known, but which are believed to be at least Five Million Dollars ($5,000,000.00.)

WHEREFORE, Plaintiffs demand judgment against Defendant for actual, special, compensatory damages and punitive damages and requests that the Court enter judgment in its favor and:

(a)     Compensatory damages on Count I in the amount of at least One Million ($1,000,000.00 or such other and greater amount proved at trial;

(b)     Compensatory damages on Count II in the amount of at least One Million ($1,000,000.00) or such other and greater amount proved at trial;

(c)     Compensatory damages on Count III in the amount of at least Five Million ($5,000,000.00) or such other and greater amount proved at trial;

(d)     Compensatory damages on Count IV in the amount of at least Five Million ($5,000,000.00) or such other and greater amount proved at trial;

(e)     Punitive damages on Counts II in the amount of $350,000.00 for the Defendants' reckless conduct  and actual malice;

(f)     Punitive damages on Counts III in the amount of $350,000.00 for Cartner's malicious and intentional interference;

(g)     Punitive damages on Counts IV in the amount of $350,000.00 for Cartner's malicious and intentional interference;

(h)     Such other and further relief that the Court may deem appropriate, or as to which Plaintiffs may show entitlement at trial.

**PLAINTIFFS HEREBY DEMAND A JURY ON ALL ISSUES SO TRIABLE.**

Dated:  June 11, 2015                    Respectfully submitted,


                                         _____/s/ Theresa A. Queen_____
                                         David G. Barger
                                         Virginia Bar No. 21652
                                         Theresa A. Queen
                                         Virginia Bar No. 44462
                                         *Counsel for AdvanFort Company, AdvanFort*
                                         *International, Inc. and Samir and Ahmed*
                                         *Farajallah*
                                         Greenberg Traurig, LLP
                                         1750 Tysons Boulevard, Suite 1000
                                         McLean, VA 22102
                                         Tel:  (703) 749-1339
                                         Fax:  (703) 714-8339
                                         bargerd@gtlaw.com
                                         queent@gtlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 11th day of June, 2015, I will electronically file the

foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification

of such filing (NEF) to the following:

Thomas G. Connolly
Harris, Wiltshire & Grannis LLP
1919 M Street, N.W., 8th Floor
Washington, D.C. 20036-3537
*Counsel for Defendant John A.C. Cartner*

Charles B. Molster, III
Winston & Strawn LLP
1700 K Street, N.W.
Washington, D.C. 20006
*Counsel for Defendant The Maritime Executive LLC*

Charles F. B. McAleer, Jr.
Miller & Chevalier Chartered
655 15th Street, N.W., Suite 900
Washington, D.C. 20005
*Counsel for Defendant International Registries, Inc.*


        /s/ Theresa A. Queen
David G. Barger
Virginia Bar No. 21652
Theresa A. Queen
Virginia Bar No. 44462
*Counsel for AdvanFort Company, AdvanFort*
*International, Inc. and Samir and Ahmed*
*Farajallah*
Greenberg Traurig, LLP
1750 Tysons Boulevard, Suite 1000
McLean, VA 22102
Tel:  (703) 749-1339
Fax:  (703) 714-8339
bargerd@gtlaw.com
queent@gtlaw.com