## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

|  |  |
|---|---|
| ADVANFORT COMPANY, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| INTERNATIONAL REGISTRIES, INC., *et al.*, | ) |
| | ) |
| Defendants. | ) |

Civil Action No. 1:15-cv-220

### MEMORANDUM OPINION

This matter comes before the Court on Plaintiffs' Motion to Alter or Amend (Dkt. No. 47) the Court's Memorandum Opinion dated May 12, 2015, in which it granted Defendant International Registries, Inc.'s ("IRI") motion to dismiss for failure to state a claim and dismissed Plaintiffs' tortious interference claims against IRI with prejudice. Based on a recent decision issued by the Supreme Court of Virginia as well as the discovery of additional facts pertinent to these claims, Plaintiffs seek to amend the Complaint and therefore request that the Court alter its decision so that the dismissal is without prejudice. For the reasons set forth below, the motion will be granted.

### I.   Background

This controversy arises out of an article ("Article") written by Defendant John Cartner and published by Defendant The Maritime Executive, LLC ("TME") on its website. The following facts are drawn from the Complaint and accepted as true. Plaintiffs are father and son Samir Farajallah and Ahmed Farajallah, and their privately held companies AdvanFort Company and AdvanFort International, Inc. Both AdvanFort companies "provid[e] world class global

1

security solutions" and "specialize[] in ... maritime, port and terminal security . . . ." Compl. ¶ 3. Such entities are referred to in the maritime industry as "private maritime security compan[ies]." *Id.* Defendants include Cartner, a maritime lawyer who represented Plaintiffs during some of the underlying events; TME, a maritime industry journal; and International Registries, Inc. ("IRI"), a Virginia corporation that "administers the maritime and corporate programs of the Republic of the Marshall Islands." *Id.* ¶ 9.

On October 11, 2013, a typhoon developed over the Indian Ocean. Due to the severe weather conditions, AdvanFort's vessel, the MV Seaman Guard Ohio ("the Ohio"), was running low on fuel and anchored off the coast of India. The vessel requested permission to come into port to refuel, which was denied. As a result, the ship was forced to buy fuel from a private vendor—an act later alleged to violate Indian law, as the vendor lacked the necessary permits. The Indian Coastguard later directed the Ohio to come into port. On October 12, 2013, all thirty-five crew members of the Ohio were detained by Indian authorities. The Indian Coastguard proceeded to seize all 35 non-automatic weapons and numerous rounds of ammunition found on board.

On October 18, 2013, thirty-three of the crew members were arrested by Indian authorities.[1] Upon learning of the crew and ship's detention, Plaintiffs "assembled a crisis reaction team that worked round the clock to address the matter and to secure the release of the vessel and the crew." *Id.* ¶ 27. AdvanFort flew its representatives to India to address the crisis. Plaintiffs also made multiple attempts to secure bail for its crew and promptly retained legal counsel, including Defendant Cartner, a maritime and admiralty lawyer. Pursuant to Cartner's advice, AdvanFort also retained local as well as English counsel with ties in India.

---

[1] The remaining two crew members were allowed to stay on board the Ohio, but were later arrested as well.

Approximately two months after the initial detention, charges were brought against the crew for alleged violations of India's Arms Act. The charges were ultimately dropped on July 10, 2014.

Approximately eleven days after Cartner's initial retention, a fee dispute arose over his billing Plaintiffs more than $28,000 for less than two weeks' worth of legal services. The dispute was submitted to arbitration and later became the subject of a bar complaint against Cartner, which remains pending.

On November 11, 2013, Cartner engaged in email correspondence with AdvanFort's then-President, William Watson, in which he "solicited Watson ... and ... the two engaged in discussions and made plans to go into business together." *Id.* ¶ 83. "The two appear to be currently working together at a firm called Gulf Coast Maritime, LLC ("GCM") which provides consulting 'in maritime consulting, security, training, intelligence operations, and information security.'" *Id.* ¶ 84. Plaintiffs allege that GCM is a competitor of AdvanFort.

On or about January 6, 2014, Cartner authored an article entitled "Self-Described AdvanFort 'Billionaire' May Not Be." Compl. ¶ 45. The Article was labeled an "exclusive" and published on TME's website. *Id.* The Article is alleged to contain multiple defamatory statements that were calculated to lower the estimation of Plaintiffs in the maritime community. For example, Cartner wrote that AdvanFort had "been accused by the Indian government of arms running." *Id.* ¶ 93. Plaintiffs allege that Cartner wrote the Article out of "personal spite, or ill-will and a desire to hurt one or more of the Plaintiffs." *Id.* ¶ 48. Plaintiffs claim that the defamatory statements in the Article have caused them to suffer "tangible economic losses and substantial injury to their reputation and their business." *Id.* ¶ 56.

On January 7, 2014, the day after the Article was published, AdvanFort received a letter from the Republic of the Marshall Islands ("RMI") Maritime Administrator ("the

3

Administrator") stating that "it was no longer permitted to provide security services to Marshall Islands registered vessels, effective immediately." *Id.* ¶ 65. Defendant IRI, charged with providing technical and administrative support to the Administrator, then directed all RMI flagged ships not to allow AdvanFort personnel on their vessels due to the company's suspension. Plaintiffs allege that AdvanFort's suspension was "improper and done without providing proper notice … or a meaningful opportunity to respond to the allegations." *Id.* ¶ 68. The suspension was eventually lifted over six months later, on June 17, 2014. As a result of the suspension, Plaintiffs claim to have lost a significant portion of its customer base as well as prospective clients.

Based on the above events, on January 20, 2015, Plaintiffs filed this action against Defendants in Fairfax County Circuit Court alleging four counts of common law claims: defamation and defamation *per se* against TME and Cartner (Counts I and II) as well as tortious interference with contract and business expectancy against Cartner and IRI (Counts III and IV). On February 19, 2015, Defendants removed the action to this Court. Dkt. No. 1. The sole basis for removal is the alleged fraudulent joinder of non-diverse defendant IRI, which is a citizen of Virginia, like Plaintiff Ahmed Farajallah.

A week after the Notice of Removal was filed in this Court, each of the three Defendants moved to dismiss the respective claims against them on various grounds. Dkt. Nos. 3, 7, 9. Plaintiffs in turn moved to remand the matter to state court. Dkt. No. 20. On April 17, 2015, the Court heard oral argument on the above motions. Relevant here, the Court granted IRI's motion and dismissed the claims against it with prejudice because it found that "Plaintiffs cannot plausibly allege that IRI is a competitor." May 12, 2015 Mem. Op. 25. For the same reason, the

Court denied Plaintiffs' motion for remand.  Plaintiffs have since filed the Motion to Alter or

Amend currently before the Court.  Dkt. No. 47.

## II.   Discussion

Federal Rule of Civil Procedure 54(b) provides that "a district court retains the power to

reconsider and modify its interlocutory judgments ... at any time prior to final judgment when

such is warranted." *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514–15 (4th Cir.

2003) (citing Fed. R. Civ. P. 54(b)); *see also Moses H. Cone Mem. Hosp. v. Mercury Const.

Corp.*, 460 U.S. 1, 12 (1983) (noting that "every order short of a final decree is subject to

reopening at the discretion of the district judge").  Reconsideration under Rule 54(b) is therefore

"not subject to the strict standards applicable to motions for reconsideration of a final judgment."

*Id.* at 514.  In full, the Rule provides as follows:

> When an action presents more than one claim for relief—whether
> as a claim, counterclaim, crossclaim, or third-party claim—or
> when multiple parties are involved, the court may direct entry of a
> final judgment as to one or more, but fewer than all, claims or
> parties only if the court expressly determines that there is no just
> reason for delay. Otherwise, *any order* or other decision, however
> designated, *that adjudicates fewer than all the claims or the rights
> and liabilities of fewer than all the parties does not end the action
> as to any of the claims or parties and may be revised at any time
> before the entry of a judgment adjudicating all the claims* and all
> the parties' rights and liabilities.

Fed. R. Civ. P. 54(b) (emphasis added).  Because the Court did not certify its decision under the

first clause of the Rule by "expressly determin[ing] that there is no just reason for delay," the

dismissal order at issue is an interlocutory order subject to revision under the second clause.

Plaintiffs have curiously, and mistakenly, interpreted the Fourth Circuit's decision in

*Fayetteville Investors* as suggesting that, "[i]n evaluating a Motion under Rule 54 (b) ... the

Court is guided by the general principles of Rule 59(e)." Pls.' Mem. Supp. Mot. Alter or Amend

5

("Pls.' Mot. Amend") 3 (citing *Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1469–70 (4th Cir. 1991)). To the contrary, the Fourth Circuit upheld the district court's "finding that the Motion for Reconsideration should be considered under Rule 54(b) as a review of a prior interlocutory order" in part because "Rule 59(e) is … *applicable only to a final judgment*." *See Fayetteville Investors*, 936 F.2d at 1469–70 (emphasis added). Therefore, the more stringent standards for a Rule 59(e) motion[2] do not apply here.[3]

Fortunately for Plaintiffs, the applicable standard is that under the more liberal Rule 15(a), which requires the Court to grant leave to amend a pleading unless "the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile." *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir. 1986) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)); *see also Hart v. Hanover Cnty. Sch. Bd.*, 495 F. App'x 314, 315–16 (4th Cir. 2012) (holding that district court's failure to analyze motions for reconsideration and to amend complaint under the lens of Rule 15(a) was an abuse of discretion). Indeed, the Fourth Circuit has emphasized that even a "post-judgment motion to amend is evaluated under the same legal standard as a similar motion filed before judgment was entered—for prejudice, bad faith, or futility." *Laber v. Harvey*, 438 F.3d 404, 427 (4th Cir. 2006) (en banc); *accord Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 471 (4th Cir. 2011) (holding that, in considering a post-judgment motion to amend, "[t]he court need only ask whether the amendment should be granted, just as it would on a prejudgment motion to amend pursuant to Fed. R. Civ. P. 15(a)"). The court has further illuminated the "one difference

---

[2] The Fourth Circuit has previously recognized three grounds for amending an earlier judgment under Rule 59(e): (1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice." *Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co.*, 148 F.3d 396, 402 (4th Cir. 1998) (citations omitted).
[3] Although Plaintiffs eventually cited *Fayetteville Investors* and *American Canoe* in their rebuttal brief, they did not articulate the appropriate standard of review—that under Rule 15(a).

6

between a pre- and a post-judgment motion to amend: the district court may not grant the post-judgment motion unless the judgment is vacated pursuant to Rule 59(e) or Fed. R. Civ. P. 60(b)." *Laber*, 438 F.3d at 427. Conversely, then, a plaintiff need not have an interlocutory order dismissing its claim with prejudice vacated under Rule 59(e) prior to seeking leave to amend its complaint. *Id.* Even if the Court were to accept IRI's interpretation and construe the motion as a *post*-judgment motion to amend, the Fourth Circuit has been clear that "[t]o determine whether vacatur is warranted, ... the court need not concern itself with [Rule 59(e)'s] legal standards. The court need only ask whether the amendment should be granted, just as it would on a prejudgment motion to amend pursuant to Fed. R. Civ. P. 15(a)." *Katyle*, 637 F.3d at 471. Accordingly, the Court will analyze Plaintiffs' motion to alter or amend under the lens of Rule 15(a)—"for prejudice, bad faith, or futility." *Id.*

### A. Prejudice

Whether an amendment to a complaint poses prejudice to the opposing party "will often be determined by the nature of the amendment and its timing." *Laber*, 438 F.3d at 427. "[P]rejudice can result where a proposed amendment raises a new legal theory that would require the gathering and analysis of facts not already considered by the opposing party [and] is offered shortly before or during trial." *Johnson*, 785 F.2d at 510. By contrast, prejudice does not exist where the "defendant was from the outset made fully aware of the events giving rise to the action" and the amendment "is offered before any discovery has occurred." *Davis v. Piper Aircraft Corp.*, 615 F.2d 606, 613 (4th Cir. 1980); *Laber*, 438 F.3d at 427.

Here, no new legal theories have been raised, the events giving rise to the action have not been changed, and discovery has not yet commenced. Importantly, "[d]elay alone ... is an

7

insufficient reason to deny the plaintiff's motion to amend." *Laber*, 438 F.3d at 427. The Court thus sees no basis for denying the motion to amend based on prejudice to the opposing parties.

### B.  Bad Faith

Likewise, there is no indication that Plaintiffs' motion to amend has been made in bad faith. First of all, Plaintiffs' "diligence in filing [the] motion to amend ... dispels any inference of bad faith." *Laber*, 438 F.3d at 428. Moreover, their legal argument with respect to the tortious interference claims has not changed—they challenged then and now the Court's adoption of a "fifth unstated element to the prima facie case: a competitive relationship between the party interfered with and the interferor." *Compare* Pls.' Opp'n to IRI's Mot. Dismiss ("Pls.' Opp'n"), *with* Pls.' Notice of Supplemental Authority (citing *17th St. Assocs. v. Markel Int'l Ins. Co.*, 373 F. Supp. 2d 584, 600 (E.D. Va. 2005)). At the hearing on the motion to dismiss, Plaintiffs' counsel zealously urged his position based on his interpretation of Virginia caselaw. The Supreme Court of Virginia has subsequently strengthened this interpretation with its somewhat cryptic invitation to take up the issue at a later date. *See Schaecher v. Bouffault*, No. 141480, 2015 WL 3505252, at *12 (Va. June 4, 2015). Importantly, it did not reject his interpretation. Plaintiffs may even be able to satisfy their pleading requirements under the standard previously articulated by the Court, having come across information that suggests IRI may in fact be a competitor. Accordingly, as there is no evidence of bad faith, there is no justification for denying the motion to amend on this basis either.

### C.  Futility

This prong of the Rule 15(a) standard presents IRI with the best opportunity for persuading the Court to deny the motion to amend. However, the Court bears in mind Rule 15(a)'s instruction that leave to amend "shall be freely given when justice so requires." Fed. R.

8

Civ. P. 15(a); *see also Laber*, 438 F.3d at 426 ("This liberal rule gives effect to the federal policy in favor of resolving cases on their merits instead of disposing of them on technicalities."). Under this lenient standard, the Court examines the issue of futility.

In this case, Plaintiffs seek to amend the Complaint for two principal reasons. First, new authority from the Supreme Court of Virginia indicates that it may be receptive to a claim for tortious interference even where a competitive relationship does not exist between the parties. *See Schaecher v. Bouffault*, No. 141480, 2015 WL 3505252, at *12 (Va. June 4, 2015). In *Schaecher*, the defendant urged the court to recognize that the plaintiff's tortious interference with contractual relations claim "requires direct competitive interference with a contract." *Id.* She argued that because "she was not a competitor for the land purchase contract involved in this case, she cannot be liable for tortious interference with that contract under applicable Virginia precedent." *Id.* The Supreme Court of Virginia declined to "reach this issue today" and affirmed the demurrer on other grounds, essentially inviting the inquiry for another day on better facts. Significantly, it recited the elements of the claim in the same manner as Plaintiffs have in this case—without a fifth element requiring a competitive relationship. Accordingly, Plaintiffs may be able to state claims for tortious interference with contracts and business expectancies under Virginia law.

Alternatively, even accepting the "fifth unstated element" of a competitive relationship between the parties, Plaintiffs have brought to the Court's attention new facts indicating that IRI may in fact be a competitor of the Advanfort entities. They are apparently "in possession of allegations that suggest that IRI has deliberately engaged in efforts to divert business away from service providers to Republic of the Marshall Islands ("RMI") vessels (in this context ship inspectors) to profit itself, and also of allegations that IRI officials potentially profited from

9

referrals." Pls.' Mot. Amend 2.  Furthermore, Plaintiffs contend that IRI "has a track record of promoting one [private maritime security] company over others." *Id.* These new facts derive from a complaint filed against IRI in a Florida circuit court as well as memoranda on the "[u]se of Privately Contracted Armed Security Personnel" from the RMI Maritime Administrator, which is assisted in its operations by IRI, directed to "all ship owners, operators, masters and officers of vessels registered in [RMI]." *Id.* at Exs. A–C.  If allowed to amend their Complaint to include allegations of this sort, Plaintiffs would be able to satisfy their pleading requirement on the additional element of a competitive relationship.

IRI maintains that, even if the Court were to vacate its prior order dismissing the claims for failure to state a claim, the Court could still uphold its dismissal with prejudice on the alternative bases laid out in its prior motion to dismiss—namely, the act of state doctrine, the misjoinder of causes of action, and Plaintiffs' lack of standing.  In other words, IRI argues that granting Plaintiffs leave to amend would be futile.  The Court will therefore address each alternative basis for dismissal.

### i.   Act of State Doctrine

In its prior motion, IRI moved to dismiss the claims against it pursuant to the act of state doctrine.  Under the doctrine, which aims to prevent judicial pronouncements from interfering with the political branches' handling of foreign affairs, courts may not sit in judgment of the public acts of a sovereign state performed within its own territory. *E.g.*, *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 428, 439 (1964) (precluding American courts from inquiring into validity of Cuban expropriation decree); *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897) (shielding Venezuelan military commander from tort liability for detaining American citizen during Venezuelan revolution).  In practice, the doctrine requires courts to accept "the acts of

10

foreign sovereigns taken within their own jurisdictions ... [as] valid" and then decide the case on

the merits. *W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l*, 493 U.S. 400, 409 (1990). As

a result of this treatment, courts have typically converted a motion to dismiss invoking the

doctrine to a motion for summary judgment. *E.g., id.* at 403, 409.

The burden of establishing that the act of doctrine applies naturally rests with the

defendant invoking it. *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 694

(1976). The doctrine is characterized by two elements: (1) "the act undertaken by the foreign

state must be public"; and (2) "the act must be completed within the sovereign's territory."

*Eckert Int'l, Inc. v. Gov't of Sovereign Democratic Republic of Fiji*, 834 F. Supp. 167, 171–72

(E.D. Va. 1993), *aff'd on other grounds*, 32 F.3d 77 (4th Cir. 1994); *accord Kirkpatrick*, 493

U.S. at 409. "The territorial limitation is based on the rationale that 'it is usually only when the

state has the actual power to complete the action at issue within its own borders that the state can

be said to have a reasonable expectation of dominion over the matter.'" *Eckert Int'l*, 834 F.

Supp. at 172 (quoting *Drexel Burnham Lambert Grp. Inc. v. Galadari*, 610 F. Supp. 114, 117

(S.D.N.Y.), *aff'd in relevant part*, 777 F.2d 877 (2d Cir. 1985)).

Based on the allegations in the Complaint, it is very likely that Plaintiffs' claims against

IRI involve the public acts of the RMI. Plaintiffs have alleged that the Administrator "has been

*delegated responsibility for performing various governmental functions on behalf of RMI*

including administering all matters pertaining to vessels of RMI . . . ." Compl. ¶ 58. Plaintiffs

further allege that "*IRI assists the Administrator in performing its government functions* all over

the world and wherever vessels seeking to be registered under RMI's flag may be located." *Id.* ¶

59 (emphasis added). The specific acts underlying the tortious interference claims are IRI's

emails, pursuant to the Administrator's suspension of AdvanFort's permit to provide security

services, instructing RMI flagged vessels that they were "not to allow AdvanFort personnel on their vessels." *Id.* ¶¶ 65–67. It seems, then, that IRI merely assisted the Administrator in implementing the suspension with these emails. According to the allegations in the Complaint, an adjudication of the claims against IRI would appear to require the Court to sit in judgment of the acts of the Administrator and, consequently, of the RMI. Thus, the public act element may be met.

With respect to the territorial element, Plaintiffs argue that the acts did not occur in the RMI, but rather in the Commonwealth of Virginia where IRI is incorporated and maintains its principal place of business. Pls.' Opp'n 5; Compl. ¶ 8. Although it is likely that the challenged emails originated in IRI's offices in Virginia, the public act at issue—AdvanFort's suspension and IRI's announcement of it to RMI flagged ships—was directed at and only had effect on RMI flagged ships, which are clearly within RMI's territory. *Lauritzen v. Larsen*, 345 U.S. 571, 584–85 (1953) (holding that a ship "is deemed to be a part of the territory of that sovereignty whose flag it flies" (citation and internal quotation marks omitted)). Moreover, this Court has previously held that the situs of the decision-maker, by itself, does not satisfy the territorial requirement. *Eckert Int'l*, 834 F. Supp. at 172. Conversely, the fact that a government actor made a decision outside the boundaries of the sovereign, as Plaintiffs have claimed here, will not defeat the doctrine's application where the decision has its effect within that state's sovereign territory. *Compare In re Refined Petroleum Prods. Antitrust Litig.*, 649 F. Supp. 2d 572 (S.D. Tex. 2009), *aff'd sub nom.*, *Spectrum Stores, Inc., v. Citgo Petroleum, Inc.*, 632 F.3d. 938 (5th Cir. 2011) (applying act of state doctrine to oil production decisions of sovereign state members of OPEC even though those decisions were made outside the sovereigns' territories at OPEC meetings in Vienna, Austria), *and Bokkelen v. Grumman Aerospace Corp.*, 432 F. Supp. 329,

12

333 (E.D.N.Y. 1977) (applying act of state doctrine to case involving Brazil's decision to deny import licenses because "the control of foreign trade, like the expropriation of oil wells, involves a decision of a government acting within its own territory"), *with Allied Bank Int'l v. Banco Credito Agricola de Cartago*, 757 F.2d 516 (2d Cir. 1985) (holding act of state doctrine did not apply where the situs of a debt—subject to a taking by Costa Rica—was in the United States). The original allegations against IRI thus appear to satisfy the second element as well.

A conclusion that the threshold elements have been met, however, does not end the inquiry. Indeed, the Supreme Court has called on courts to employ a "balancing approach" to determine whether application of the doctrine is justified in light of its purposes, even where "the validity of the act of a foreign sovereign within its own territory is called into question." *Kirkpatrick*, 493 U.S. at 409 (citing *Sabbatino*, 376 U.S. at 428). For instance, the doctrine could be set aside "if the government that committed the challenged act of state is no longer in existence." *Id.* (citation and internal quotation marks omitted). Where the challenged act constitutes a violation of a treaty or a clearly established norm of customary international law also weighs against application of the doctrine. *Sabbatino*, 376 U.S. at 428 ("It should be apparent that the greater the degree of codification or consensus concerning a particular area of international law, the more appropriate it is for the judiciary to render decisions regarding it."). Another possible exception lies in "cases in which the Executive Branch has represented that it has no objection to denying validity to the foreign sovereign act, since then the courts would be impeding no foreign policy goals." *Kirkpatrick*, 493 U.S. at 405 (citing *First Nat'l City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 768–70 (1972)).

The first two scenarios are clearly inapplicable in this case. With respect to the third, the Court does not yet have the answer. Courts have routinely "requested and received ... letter[s]

13

expressing the views of the legal adviser to the United States Department of State as to the applicability of the act of state doctrine." *E.g.*, *Kirkpatrick*, 493 U.S. at 403. A thorough and proper determination on the application of the doctrine likely entails such a request. As a result, the Court finds that the issue of whether the act of state doctrine bars the claims against IRI is one better suited for resolution following discovery. Accordingly, the Court is persuaded that granting Plaintiffs leave to amend the complaint will not be futile in light of IRI's act of state doctrine defense.

> ii.    Misjoinder of Causes of Action

IRI also advances its prior argument that the causes of action were fatally misjoined, thereby providing an alternative basis for dismissal. This Court has reiterated on multiple occasions, however, that "[m]isjoinder is not a ground for dismissal." *Malibu Media, LLC v. John Does 1-23*, 878 F. Supp. 2d 628, 630 (E.D. Va. 2012) (citing Fed. R. Civ. P. 21). Rather, the proper remedy for misjoinder is severance. *Id.*

In determining whether joinder was proper, courts routinely apply the "same transaction or occurrence" test of Rule 20(a). *E.g.*, *Advamtel, LLC v. AT & T Corp.*, 105 F. Supp. 2d 507, 513-14 (E.D. Va. 2000). The Rule provides as follows:

> Persons ... may be joined in one action as defendants if ... any right to relief is asserted against them jointly, severally, or in the alternative with respect to or *arising out of the same transaction, occurrence, or series of transactions or occurrences*; and ... *any question of law or fact common to all defendants will arise* in the action ... Neither a plaintiff nor a defendant need be interested in obtaining or defending against all the relief demanded . . . ."

Fed. R. Civ. P. 20(a) (emphasis added). The "same transaction or occurrence" test thus allows "all reasonably related claims for relief by or against different parties to be tried in a single proceeding. Absolute identity of all events is unnecessary." *Saval v. BL Ltd.*, 710 F.2d 1027,

14

1031 (4th Cir. 1983) (citation and internal quotation marks omitted). "Further, the rule should be construed in light of its purpose, which is to promote trial convenience and expedite the final determination of disputes, thereby preventing multiple lawsuits." *Id.* The Rule thus permits "the *broadest possible scope of action* consistent with fairness to the parties, [and] joinder of claims ... *is strongly encouraged*." *Gibbs*, 383 U.S. at 724 (emphasis added); *accord Meth v. Natus Med. Inc.*, No. 3:14-cv-173, 2014 WL 3544989, at *3 (E.D. Va. July 17, 2014) (observing that Rule 20 "is liberally construed by the courts").

IRI analogizes this case to *Powers v. Cherin*, 249 Va. 33 (1995), a case in which a plaintiff who was injured in a car accident joined both the driver of the other car and the dentist who treated her afterwards in the same lawsuit. The Virginia Supreme Court held that:

> the plaintiff's claim against [the driver] for negligent operation of an automobile does not arise from the same transaction or occurrence as the plaintiff's claim against Dr. Cherin for medical malpractice. Rather, the amended motion for judgment sets forth two transactions or occurrences: first, the negligent operation of a motor vehicle by Pope resulting in an accident; and, second, the negligent medical treatment of plaintiff at a later date by Dr. Cherin resulting in injury.

*Id.* at 37. It further observed that the injuries allegedly caused by each defendant were "separate and distinct" and thus they could not be held liable for the other's negligence. *Id.* at 38. The court accordingly ruled that "there was a fatal misjoinder of causes of action," and upheld the trial court's dismissal of the dentist. *Id.*

In their opposition to the motion to dismiss, Plaintiffs urged the Court to find this case more akin to the facts of *Fox v. Deese*, 234 Va. 412 (1987). Fox was a concert promoter who entered into negotiations with representatives of the City of Richmond. *Id.* at 415–16. He relied on an oral promise whereby he would bring a show to City Stadium that year. However, Fox was later presented with a written instrument that contained provisions that were not initially

15

discussed and to which he would not have agreed. *Id.* at 417–18. He subsequently filed suit against the City of Richmond and several other parties alleging breach of contract, malicious and reckless disregard for his rights under contract, and conspiracy to interfere with his contract. Five of the counts sounded in tort, while three others sounded in contract. *Id.* at 415. The Virginia Supreme Court upheld the joinder of claims as proper, stating that the plaintiff had "pled alternative theories of recovery against the same group of defendants and that the claims arise out of the same transaction or occurrence." *Id.* at 423 (citations omitted).

Although cited by neither side, the doctrine of joint and several liability in tort is instructive here. In Virginia, "when two or more tortfeasors cause a *single indivisible injury* to a third-party and 'it is impossible to determine in what proportion each contributed to the injury,' then an individual tortfeasor can be held liable for the entire injury." *Gross v. Shearson Lehman Bros. Holdings, Inc.*, 43 F. App'x 672, 677 (4th Cir. 2002) (emphasis added) (quoting *Dickenson v. Tabb*, 208 Va. 184, 192 (1967)). Because the Virginia Supreme Court has decided misjoinder issues by inquiring whether a defendant can be held liable for another's tortious acts, this doctrine should aid the inquiry here. *See Powers*, 249 Va. at 37–38.

Here, the claims arise out of Cartner's allegedly defamatory article. The next day, IRI emailed RMI flagged ships to announce AdvanFort's suspension. The events are clearly temporally related and thus support an inference that the first event led to the other. Furthermore, the damages allegedly resulting from both actions are one and the same—"loss of business and income" and "loss of, and damage to, business relationships" in the amount of "at least Five Million Dollars." Compl. ¶¶ 111, 114, 119, 125. As a result, it is evident that Plaintiffs have alleged IRI and Cartner were two tortfeasors causing "a single indivisible injury." *Gross*, 43 F. App'x at 677. Additionally, due to the nature of the claims, it would "impossible to

16

determine in what proportion each contributed to the injury." *Dickenson*, 208 Va. at 192.

Because it appears that Cartner and IRI may potentially be held jointly and severally liable for

injuries that each allegedly contributed to, Plaintiffs' joinder of the tort claims against them was

not improper. Accordingly, granting leave to amend the Complaint would not be futile in light

of this alternative basis for dismissal.

      iii.   <u>Plaintiffs' Lack of Standing</u>

      Finally, IRI previously moved to dismiss the corporate entities' claims against it for lack

of standing. Under Virginia law, "[a] foreign corporation transacting business in the

Commonwealth without a certificate of authority may not *maintain* a proceeding in any court in

the Commonwealth until it obtains a certificate of authority." Va. Code Ann. § 13.1-758

(emphasis added). IRI argued that since AdvanFort Company is a D.C. corporation and

AdvanFort International Inc. is a Delaware corporation, and neither had been issued a certificate

of authority, those Plaintiffs may not pursue their Virginia claims in this Court. Subsequently,

however, both corporate Plaintiffs incorporated under the laws of Virginia, effective March 3,

2015. Plaintiffs asserted that this event satisfied their standing requirements, given that the

Virginia Supreme Court has "interpreted the word 'maintain' to mean a continuation of the

proceeding already begun, and compliance with the requirements of the statute before judgment

is sufficient to entitle the corporation to continue its prosecution." *Video Eng'g Co. v. Foto-*

*Video Elecs., Inc.*, 207 Va. 1027, 1029 (1967). This Court agrees. Because Plaintiffs are no

longer foreign corporations, IRI's argument with respect to the AdvanFort companies' standing

is moot.

      The same result does not necessarily follow with respect to the individual Plaintiffs. In

Virginia, shareholders, managers, owners, and employees do not have legal standing to bring suit

for tortious interference on behalf of a corporation. *Keepe v. Shell Oil Co.*, 220 Va. 587, 591 (1979); *Schur v. Sprenkle*, 84 Va. Cir. 418, at *6 (Richmond Cir. Ct. 2012) (holding that owner of a limited liability corporation did not have standing for tortious interference claim where the corporation was a party to the contracts at issue and he was not). "The corporation is a legal person, separate and distinct from the persons who own it, and the corporation, as the alleged owner and operator of the business, is the person entitled to" bring the claim. *Keepe*, 220 Va. at 591.

Here, the individual Plaintiffs have not alleged that they are parties to any contract or business expectancy with which IRI allegedly interfered. Instead, the Complaint alleges injuries to the AdvanFort entities. Compl. ¶¶ 57–80. Although the Court finds that the individual Plaintiffs did not allege sufficient facts to demonstrate their standing in the prior Complaint, it will allow them to attempt to satisfy their standing requirements on a third amended complaint.

## III.   Conclusion

For the foregoing reasons, the Court will grant Plaintiffs leave to file a third amended complaint pursuant to Rule 15(a).

An appropriate Order shall issue.

July 3, 2015

Alexandria, Virginia

/s/
Liam O'Grady
United States District Judge