IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| ADVANFORT COMPANY, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 1:15-cv-220 |
| ) | |
| THE MARITIME EXECUTIVE, LLC, *et al.*, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION

This matter comes before the Court on Motions to Dismiss by Defendants John Cartner and The Maritime Executive, LLC ("TME"). Dkt. Nos. 56, 59. The motions have been fully briefed by the parties, and the Court heard oral argument on July 24, 2015. For the reasons set forth below, the Motions to Dismiss by both TME and Cartner will be granted.[1]

### I. Background

This controversy arises out of an article ("Article") written by Defendant Cartner and published by Defendant TME on its website and newsletter. Because this matter is before the Court on motions to dismiss, the following facts are drawn from the Complaint and accepted as true. Plaintiffs are father and son Samir Farajallah and Ahmed Farajallah, and their privately held companies AdvanFort Company and AdvanFort International, Inc. Both AdvanFort companies "provid[e] world class global security solutions" and "specialize[] in ... maritime, port and terminal security . . . ." Compl. ¶ 3. Such entities are referred to in the maritime industry as "private maritime security compan[ies]." *Id.* Defendants include Cartner, a maritime lawyer who, notably, represented Plaintiffs during some of the underlying events; TME, a

---

[1] As will be discussed herein, some claims will be dismissed with prejudice and some without.

1

maritime industry journal; and International Registries, Inc. ("IRI"), a Virginia corporation that "administers the maritime and corporate programs of the Republic of the Marshall Islands." Compl. ¶ 9.

The instant litigation arose out of the following events. On October 11, 2013, a typhoon developed over the Indian Ocean. Due to the severe weather conditions, AdvanFort's vessel, the MV Seaman Guard Ohio ("the Ohio"), was running low on fuel and anchored off the coast of India. The vessel requested permission to come into port to refuel, which was denied. As a result, the ship was forced to buy fuel from a private vendor—an act that was alleged to violate Indian law, as the vendor lacked the necessary permits. The Indian Coastguard later directed the Ohio to come into port. On October 12, 2013, all thirty-five crew members of the Ohio were detained by Indian authorities. The Indian Coastguard proceeded to seize all 35 non-automatic weapons and numerous rounds of ammunition found on board.

On October 18, 2013, thirty-three of the crew members were arrested by Indian authorities.[2] Upon learning of the crew and ship's detention, Plaintiffs "assembled a crisis reaction team that worked round the clock to address the matter and to secure the release of the vessel and the crew." Compl. ¶ 27. AdvanFort flew its representatives to India to address the crisis. Plaintiffs also made multiple attempts to secure bail for its crew and promptly retained legal counsel, including maritime and admiralty lawyer Defendant Cartner. Pursuant to Cartner's advice, AdvanFort also retained local as well as English counsel with ties in India. Approximately two months after the initial detention, charges were brought against the crew for alleged violations of India's Arms Act. The charges were ultimately dropped on July 10, 2014.[3]

---

[2] The remaining two crew members were allowed to stay on board the Ohio, but were later arrested as well.
[3] In his reply, Defendant Cartner asserts that "the Supreme Court of India issued an opinion stating definitively that the criminal case against AdvanFort is ongoing." Cartner's Reply Br. 4–5 (citing *The State Rep. by the Inspector of*

Approximately eleven days after Cartner's initial retention, a fee dispute arose over his billing Plaintiffs more than $28,000 for less than two weeks' worth of legal services. The dispute was submitted to arbitration and later became the subject of a bar complaint against Cartner, which remains pending.

On November 11, 2013, Cartner engaged in email correspondence with AdvanFort's then-President, William Watson, in which he "solicited Watson ... and indicated that the two engaged in discussions and made plans to go into business together." Compl. ¶ 83. "The two appear to be currently working together at a firm called Gulf Coast Maritime, LLC ("GCM") which provides consulting 'in maritime consulting, security, training, intelligence operations, and information security.'" *Id.* ¶ 84. Plaintiffs allege that GCM is a competitor of AdvanFort.

On or about January 6, 2014, Cartner authored an article entitled "Self-Described AdvanFort 'Billionaire' May Not Be." Compl. ¶ 45. The Article was labeled an "exclusive" and published on Defendant TME's website. *Id.* The Article is alleged to contain multiple defamatory statements that were calculated to lower the estimation of Plaintiffs in the maritime community. For example, Cartner wrote that AdvanFort had "been accused by the Indian government of arms running." *Id.* ¶ 93. Plaintiffs allege that Cartner wrote the Article out of "personal spite, or ill-will and a desire to hurt one or more of the Plaintiffs." *Id.* ¶ 48. Plaintiffs claim that the defamatory statements in the Article have caused them to suffer "tangible economic losses and substantial injury to their reputation and their business." *Id.* ¶ 56.

On January 7, 2014, the day after the Article was published, AdvanFort received a letter from the Republic of the Marshall Islands ("RMI") Maritime Administrator ("the Administrator") stating that "it was no longer permitted to provide security services to Marshall

---

*Police, 'Q' Branch C.I.D., Tirunelveli Range, Tamil Nadu v. Mariya Anton Vijay*, Criminal Appeal No. 836 OF 2015, ¶¶ 23, 118-119 (July 1, 2015)). As will be discussed below, that fact is irrelevant to the current inquiry.

Islands registered vessels, effective immediately." *Id.* ¶ 65. Defendant IRI, charged with providing technical and administrative support to the Administrator, then directed all RMI flagged ships not to allow AdvanFort personnel on their vessels due to the company's suspension. Plaintiffs allege that AdvanFort's suspension was "improper and done without providing proper notice ... or a meaningful opportunity to respond to the allegations." *Id.* ¶ 68. The suspension was eventually lifted over six months later, on June 17, 2014. As a result of the suspension, Plaintiffs claim to have lost a significant portion of its customer base as well as prospective clients.

Based on the above events, on January 20, 2015, Plaintiffs filed this action against Defendants in Fairfax County Circuit Court alleging four counts of common law claims: defamation and defamation *per se* against TME and Cartner (Counts I and II), and tortious interference with contract and business expectancy against Cartner and IRI (Counts III and IV). On February 19, 2015, Defendants removed the action to this Court. Dkt. No. 1. The sole basis for removal is the alleged fraudulent joinder of non-diverse Defendant IRI, which is a citizen of Virginia, like Plaintiff Ahmed Farajallah.

A week after the Notice of Removal was filed in this Court, each of the three Defendants moved to dismiss the respective claims against them on various grounds. Dkt. Nos. 3, 7, 9. Plaintiffs in turn moved to remand the matter to state court. Dkt. No. 20. On April 17, 2015, the Court heard oral argument on the above motions. Relevant here, the Court granted TME's motion to dismiss without prejudice. May 12, 2015 Mem. Op. 26. It also granted Cartner's motions to dismiss the tortious interference claims against him without prejudice. *Id.* at 25. Plaintiffs have since filed their First Amended Complaint. Dkt. No. 51. On June 29, 2015, Defendants Cartner and TME moved again to dismiss the claims against them.

## II. Legal Standard

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint. *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). The Court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in Plaintiff's favor. *Tobey v. Jones*, 706 F.3d 379, 383 (4th Cir. 2013). To survive a motion to dismiss, the complaint "must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint "establish[es] facial plausibility by pleading factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 554 (4th Cir. 2013) (citation and internal quotation marks omitted). Moreover, a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

## III. Analysis

Cartner and TME have each raised distinct bases in support of their motions to dismiss. The Court will address each in turn.

### A. *Defamation Claims Against Cartner*

Defendant Cartner has moved to dismiss certain allegations within the defamation claims "to the extent that they rely on statements other than the four identified as potentially actionable in the Court's May 12, 2015 dismissal order, and should reiterate that Plaintiffs are at least limited-purpose public figures who must meet the actual malice standard to prevail." Cartner's Mem. Supp. Mot. Dismiss ("Cartner's Mot. Dismiss") 5 (citing *Tandberg, Inc. v. Advanced Media Design, Inc.*, No. 1:09-cv-863, 2009 WL 4067717, at *2 n.2 (E.D. Va. Nov. 23, 2009)).

Plaintiffs claim that they have pled their defamation claims by "tracking exactly those portions that were upheld by the Court," and that its "including, but not limited to" language regarding the defamatory statements is inapposite, given that the Court has already ruled on which statements are actionable in defamation. Pls.' Opp'n 4–5. They also maintain that the issue of whether they are public figures is moot because the Court has already held that they are, at the very least, limited purpose public figures. As a result, they claim no further order is necessary to address their allegation in the Amended Complaint that they are not "public figures or are at most limited public figures." Am. Compl. ¶ 159.

As stated in open court, Plaintiffs will be required to strike the superfluous language from their Second Amended Complaint to better conform to the Court's prior memorandum opinion.

### B. Tortious Interference Claims Against Cartner

Cartner has also moved again to dismiss the tortious interference claims against him for failure to state a claim. Specifically, he asserts that Count III is defective as to individual Plaintiffs Samir and Ahmed Farajallah because they have failed to identify any contracts to which they were a party. He also claims that Plaintiffs have again failed to allege the existence of a specific business expectancy with which he allegedly interfered, requiring the dismissal of Count IV.

#### i. Count III

Cartner has moved to dismiss the Farajallahs' tortious interference with contract claim, claiming that they have not alleged they were a party to any contract with which he allegedly interfered. In other words, he challenges the Farajallahs' standing to bring the claim.

The Court briefly addressed the issue in its recent opinion granting Plaintiffs leave to amend their complaint as to Defendant IRI. As previously stated, in Virginia, shareholders,

6

managers, owners, and employees do not have legal standing to bring suit for tortious interference on behalf of a corporation. *Keepe v. Shell Oil Co.*, 220 Va. 587, 591 (1979); *Schur v. Sprenkle*, 84 Va. Cir. 418, at *6 (Richmond Cir. Ct. 2012) (holding that owner of a limited liability corporation did not have standing for tortious interference claim where the corporation was a party to the contracts at issue and he was not). "The corporation is a legal person, separate and distinct from the persons who own it, and the corporation, as the alleged owner and operator of the business, is the person entitled to" bring the claim. *Keepe*, 220 Va. at 591.

Here, the Farajallahs have not alleged that they are parties to any contract with which Cartner allegedly interfered. Instead, the Amended Complaint alleges injuries to the AdvanFort entities. Am. Compl. ¶ 116 (listing "AdvanFort's existing clients" who allegedly "ceased relationships with the Company" after the publication of Cartner's article); *id.* ¶ 119 ("AdvanFort, thus, lost customers, clients, and, on information and belief, prospective clients and business opportunities as a result of the damage caused by the publication of the Article . . . ."); *id.* ¶ 123 ("As a result of the actions of Cartner and TME, AdvanFort lost valuable business and was damaged in its ability to obtain future work as a PMSC contractor."). Although Count III broadly alleges that "Plaintiffs had contractual relationships with various customers," the prior allegations indicate that the contracts were with Advanfort, not the Farajallahs individually. As owner/CEO and business development manager, respectively, Samir and Ahmed Farajallah do not have standing to bring the tortious interference with contract claim. *Id.* ¶¶ 4–5; *Keepe*, 220 Va. at 591.

Based upon the representations of counsel during oral argument, Plaintiffs do not appear to have anything to add to a Second Amended Complaint that would satisfy their standing requirements for these claims. As a result, the tortious interference claims by the Farajallahs will

be dismissed with prejudice. Count III will remain intact, however, as between the AdvanFort entities and Cartner.

ii. Count IV

Cartner has also moved to dismiss Plaintiffs' tortious interference with business expectancy claim for "fail[ing] to identify any specific business expectancy they lost due to Cartner's alleged conduct." Cartner's Mot. Dismiss 8. Indeed, under Virginia law, a plaintiff's failure to allege a "*specific, existing* contract or business expectancy" with which the defendant has allegedly interfered is "fatal to the claim." *Masco Contractor Servs. E., Inc. v. Beals*, 279 F. Supp. 2d 699, 709–10 (E.D. Va. 2003) (emphasis in original). Similarly, a plaintiff's mere "'belief and hope that a business relationship will continue is inadequate to sustain the cause of action.'" *Southprint, Inc. v. H3, Inc.*, 208 F. App'x 249, 253 (4th Cir. 2006) (quoting *Commercial Bus. Sys., Inc. v. Halifax Corp.*, 253 Va. 292, 301 (1997)). Rather, a valid business expectancy requires "expectancy by and between two parties at least, based upon something that is a concrete move in that direction." *Gov't Employees Ins. Co. v. Google, Inc.*, 330 F. Supp. 2d 700, 705 (E.D. Va. 2004) (internal quotations omitted); *see also Levine v. McLeskey*, 881 F. Supp. 1030, 1057 (E.D. Va. 1995), *aff'd in relevant part*, 164 F.3d 210 (4th Cir. 1998) (stating that "there must be a particular expectancy which [the plaintiff] is reasonably certain will be realized." (citation, brackets, and internal quotation marks omitted)).

Cartner urges the Court to reject Plaintiffs' "speculat[ion] that they would have received future business from [their then current] customers or through references." Cartner's Mot. Dismiss 9. He cites two cases in support of that proposition. In *Commercial Roofing & Sheet Metal Co. v. Gardner Engineering, Inc.*, a Virginia circuit court dismissed the plaintiff's tortious interference with business expectancy claim based on a finding that its prior work for a company

did create "a reasonable expectation of further contractual relations." 60 Va. Cir. 384, at *3 (2002). That case, however, arose "in the context of a competitive bidding process for a commercial construction project," and in fact, the plaintiff's claim centered on not being allowed *to bid* for a contract. *Id.* The court premised its holding on this fact, stating that "a reasonable expectation of being allowed to bid is not a reasonable expectation of further economic benefit because an opportunity to bid does not guarantee that one will secure the contract." *Id.* Because this case does not involve, as far as the Court can surmise, a competitive bidding process, *Gardner Engineering* is inapposite.

By contrast, this Court's recent decision in *Cox v. MAG Mutual Insurance Co.* provides Cartner with much more support. No. 3:14-cv-377, 2015 WL 1640513, at *5 (E.D. Va. Apr. 9, 2015). In that case, the plaintiff claimed that the defendant caused him to lose relationships with former *and current* clients, and thus had tortiously interfered with his business expectancies. The Court rejected this argument, stating that his "hope that ten unnamed former or current customers would choose him cannot rise above a speculative level." *Cox*, 2015 WL 1640513, at *5. It therefore dismissed the claim for failure to allege "facts establishing any reasonably certain expectancies lost as a result of [the defendant's] conduct." *Id.*

In this case, Plaintiffs allege that AdvanFort "had the necessary resources and personnel committed to continued efforts under its contracts and justifiable expectations of future business," and "thus had a reasonable expectancy in continuing its works and realizing future profits from its ... business relationships." Am. Compl. ¶¶ 120–21; *see also id.* ¶ 122 ("Plaintiffs had a reasonable expectancy of future contract awards and a continued business relationship with their customers."). Moreover, Plaintiffs have alleged seventeen "existing clients [who] ceased

9

*relationships* with the Company following ... the publication of the article." *Id.* ¶ 116 (emphasis added).

As currently pled, the allegations do not demonstrate a reasonably certain business expectancy with AdvanFort's then-customers. The first element of the claim has thus not been satisfied. As discussed in open court, however, allegations that the customers were long-term or had renewed their contracts with AdvanFort on multiple occasions will very likely suffice on a Second Amended Complaint. The Court will therefore dismiss Count IV without prejudice to allow Plaintiffs to include such allegations if they have a good faith basis for doing so.

C.  *Defamation Claims Against TME*

TME has advanced several reasons why the claims against it should be dismissed, including failure to state a claim, lack of personal jurisdiction, and immunity under the Communications Decency Act. The Court will address each in turn.

i.  Failure to Plead Actual Malice

TME asserts that the Amended Complaint fails to allege specific facts to support a finding of actual malice. TME's Mem. Supp. Mot. Dismiss ("TME's Mot. Dismiss") 11–12. To recover against a public official or public figure in defamation, a plaintiff must prove "that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964). Because the Court has already held that Plaintiffs are, at the very least, limited-purpose public figures, they are subject to the actual malice standard.

Plaintiffs advance two bases for finding their allegations satisfy the actual malice standard. First, they allege that TME is liable for "Cartner's actual malice ... under the doctrine of agency." Am. Compl. ¶ 87. They also allege that TME is liable "for its own ... reckless

indifference and willful disregard of the truth as it failed to ascertain the veracity of the factual statements it published on its website." *Id.* For the reasons set forth below, both theories fall short of meeting Plaintiffs' pleading requirement on their defamation claim against TME.

With respect to the agency theory, it is well established that actual malice must be proved with respect to *each* defendant. *Cantrell v. Forest City Publ'g Co.*, 419 U.S. 245, 252–54 (1974). Although reckless disregard may be imputed to a defendant under *respondeat superior*, multiple courts have held that actual malice "cannot be imputed from one defendant to another absent an employer-employee relationship." *E.g., Secord v. Cockburn*, 747 F. Supp. 779, 787 (D.D.C. 1990); *accord McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1302–03 (D.C. Cir. 1996) (holding that "under *New York Times* actual malice may not be attributed outside *respondeat superior*"); *Price v. Viking Penguin, Inc.*, 881 F.2d 1426, 1446 (8th Cir. 1989) ("If [the author] is not an employee of [the publisher], independent evidence of [the publisher's] culpability is required.").

It is apparent from the Amended Complaint as well as the pleadings that Cartner was not an employee of TME, and thus Plaintiffs' allegations as to *his* actual malice cannot be imputed to TME. Notably, Plaintiffs have omitted all argument on their purported agency theory from their opposition, and so the matter may and should be deemed conceded. This leaves the issue of whether Plaintiffs have adequately alleged that TME had knowledge that Cartner's statements were false or published them with reckless disregard of their probable falsity. The Amended Complaint demonstrates that only the latter potentially applies.

In defamation cases, reckless disregard for the truth "is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). Instead, it requires a determination as to

11

whether there is "sufficient evidence to permit the conclusion that the defendant *in fact entertained serious doubts* as to the truth of his publication." *Id.* (emphasis added); *see also id.* at 732 ("[R]ecklessness may be found where there are *obvious reasons to doubt the veracity* of the informant or the accuracy of his reports." (emphasis added)). The Fourth Circuit has observed that "[a]lthough actual malice is a very difficult standard for any plaintiff to meet, simple reliance upon someone else's statement does not absolve an author or publisher of liability." *Fitzgerald v. Penthouse Int'l, Ltd.*, 691 F.2d 666, 670 (4th Cir. 1982). However, "[a]s long as the sources of the libelous information appeared reliable, and the defendant had no doubts about its accuracy, the courts have held the evidence of malice insufficient to support a jury verdict, even if a more thorough investigation might have prevented the admitted error." *Ryan v. Brooks*, 634 F.2d 726, 734 (4th Cir. 1980).

The Fourth Circuit recently put these principles to the test in *Hatfill v. New York Times Co.*, 532 F.3d 312 (4th Cir. 2008), in which it affirmed summary judgment in favor of the defendant where the author received his information from a source who was considered an expert in the field, even though he had been warned that she was untrustworthy:

> Dr. Hatfill contends that because Kristof was warned that one of his main sources, Dr. Barbara Rosenberg, was untrustworthy, and yet still published his columns, we should find actual malice. But Dr. Rosenberg was considered an expert in the field of biological weapons and had been called upon by the FBI to discuss the anthrax investigation. Given Dr. Rosenberg's background, there is no reason that Kristof's reliance on her statements constitutes actual malice, even given the expressed disagreement of others with regard to her opinions.

*Id.* at 325. Likewise here, Plaintiffs have not alleged any facts to support a finding that TME "entertained serious doubts" as to the truth of the Article. To the contrary, Plaintiffs themselves have alleged that "Cartner has a long and productive relationship with TME," and that TME has

published "many articles, book reviews and white papers" written by Cartner. Am. Compl. ¶ 74. They further allege that Cartner has spoken "on numerous occasions as a panelist on presentations sponsored or hosted by TME and appeared on several of the publication[']s webcast . . . ." *Id.* ¶ 77. Based on this extensive business relationship, TME would have little reason to doubt, under ordinary circumstances, Cartner's veracity or the accuracy of his statements. *See St. Amant*, 390 U.S. at 731–32.

Plaintiffs point to two sets of allegations that purportedly show TME had "obvious reasons to know" of the Article's probable falsity. Pls.' Opp'n 12. First, they claim that TME previously published articles and interviews in which government officials criticized the detention of the Ohio as unlawful. Am. Compl. ¶¶ 90–91. Because the Article did not dispute that contention—that is, the illegality of the ship's detention—these allegations are irrelevant.

Plaintiffs also assert that "the allegations of the Complaint clearly and convincingly show that Cartner harbored ill will and hostility towards the Plaintiffs." Pls.' Opp'n 13. This argument also fails. Although the Article certainly exhibits a disparaging tone and even contains multiple instances of character attacks against the Farajallahs personally, without knowledge of the strained lawyer-client relationship between Cartner and the Plaintiffs, nothing in the Article is so outlandish that it would cause TME to doubt the veracity of its long-term editorial contributor and maritime expert.

During oral argument, however, Plaintiffs' counsel stated that TME *in fact knew* that Cartner's relationship with Plaintiffs had gone sour, citing their allegation that "TME's recklessness is evident where reasons existed to doubt the veracity of Cartner and the accuracy of his reports which TME knew or willfully disregarded, i.e. Cartner's past unsuccessful business relationship with AdvanFort and the Farajallahs." Am. Compl. ¶ 94. Of course, this statement

does not say that TME "knew" of the relationship, but rather that it "knew *or* willfully disregarded" the relationship. *Id.* (emphasis added). If, in fact, TME knew of the bad blood between Plaintiffs and Defendant Cartner, it would have indeed had obvious reason to doubt Cartner's veracity and the accuracy of his statements given the blatantly hostile and sarcastic tone of the Article. *St. Amant*, 390 U.S. at 732. Accordingly, Plaintiffs will be given a final opportunity to plead actual malice on the part of TME.

    ii.   <u>Lack of Personal Jurisdiction</u>

Under Federal Rule of Civil Procedure 4(k)(1)(A), a federal court may exercise personal jurisdiction over a defendant in the manner provided by state law. Once a defendant challenges personal jurisdiction, the plaintiff bears the burden of establishing that jurisdiction exists over each defendant by a "preponderance of the evidence." *JTH Tax, Inc. v. Liberty Servs. Title, Inc.*, 543 F. Supp. 2d 504, 505 (E.D. Va. 2008). In Virginia, a district court may exercise personal jurisdiction over a non-resident defendant if doing so: (1) is authorized by Virginia's long-arm statute, Va. Code Ann. § 8.01-328.1; and (2) "comport[s] with the due process requirements of the Fourteenth Amendment." *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003). The Fourth Circuit has held that the Virginia long-arm statute is coextensive with the Constitution's due process requirements, and as a result, "the statutory and constitutional inquiries coalesce into the question of whether [defendants] had sufficient minimum contacts with Virginia to satisfy due process requirements." *Diamond Healthcare of Ohio, Inc. v. Humility of Mary Health Partners*, 229 F.3d 448, 450 (4th Cir. 2000).

Because neither the Complaint nor the pleadings suggest that TME had "continuous and systematic" contacts with Virginia, the Court should focus its inquiry on the conduct giving rise

to the suit to determine whether specific personal jurisdiction exists.[4] *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851 (U.S. 2011) (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 317 (1945)) (holding that general personal jurisdiction exists where a defendant's "affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State"). The constitutional standard for specific personal jurisdiction requires a plaintiff to show that: (1) the non-resident defendant purposely directed its activities toward residents of the forum state or purposely availed itself of the privilege of conducting activities therein; (2) the cause of action arises out of or results from those activities; and (3) the forum's exercise of personal jurisdiction in the case is reasonable—that is, consistent with fair play and substantial justice. *Carefirst of Md.*, 334 F.3d at 397; *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476–78 (1985).

"Traditional notions of fair play and substantial justice" require that the defendant have certain "minimum contacts" with the forum state. *Int'l Shoe*, 326 U.S. at 316 (citations omitted). Such minimum contacts only exist when the "defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). Notably, the "mere fact that [defendant's] conduct affected plaintiffs with connections to the forum State does not suffice to authorize jurisdiction." *Walden v. Fiore*, 134 S. Ct. 1115, 1126 (2014). Furthermore, the relation between the defendant and the forum "must arise out of contacts that the '*defendant himself*' creates with the forum." *Id.* at 1122 (emphasis added). Particularly relevant in this case, the Fourth Circuit has held that personal jurisdiction exists over a non-resident defendant

---

[4] A court may also exercise general personal jurisdiction over a corporation in a state in which it is incorporated or maintains its principal place of business, as these are "paradig[m] ... bases for general jurisdiction." *Daimler AG v. Bauman*, 134 S. Ct. 746, 760 (2014) (citation omitted). Here, by contrast, Plaintiffs allege that TME's principal place of business is in Florida and do not allege that TME is incorporated in Virginia. *See* Am. Compl. ¶ 6.

when it solicits business and bills customers within the forum state. *Peanut Corp. of Am. v. Hollywood Brands, Inc.*, 696 F.2d 311, 314 (4th Cir. 1982) (upholding exercise of personal jurisdiction where the transaction of business in Virginia was a single contract for the sale of peanuts).

Plaintiffs assert that personal jurisdiction exists over TME due to its having "caused tortious injury in this Commonwealth." Am. Compl. ¶ 11. They also allege that TME "transacts business in the [Commonwealth of Virginia]," and that "on information and belief, its newsletter is distributed to Virginia Customers." *Id.* TME argues that this Court lacks jurisdiction over it because the allegations fail to show that TME "purposely availed itself of the privilege of doing business in Virginia." TME's Mot. Dismiss 15 (internal quotation marks omitted). Yet it strikes the Court as extremely unrealistic that TME, "the largest business journal in the maritime industry," does not do a substantial amount of business in Virginia, which has an enormous maritime industry. Am. Compl. ¶ 64. Indeed, in its pleadings, TME does not dispute the fact that it has Virginia customers and thus "transacts business" in the Commonwealth. The Court will therefore allow the case to proceed to discovery to better establish whether personal jurisdiction exists over TME.

iii. <u>Communications Decency Act</u>

Finally, TME again argues that Section 230 of the Communications Decency Act ("CDA") bars Plaintiffs' defamation claims against it. That section provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). In plain language, the statute "precludes plaintiffs from holding interactive computer service providers liable for the publication of information created and developed by others." *Nemet Chevrolet,*

*Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 252 (4th Cir. 2009). "Specifically, § 230 precludes courts from entertaining claims that would place a computer service provider in a publisher's role. Thus, lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content—are barred." *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997). "To further the policies underlying the CDA, courts have generally accorded § 230 immunity a broad scope." *Consumeraffairs.com*, 591 F.3d at 254.

In its prior memorandum opinion, the Court stated that "it appears that TME is an 'interactive computer service' because it is both a website operator and 'enables computer access by multiple users to a computer server.'" May 12, 2015 Mem. Op. 23 (quoting *DiMeo v. Max*, 248 F. App'x 280, 282 (3d Cir. 2007)). Assuming TME meets the statutory definition of an "interactive computer service provider," the Court proceeds to the next inquiry—whether TME nevertheless remains outside the scope of CDA's immunity because it also functions as an "information content provider." *Consumeraffairs.com*, 591 F.3d at 254.

The statute defines the term "information content provider" as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3). The most recent court of appeals to discuss the extent of "information content provider" liability was the Sixth Circuit in *Jones*. In that case, the court surveyed the decisions of its sister circuits to "provide a workable measure of 'development' that not only preserves the broad immunity the CDA provides for website operators' exercise of traditional publisher functions but also highlights the limited circumstances under which exercises of those functions are not protected." *Jones*, 755 F.3d at 410. It went on to hold that "'development' ... means something more

17

involved than merely displaying or allowing access to content created by a third party." *Id.* Thus, even a website operator that edits third-party content, such as by correcting spelling, adding headnotes, removing obscenity, or trimming down for length, does not lose its CDA immunity unless it "contributes materially to the alleged illegality of the conduct." *Id.* at 410–13 (emphasis added) (quoting *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1167–68 (9th Cir. 2008) (en banc)). The Sixth Circuit ultimately adopted the "material contribution test" from *Roommates*, citing the Fourth and Tenth Circuit's application of the test "with instructive effect." *Id.* at 412–13 (citing *Consumeraffairs.com*, 591 F.3d at 257–58; *F.T.C. v. Accusearch Inc.*, 570 F.3d 1187, 1200–01 (10th Cir. 2009)).

Because Plaintiffs concede that TME did not author the Article, they are "required to plead facts to show any alleged drafting or revision by [TME] was something more than a website operator performs as part of its traditional editorial function," *i.e.*, some sort of material contribution to the defamatory content. *Consumeraffairs.com*, 591 F.3d at 258 (4th Cir. 2009). TME points to the following allegations as deficient: (1) that TME "has an editorial staff that reviews articles before they are posted," Am. Compl. ¶ 70; (2) that articles published on TME's "web site is reviewed and approved by their editorial staff prior to posting," *id.* ¶ 71; and (3) that TME "had the opportunity to review and edit the article and may have made edits," *id.* ¶ 81. With respect to the allegation that TME staff "may have made edits," TME argues that such an allegation is "insufficient to support any conclusion that Maritime Executive authored any part of Cartner's article." TME's Mot. Dismiss 10 (citing *e.g.*, *Joseph v. Amazon.com, Inc.*, 46 F. Supp. 3d 1095, 1107 (W.D. Wash. 2014) (holding allegation that an unidentified employee of defendant may have authored the product review at issue "without explaining how or why that might be the case" was "mere speculation" and insufficient to strip defendant of its immunity)).

Plaintiffs maintain that they have pled sufficient facts to support a finding that TME is responsible for the creation or development of the Article. In addition to those highlighted above by TME, they allege that: (1) "TME's website boasts that it provides 'original editorial content,'" Am. Compl. ¶ 68; (2) "TME's newsletter is published five times a week and is sent to more than 60,000 subscribers," *id.* ¶ 65; and (3) the Article "did not contain any disclaimers that the content was not created by the TME or that the opinions and representations expressed therein were not those of the publisher," *id.* ¶ 82. Additionally, Plaintiffs refer to a newly discovered copy of the Article, appended by TME to its latest motion, which states, under the title, "BY MAREX." TME's Mot. Dismiss, Ex. A.

Although not alleged in the Amended Complaint, it also seems plausible that TME's newsletter appears in print format. Plaintiffs' Exhibit B shows the Article as appearing in the "MarEx Newsletter—*Web Edition.*" Pls.' Opp'n to TME's Mot. Dismiss, Ex. B (emphasis added). This fact certainly may support a reasonable inference that the newsletter—and consequently, the Article—also appears in print, thereby placing it outside the scope of CDA immunity under the plain language of the statute. *See Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1122 (9th Cir. 2003) ("Congress granted most Internet services immunity from liability .... As a result, Internet publishers are treated differently from corresponding publishers in print, television and radio."). Furthermore, the inclusion of the newly discovered information discussed above may support a reasonable inference that TME was at least partly responsible for the creation or development of the Article, rendering the CDA inapplicable. Accordingly, the Court will grant TME's motion and dismiss the claims against it without prejudice to allow Plaintiffs to include allegations to that effect, provided they have a good faith basis for doing so.

## IV. Conclusion

For the foregoing reasons, Plaintiffs will be required to strike the superfluous language from their defamation claims in a Second Amended Complaint. The Farajallahs' tortious interference claims against Cartner will be dismissed with prejudice. As to the AdvanFort entities, Count IV will be dismissed without prejudice. Finally, the defamation claims against TME will be dismissed without prejudice.

An appropriate Order shall issue.

July 28, 2015

Alexandria, Virginia

/s/
Liam O'Grady
United States District Judge