OCT 3 0 2015

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

|  |  |  |
|---|---|---|
| ADVANFORT COMPANY, ADVANFORT INTERNATIONAL, INC., SAMIR FARAJALLAH, AHMED FARAJALLAH, | ) ) ) ) | |
| *Plaintiffs,* | ) ) | Case No. 1:15-cv-220 |
| v. | ) ) | |
| JOHN A.C. CARTNER, THE MARITIME EXECUTIVE, LLC, INTERNATIONAL REGISTRIES, INC., | ) ) ) ) | |
| *Defendants.* | ) ) | |

## ORDER

This matter comes before the Court on three Motions to Dismiss the Second Amended Complaint filed separately by the three Defendants in this case. First, Defendant John Cartner ("Cartner") moves to dismiss Count IV. Second, Defendant The Maritime Executive, LLC ("MarEx") moves to dismiss Counts I and II. Third, Defendant International Registries, Inc. ("IRI") moves to dismiss Counts III and IV. This case has already been before the Court several times; accordingly, the Court will not rehash the background it has previously provided. *See* Dkt. 78, at 1-4. The Second Amended Complaint alleges a few new factual details not contained in the original Complaint or the First Amended Complaint. These new facts will be highlighted throughout this order where appropriate.

### I. Cartner's Motion to Dismiss Count IV

The first motion before the Court is Cartner's Motion to Dismiss Count IV, tortious interference with business expectancy. Dkt. 88. Cartner argues that Count IV, should be

dismissed because Plaintiffs have failed to plead all of the required elements of that cause of action. The Virginia Supreme Court, in *Glass v. Glass*, 228 Va. 39, 51, 321 S.E.2d 69, 76-77 (1984), recognized this tort and summarized the elements of the cause of action as follows: "(1) the existence of a business relationship or expectancy, with a probability of future economic benefit to plaintiff; (2) defendant's knowledge of the relationship or expectancy; (3) a reasonable certainty that absent defendant's intentional misconduct, plaintiff would have continued in the relationship or realized the expectancy; and (4) damage to plaintiff." This state law tort is sometimes alternatively called the "tort of wrongful interference with prospective business or economic advantage." *Commercial Bus. Sys., Inc. v. Halifax Corp.*, 253 Va. 292, 300 (1997).

Cartner argues that Plaintiffs have failed to plead the first element because they have failed to allege a specific business expectancy with a probability of future economic benefit. In order for this claim to survive, Plaintiffs must identify a particular and specific business relationship or expectancy. *Masco Contractor Service, Inc. v. Beals*, 279 F. Supp. 2d 699, 709-710 (E.D. Va. 2003). Further, Plaintiffs' Complaint must establish a business expectancy based on something objective and concrete rather than a mere hope that a business relationship will continue. *Gov't Employees Ins. Co. v. Google, Inc.*, 330 F. Supp. 2d 700, 705 (E.D. Va. 2004) (citations omitted). In its Order dismissing the First Amended Complaint this Court advised that, "allegations that the customers were long-term or had renewed their contracts with AdvanFort on multiple occasions will very likely suffice on a Second Amended Complaint." Dkt. 78, at 10.

The Eastern District of Virginia has dismissed a claim of tortious interference with a business expectancy where the plaintiff only alleged a broad expectancy that consumers will generally continue purchasing its product. *See Gov't Employees Ins. Co.*, 330 F. Supp. 2d at 705. Such claims have also been dismissed where the plaintiff merely listed the names of

various companies it expected to deal with, but failed to allege that it had any existing business

relationship with any of them in particular. *Masco Contractor Servs. E., Inc. v. Beals*, 279 F.

Supp. 2d 699, 710 (E.D. Va. 2003). In contrast, a Virginia circuit court has declined to dismiss a

claim of tortious interference with a business expectancy where the plaintiff identified a contract

it had with a specific company that was about to come up for renewal when the defendant

allegedly interfered. *BB&T Ins. Servs., Inc. v. Thomas Rutherfoord, Inc.*, 80 Va. Cir. 174 (2010).

While the Virginia circuit court acknowledged that a current contract with an upcoming renewal

"is not a guarantee of a continuation of the business relationship," the court concluded it was

"enough to meet an objective standard as to the reasonable expectation of that continuance." *Id.*

Plaintiffs' Second Amended Complaint contains several specific allegations of long-term

business relationships that ceased following publication of the article:

> 175. For example AdvanFort's client, Chilobrok Maritime Co. Ltd, had used AdvanFort's services since 2011 when they contracted with AdvanFort twenty (20) times in 2011, thirty-two (32) times in 2012, and twenty (20) times in 2013, but did not retain the company for services following publication of the article in 2014 and also did not retain them in 2015.

> 176. Dalian Ocean Shipping Company also utilized AdvanFort's services on seventeen (17) occasions in 2012 and eight (8) occasions in 2013, but did not retain AdvanFort as a client in 2014 after the publication of the article and also did not use AdvanFort's services in 2015.

> 177. Horizon Tankers Limited had been a client to AdvanFort since 2012 when they contracted with the company on seven (7) occasions, and, in 2013, Horizon contracted with AdvanFort six ( 6) times, but Horizon did not use AdvanFort's services in 2014 or 2015.

> 178. Eagle Bulk worked with AdvanFort since 2013 and during that year awarded AdvanFort nineteen (19) contracts, but it ceased to work with AdvanFort in 2014 and did not engage their services in 2015.

> 179. As stated previously, MOMPS used AdvanFort services for its clients in 2013 where it awarded AdvanFort three (3) different contracts, but MOMPS stopped using AdvanFort in 2014.

180. Likewise, ISM/UNIMOR SHIPPING AGENCY utilized AdvanFort as a PMSC since 2011 when they contracted with them on four (4) occasions, thirteen (13) times in 2012 and twenty (20) times in 2013, but the Company used AdvanFort only once in 2014 and not at all in 2015.

181. NSC Schifffahrtsgesellschaft mbH & Cie.KG utilized AdvanFort's services since 2011, when it awarded the company nineteen (19) different contracts, and it used AdvanFort on fifteen (15) occasions in 2012 and on twenty six (26 ) times in 2013, but it did not award any contracts to the company in 2014.

182. Kuwait Oil Tanker Company utilized AdvanFort on forty –seven (47) occasions in 2012, and on one hundred forty nine (149) occasions in 2013 but that patronage dwindled to just fifteen 15 contracts in 2014 and it did not award AdvanFort any contracts in 2015, following the publication of the article and AdvanFort's termination by the IRI.

183. Overall, AdvanFort lost more than 150 clients and its revenues plummeted from approximately nineteen (19) million dollars in 2013 to less than three (3) million in 2014 and are expected to be less than one (1) million in 2015.

Second Amended Complaint, Dkt. 86, at 34-35. These allegations are enough to survive a motion to dismiss. These allegations identify specific business relationships and AdvanFort's history of contracting with these specific businesses. These allegations support Plaintiffs' contention that they had a reasonable expectancy that, absent defendant's tortious interference, they would have continued contracting with these companies. Accordingly, this Court finds the Plaintiffs have alleged all of the elements of a claim of tortious interference with a business expectancy against Cartner. Therefore, the Court finds good cause to deny Cartner's Motion to Dismiss.

## II. MarEx's Motion to Dismiss Counts I and II

The next motion before the Court is MarEx's Motion to Dismiss Count I, defamation, and Count II, defamation per se. Dkt. 93. Counts I and II, are the only counts Plaintiffs have brought against MarEx. MarEx argues that Plaintiffs' defamation claims should be dismissed for three reasons. First, MarEx argues that these claims are barred by section 230 of the Communications

Decency Act ("CDA"). Second, MarEx argues that Plaintiffs failed to establish actual malice on the part of MarEx, as required to successfully state a claim of defamation in this case. Finally, MarEx argues that the Court does not have personal jurisdiction over it. Finding that the claims are barred by section 230 of the CDA, the Court declines to adjudicate MarEx's additional arguments.

Section 230 of the CDA "precludes plaintiffs from holding interactive computer service providers liable for the publication of information created and developed by others." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 252 (4th Cir. 2009); 47 U.S.C.A. § 230(c). Thus, "[s]tate-law plaintiffs may hold liable the person who creates or develops unlawful content, but not the interactive computer service provider who merely enables that content to be posted online." *Id.*

When determining whether a defendant is immune from suit under section 230 of the CDA, "[c]ourts engage in a three part inquiry." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 564 F. Supp. 2d 544, 548 (E.D. Va. 2008) (citing *Schneider v. Amazon.com*, 108 Wash. App. 454, 31 P.3d 37, 40 (Wash. 2001)) *aff'd*, 591 F.3d 250 (4th Cir. 2009). "The Court must determine: 1) whether Defendant is a provider of an interactive computer service; 2) if the postings at issue are information provided by another information content provider; and 3) whether Plaintiffs claims seek to treat Defendant as a publisher or speaker of third party content." *Id.*

To benefit from the CDA safe harbor, MarEx must first qualify as an "interactive computer service." *Id.* The CDA defines an "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides

access to the Internet and such systems operated or services offered by libraries or educational institutions." 47 U.S.C. § 230(f)(2). As this Court stated in an Order dismissing the original Complaint, MarEx is an interactive computer service "because it is both a website operator and 'enables computer access by multiple users to a computer server.'" Dkt. 45, at 23 (quoting *DiMeo v. Max*, 248 F. App'x 280, 282 (3d Cir. 2007); *see also Jones v. Dirty world Entm't Recordings LLC*, 755 F.3d 398, 406 n.2 (6th Cir. 2014) (concluding that "interactive computer service" "includes broadband providers, hosting companies, and website operators"); *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1162 n.6 (9th Cir. 2008) ("Today, the most common interactive computer services are websites."). Plaintiffs do not contest this conclusion and do not allege in the Second Amended Complaint that MarEx published a print edition of the article.[1] MarEx would not have qualified for immunity under the CDA if it had published a print edition of the article.

Plaintiffs also do not contest the second part of the three-part inquiry. The parties agree that the Article at issue is information provided by another information content provider, namely, Cartner. Plaintiffs have thus conceded that MarEx did not author the article.

Plaintiffs do, however, contest the third part of the three-party inquiry. Plaintiffs contend that MarEx is an "information content provider" that is not immune under the CDA because it was "responsible, in whole or in part, for the creation or development of" the Article. *See Consumeraffairs.com, Inc.*, 591 F.3d at 254–58; 47 U.S.C. § 203(f)(3). In order to sufficiently plead that MarEx was an information content provider not entitled to immunity under the CDA, Plaintiffs must have pleaded "facts to show any alleged drafting or revision by [MarEx] was something more than a website operator performs as part of its traditional editorial function," or

---

[1] Plaintiffs had previously insinuated that the article might have appeared in print and this Court urged Plaintiffs to allege this in the Second Amended Complaint if they had a good faith basis for doing so. Because they did not, this Court concludes Plaintiffs did not have a good faith basis for this allegation.

that MarEx "contributed to the allegedly fraudulent nature of the comments at issue." *Consumeraffairs.com*, 591 F.3d at 255-58.

Plaintiffs allege that MarEx may have edited the article and asks the Court for a chance to conduct discovery to determine whether this editing contributed to the allegedly fraudulent nature of the Article. In an attempt to raise an inference that MarEx made a material contribution to the article, Plaintiffs point to several facts. First, MarEx has editorial and news staffs that review articles before they are posted. Second, it is the practice of MarEx to review and approve content before posting it on its website or in its newsletter. Third, the website is read only, meaning unauthorized third parties, such as Cartner, do not have the ability to edit the website. Fourth, the article contained the byline "BY MAREX." Fifth, the Article was published as an "exclusive," meaning no other new source published the story. Finally, MarEx republished the Article on Twitter. The only new fact that Plaintiffs have alleged that was not contained in previous Complaints is the fact that MarEx republished the Article on Twitter. As explained below, none of the facts Plaintiff cites make MarEx responsible for the creation or development of the Article. Further, when taken as a whole, these facts are not enough to survive the motion to dismiss.

First, nothing in the Second Amended Complaint alleges that MarEx materially contributed to the illegality of the article. Even if the Court assumes that MarEx engaged in some editing, as Plaintiffs allege, that does not automatically rise to the level of material contribution to the illegality of the article. *See Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997); *see also Fair Hous. Council of San Fernando Valley v. Roommates.Com*, LLC, 521 F.3d 1157, 1169 (9th Cir. 2008) ("A website operator who edits user-created content—such as by correcting spelling, removing obscenity or trimming for length—retains his immunity for any

illegality in the user-created content, provided that the edits are unrelated to the illegality."); *see also Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 410 (6th Cir. 2014). Thus, allegations that MarEx has editors and engages in the practice of editing articles before posting them do not state a claim that MarEx is an information content provider for the purposes of the Article.

Second, choosing to include an Article in an electronic newsletter or publishing the Article on a read only website does not automatically render a website publisher an information content provider. *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997) (concluding that "editorial functions—such as deciding whether to publish, withdraw, postpone or alter content" do not make a website publisher an information content provider); *Batzel v. Smith*, 333 F.3d 1018, 1031 (9th Cir. 2003) ("The 'development of information' therefore means something more substantial than merely editing portions of an e-mail and selecting material for publication."). In addition, republishing an article on Twitter is not an editorial function different than selecting an article to be published on a website or in an electronic newsletter. Thus, tweeting the Article does not make MarEx responsible for its content.

Third, Plaintiffs cannot rest their Complaint on an "adoption" theory, that is, the theory that MarEx is responsible for the Article because it adopted its content when it published the Article. Several circuit courts have rejected the adoption theory as inconsistent with the CDA. *See Dirty World*, 755 F.3d at 415 ("An adoption or ratification theory, however, is not only inconsistent with the material contribution standard of 'development' but also abuses the concept of responsibility."); *see also Parisi v. Sinclair*, 774 F. Supp. 2d 310, 316 (D.D.C. 2011). MarEx is not an information content provider simply because it included the byline "BY MAREX" on the Article or because it tweeted the Article. Although these actions may indicate to the public

that MarEx adopted the views in the Article, that is inconsequential because these actions do not show that MarEx materially contributed to the illegality of the Article.

Finally, this Court is not persuaded by Plaintiffs insistence that this issue be decided on a motion for summary judgment after some discovery has been conducted, as opposed to at the motion to dismiss stage. Fourth Circuit precedent directs this Court "to resolve the question of Section 230 immunity at the earliest possible stage of the case because that immunity protects websites not only from ultimate liability, but also from having to fight costly and protracted legal battles." *Consumeraffairs.com*, 591 F.3d at 255 (internal quotations omitted). As MarEx points out, the Eastern District of Virginia has not hesitated to grant motions to dismiss based on CDA immunity. *See, e.g., Directory Assistants, Inc. v. Supermedia, LLC*, 884 F. Supp. 2d 446, 451 (E.D. Va. 2012). Plaintiffs have also cited no binding authority that dictates that this Court must grant the Plaintiffs time to conduct discovery on the issue. Considering the Fourth Circuit's policy of resolving CDA immunity as early as possible, this Court finds dismissal is appropriate at this stage.

Because Plaintiffs have not stated facts that support a claim that MarEx is an information content provider responsible for the Article, MarEx is immune from liability under the CDA and this Court finds good cause to grant MarEx's Motion to Dismiss.

### III. IRI's Motion to Dismiss Counts III and IV

The next motion before the Court is IRI's Motion to Dismiss Count III, tortious interference with contract, and Count IV, tortious interference with business expectancy. Dkt. 92. Counts III and IV are the only counts Plaintiffs have brought against IRI. IRI cites two reasons that the claims against it in the Second Amended Complaint should be dismissed. First, IRI argues that the claims should be dismissed under the act of state doctrine. Second, IRI

argues that Plaintiffs have failed to allege sufficient facts to state claims of tortious interference with contracts or business expectancies. Finding that the claims should be dismissed under the act of state doctrine, the Court declines to reach the question of whether Plaintiffs have alleged sufficient facts to state the claims they have brought against IRI.

### A. Whether the Claims Should be Dismissed Under the Act of State Doctrine

Under the act of state doctrine, courts must accept as valid the public acts of a sovereign state performed within its own territory. *E.g. Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 428, 439 (1964). The act of state doctrine is not a jurisdictional bar that prevents a court from hearing a particular case; rather, it requires that, in the process of deciding the merits of a claim, a court must deem "the acts of foreign sovereigns taken within their own jurisdiction . . . valid." *W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l*, 493 U.S. 400, 406 (1990). However, "when a court *must decide*—that is, when the outcome of the case turns upon—the effect of official action by a foreign sovereign," the court is precluded from considering the claim. *Id.* "The major underpinning of the act of state doctrine is the policy of foreclosing court adjudications involving the legality of acts of foreign states on their own soil that might embarrass the Executive Branch of our Government in the conduct of our foreign relations." *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 697 (1976).

A defendant invoking the act of state doctrine carries the burden of establishing that it applies to the case at hand. *Id.* at 694. As a threshold matter, the defendant must establish two elements: (1) the act undertaken by the foreign state was public; and (2) the act was completed within the sovereign's territory. *Eckert Int'l, Inc. v. Gov't of Sovereign Democratic Republic of Fiji*, 834 F. Supp. 167, 171 (E.D. Va. 1993) *aff'd, on other grounds* 32 F.3d 77 (4th Cir. 1994).

However, the act of state doctrine is a flexible rule; therefore, a court could still apply the doctrine even if these two elements are not satisfied. *Id.* at 175 n.5.

After considering the facts as set forth in the Second Amended Complaint, this Court concludes that IRI has met its burden of establishing these two elements.

i. The Public Act of State Requirement

The act at issue—the decision of the Maritime Administrator of the Republic of the Marshall Islands to suspend AdvanFort's permits to provide security services—was a public act of state. *See Gov't of Dominican Republic v. AES Corp.*, 466 F. Supp. 2d 680, 695 (E.D. Va. 2006) ("Here, the Government of the Dominican Republic issued a permit, a public act, that allowed the dumping of coal ash.").

Plaintiffs argue that the act of state doctrine does not apply because IRI's conduct, rather than the conduct of the Republic of the Marshall Island, is at issue in this case. Plaintiffs argue that IRI has failed to establish that the Marshall Islands actually engaged in formal government action or that it ratified IRI's acts. The Court does not find these arguments persuasive as the Complaint reveals that the Marshall Islands, rather than the IRI, is the authority that revoked AdvanFort's permit.

As the Complaint explains, the RMI Maritime Administrator contracted with IRI, a private company, to "perform[] various functions on behalf of RMI including administering all matters pertaining to vessels of RMI that are subject to the provisions of the Maritime Act." Dkt. 86, ¶ 141. In addition, "[t]he RMI requires its flagged ships to obtain letters of no objection (LONOs) before placing a security company's guards on board." *Id.* at ¶ 147. The Complaint then states that, "AdvanFort received a letter from Evan Curt of IRI on RMI Maritime Administrator stationary indicating that 'it was no longer permitted to provide security services

to Marshall Islands registered vessels, effective immediately.' The Stationary indicated the action was taken by the authority of the TCMI and MIMCA." Dkt. 86, ¶ 148. "TCMI is, alleged by IRI to be a Marshall Island's corporation duly authorized by the RMI as the Maritime Administrator." *Id.* ¶ 162. The Complaint does not allege that IRI acted on its own, without the authority of the RMI. Considering these facts, this Court finds the Maritime Administrator, a governmental entity of RMI, revoked AdvanFort's permit to provide security services for Marshall Islands ships. The emails IRI sent out announcing this action and the letter Evan Curt sent to AdvanFort informing it of the action merely implemented the permit revocation. While the IRI was acting on behalf of the RMI, the actual revocation was done by the RMI, a foreign sovereign.

Plaintiffs try to analogize this case to *Gov't of Dominican Republic v. AES Corp.*, 466 F. Supp. 2d 680 (E.D. Va. 2006). Plaintiffs argue that the motion to dismiss in this case should be denied like the motion to dismiss was denied in *AES Corp.* This argument is unconvincing because the cases are factually distinct. In *AES Corp.*, a foreign sovereign, the Dominican Republic, sued several American companies for dumping coal ashes on that country's beaches. *Id.* At one point in time the Dominican Republic had issued permits to these companies to dump coal ash, but the case involved the companies' subsequent acts. *Id.* at 683-86. At issue was not the fact that the Dominican Republic had at one point issued a permit—an act of state—but rather how much damage the companies had done to the beaches when they did not have a permit to dump ash there. *Id.* at 694-95. In contrast, here a private company is protesting the decision of a foreign sovereign to revoke that company's permit. Squarely at issue is the country's public act of revoking a company's permit.

Plaintiffs argue in a different subsection of their brief that the act of state doctrine does not apply because IRI's activities are purely commercial and commercial activities are not immune under the act of state doctrine. It is true that "[t]he act of state doctrine does not cover private and commercial acts of sovereign states." *AES Corp.*, 466 F. Supp. 2d at 695. However, the issuance or denial of a permit, the act at issue here, is governmental, not commercial. *Id.*; *see also* 37 A.L.R.2d 694. The Supreme Court in *Republic of Argentina v. Weltover* explained the difference between governmental activity and commercial activity:

> [A] foreign government's issuance of regulations limiting foreign currency exchange is a sovereign activity, because such authoritative control of commerce cannot be exercised by a private party; whereas a contract to buy army boots or even bullets is a "commercial" activity, because private companies can similarly use sales contracts to acquire goods.

504 U.S. 607, 614–15 (1992). The act at issue here is governmental because a private party, acting alone, without the authority of the Marshall Islands, could not issue or deny a permit to a private company that would allow it to provide security services on Marshall Islands ships. The Plaintiffs have cited no authority that holds that a foreign sovereign's governmental acts become "commercial" acts when the government contracts with a private company to implement the acts. Thus, this Court cannot conclude that the acts at issue here are commercial acts that would render the act of state doctrine inapplicable.

### ii. The Territorial Requirement

IRI has also met its burden because the act at issue, revoking the permit, was completed within the territory of the Marshall Islands. Plaintiffs again argue that IRI's acts are the pertinent acts at issue. Plaintiffs argue that because IRI performed its services in Reston, Virginia, the territorial requirement is not satisfied. As explained above, at issue here is not the emails IRI

sent announcing AdvanFort's permit suspension, but rather the decision of the Maritime Administrator of the RMI to revoke AdvanFort's permit.

In addition, the exact location of a decision cannot be the sole focus of the Court when considering the territorial requirement because "[f]oreign governments can always claim to have made decisions within their borders." *Eckert,* 834 F. Supp. at 172. Therefore, the fact that a government entity acted outside of the physical boundaries of the sovereign will not automatically defeat the doctrine's application where the decision has its effect within the state's sovereign territory or is "governmental" in nature. *See Hourani v. Mirtchev*, 796 F.3d 1, 12 (D.C. Cir. 2015) (applying act of state doctrine to acts of Kazakhstan Ambassador, even though the Ambassador's conduct took place at the Embassy in Washington, D.C.); *In re Refined Petroleum Products Antitrust Litig.*, 649 F. Supp. 2d 572, 594 (S.D. Tex. 2009) (applying the act of state doctrine to oil production decisions of sovereign state members of OPEC even though those decision were made in Vienna, Austria, outside of the sovereigns' territory). The decision at issue here both had its effect within RMI's territory and was governmental in nature. First, this decision was directed at, and affected only, RMI's flagged ships, which are all within RMI's territory. *See United States v. Flores*, 289 U.S. 137, 155 (1933) (holding that a ship "is deemed to be a part of the territory of that sovereignty" whose flag it flies). Second, the act of granting or withholding permits is a governmental function. *See* 37 A.L.R.2d 694. Thus, even if the pertinent acts occurred in Virginia, the act of state doctrine would still apply.

### iii. Applicability of Any Exceptions to the Act of State Doctrine

Plaintiffs next argue that the act of state doctrine should not apply because the "Bernstein Exception" applies in this case. The Bernstein Exception to the act of state doctrine applies in cases "in which the Executive Branch has represented that it has no objection to denying validity

to the foreign sovereign act, since then the courts would be impeding no foreign policy goals."
*Kirkpatrick*, 493 U.S. at 405. As IRI points out, although the Bernstein Exception was
acknowledged by the Supreme Court in *First National City Bank v. Banco Nacional de Cuba*,
406 U.S. 759 (1972), that opinion was only joined by three justices. Further, one subsequent
decision of the Supreme Court has suggested that courts may not need to consider this exception.
*See Kirkpatrick*, 493 U.S. at 405 ("Some Justices have suggested possible exceptions to
application of the doctrine . . . for cases in which the Executive Branch has represented that it has
no objection to denying validity to the foreign sovereign act."). The Fourth Circuit has not
weighed in on the validity of this exception.

   Plaintiffs suggest that this Court should send an inquiry to the State Department to see if
the Executive Branch objects to the Court considering the lawsuit at hand. This is an option
available to the Court. *See id.* at 403. In *Kirkpatrick*, "[t]he District Court . . . requested and
received a letter expressing the views of the legal adviser to the United States Department of
State as to the applicability of the act of state doctrine." *Id.* Having taken this action at the
motion to dismiss stage, the District Court then "treated the motion as one for summary
judgment under Rule 56 of the Federal Rules of Civil Procedure and granted the motion." *Id.*
While this is an option, the Plaintiffs cite no authority that has held that this Court must inquire
with the Executive Branch. *Kirkpatrick* also does not stand for the notion that the Court must
grant Plaintiffs the opportunity to conduct their own inquiry during discovery. In contrast, IRI
catalogues a number of cases that have granted motions to dismiss on the ground that the act of
state doctrine applies. *See, e.g., Hourani v. Mirtchev*, 796 F.3d 1 (D.C. Cir. 2015); *Konowaloff v.
Metro. Museum of Art*, 702 F.3d 140 (2d Cir. 2012). Thus, deciding the applicability of the act
of state doctrine is appropriate at this stage in the litigation. While the Court could conduct its

own inquiry or give Plaintiffs the opportunity to engage in discovery, this would only result in further delay and would be unlikely to change the outcome.

Viewing the facts in a light most favorable to the Plaintiff, the Court holds that the act of state doctrine applies in this case. If the Court allowed the case to go forward, the Court would have to adjudicate the validity of the decision of the Marshall Islands to deny a permit to a private company. If this Court were to find the decision of the RMI invalid, that would create problems in our foreign relations with the RMI and potentially embarrass the Executive Branch. This is the scenario the act of state doctrine seeks to avoid. Accordingly, this Court finds good cause to grant IRI's Motion to Dismiss.

**IV. Conclusion**

For the foregoing reasons it is ORDERED that:

1. Cartner's Motion to Dismiss is DENIED. All four claims made against Cartner in the Second Amended Complaint still stand.

2. MarEx's Motion to Dismiss is GRANTED. The claims made against Maritime Executive are DISMISSED WITH PREJUDICE.

3. IRI's Motion to Dismiss is GRANTED. The claims made against IRI are DISMISSED WITH PREJUDICE.

October 30, 2015
Alexandria, Virginia

/s/
Liam O'Grady
United States District Judge

16